PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name _____ THOMAS _____ JAMES _____

      (Last)                  (First)

Prisoner Number ___ C-70569 ___

Institutional Address ___ SAN QUENTIN STATE PRISON, SAN QUENTIN, CA 94974 ___

UNITED STATES DISTRICT COURT

**JSW**

NORTHERN DISTRICT OF CALIFORNIA

**CV 08**      **2938**

JAMES THOMAS,

Full Name of Petitioner

Case No.(To be provided by the clerk of court) **(PR)**

vs.     **E-filing**

ROBERT AYERS, JR., Warden,

PETITION FOR A WRIT OF HABEAS CORPUS

Name of Respondent
(Warden or jailor)

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

Petitioner is incarcerated at San Quentin State Prison, San Quentin, California, within the jurisdiction of the Northern District Court.

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

| Los Angeles County Superior Court | Los Angeles |
|---|---|
| Court | Location |

(b) Case number, if known __A624051__

(c) Date and terms of sentence __September 1982, 16 years-to-life__

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes ___ No

Where? __San Quentin Atate Prison, San Quentin, CA 94974__

(Name of Institution)                    (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Second degree murder with a use of a firearm.

3.    Did you have any of the following?

Arraignment: Yes $\underline{X}$ No ___ Preliminary Hearing: Yes $\underline{X}$ No ___ Motion to Suppress: Yes ___ No ___

3

4.    How did you plead?

Guilty __X__    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes __ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes __        No __
(b)    Preliminary hearing        Yes        No __
(c)    Time of plea   Yes __       No _
(d)    Trial   Yes __   No __
(e)    Sentencing   Yes __        No __
(f)    Appeal        Yes ___      No
(g)    Other post-conviction proceeding   Yes __        No __

8.    Did you appeal your conviction?   Yes __ No __

      (a)    If you did, to what court(s) did you appeal?

Court of Appeal      Yes __    No __X__    _____    _____
                                           (Year)                      (Result)

Supreme Court of
California            Yes __    No __X__    _____    _____
                                           (Year)                      (Result)

Any other court      Yes __    No __    _____    _____
                                        (Year)                      (Result)

      (b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                                       Yes __ No __

      (c)    Was there an opinion?        Yes    No

      (d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                          Yes        No

4

If you did, give the name of the court and the result:

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes X    No __

California SuperiorCourt, in and for the County of Los Angeles. Petition for Writ of Habeas corpus challenging the Board of Parole Hearings' September 25, 2007 decision to deny parole. The petition was denied on February 8, 2008. The grounds are the exact grounds presented in the instant petition.

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court _California Superior Court, Los Angeles County_____

Type of Proceeding _Habeas corpus petition._____

Grounds raised (Be brief but specific):

a.    Same as in instant petition._____

b.    _____

c.    _____

d.    _____

Result _Denied._____ Date of Result **Feb 5, 2008**

II.    Name of Court _California Court of Appeals, Second Appellate District_____

Type of Proceeding _Habeas corpus petition._____

Grounds raised (Be brief but specific):

a.    Same as in instant petition._____

b.    _____

c.    _____

d.    _____

Result _Denied_____ Date of Result **March 4, 2008**

III.    Name of Court _California Supreme Court_____

6

Type of Proceeding ___Petition for Review._____

Grounds raised (Be brief but specific):

a.         Same as in instant petition._____

b. _____

c. _____

d. _____

Result ___Denied_____ Date of Result __May 14. 2008__

      (b)    Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes __ No _X_

_____

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: _____See "INSERT A, Ground 1 pages 1 through 7_____

7

Supporting Facts: _____

_____

_____

_____

Claim Two:  See attache "INSERT B" Ground 2 pages 8 through 11

_____

Supporting Facts: _____

_____

_____

_____

Claim Three: _____

_____

Supporting Facts: _____

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:
    N/A
_____

_____

_____

INSERT A

Ground 1

THERE IS NOT "SOME EVIDENCE" TO SUPPORT THE BOARD OF PAROLE
HEARINGS' DECISION TO DENY PAROLE AND THE BOARD'S CONTINUED
RELIANCE ON THE COMMITMENT OFFENSE TO FIND PETITIONER UNSUITABLE
FOR PAROLE DENIED PETITIONER'S STATE AND FEDERAL DUE PROCESS
OF LAW WHEN THE COMMITMENT OFFENSE DOES NOT INDICATE THAT
PETITIONER CONTINUES TO POSE AN UNREASONABLE RISK TO SOCIETY
IF RELEASED FROM PRISON.

James Thomas (hereafter "Petitioner"), a prisoner serving a 16 years to
life term for second degree murder with use of a firearm, in the custody of
the California Department of Corrections and Rehabilitation (CDCR), hereby
petitions this court to order his release from prison; or in the alternative,
to grant him a new parole hearing that comports with due process of law.
Petitioner's minimum eligible parole date is set at January 4, 1992.

The Board of Parole Hearings' ("Board") review of suitability for
Petitioner on September 25, 2007 violated his due process rights by arbitrarily
and capriciously not considering all of the evidence before it, despite the
Board's statutory obligation to evaluate all reliable, relevant evidence. (See
California Code of Regulation, title 15 ("CCR-15"), § 2402(b).) As a result
of the flawed review of his parole suitability, Petitioner lost his statutorily-
created liberty interest in parole, thereby implicating his federal and state
due process rights by extension.

The Board's primary decision for its denial was Petitioner's commitment
offense wherein the Board found the offense "was carried out in a cruel,
callous manner... in a manner demonstrating exceptionally callous disregard
for human suffer." (Exhibit A, Parole Transcript (hereafter "TR") at 98-99.)
This reasoning and its relevance is misplaced because: (1) the crime was
undeniably wrong, but the Board is not permitted to rely on the crime in
perpetuity without demonstrating that the crime is indicative that the inmate
continues to pose an unreasonable risk to society if released. There must be
a nexus between the commitment offense and Petitioner's current risk to the

1

INSERT A

public; (2) Petitioner second degree murder, committed when he was 16 years
of over 25 years ago, was not carried out in an "especially heinous, atrocious
or cruel manner" as described in Cal. Penal Code § 190.2 (14), or as described
by California Code of Regulations Title 15 ("CCR-15") § 2042, sub. (c)(1)(B)
and therefore arbitrary and capricious. Furthermore, the California Superior
Court, in and for the County of Los Angeles had found that "[t]here is no
evidence in the record that Petitioner's offense was more aggravated or violent
than ordinarily shown in the commission of second degree murder. Thus, there
is no evidence to support the Board's conclusion that the offense demonstrated
an exceptionally callous disregard for human suffering." (Exhibit B, Court
Order of February 24, 2005, By Honorable David Wesley, J, Superior Court.)
The Board did not appeal that decision; and (3) In November 2006, Petitioner
received a one-year denial. He is in 100% compliance with the Board's
recommendation.

    In re Dannenberg, held that when the Board of Prison Terms bases a finding
that an inmate, who is sentenced to an indeterminate life term, is unsuitable
for parole on the circumstances of the commitment offense, it must cite some
evidence of aggravating facts beyond the minimum elements of that offense.
See In re Dannenberg, (2005) 34 Cal.4th 1061. Therefore, the Board's continued
reliance on the commitment offense is only permitted if the offense is evidence
of an on-going threat to public safety posed by the inmate. Id. at 1084. The
decision to deny parole must rely on evidence which establishes factually that
the inmate currently poses an "unreasonable risk of" danger to the public.
CCR-15 § 2402(a). That finding can not be based on unspecified evidence as
to render it mere whim or caprice.

    In fact, federal case law is quite clear that continued reliance on the
immutable nature of the crime violates a life inmate's due process rights.

INSERT A

Biggs v. Terhune, (2003) 334 F.3d 910, 915-916 (repeated reliance on unchanging facts in the face of uncontradicted evidence of rehabilitation violates due process). "A continued reliance in the future on an unchanging factor, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Id. at 916-917. If an inmate "continue[s] to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Id.

In Irons v. Warden, (E.D. Cal. 2005) 358 F.Supp.2d 936, the court found the Board violated the prisoner's due process by continuing to rely on immutable factors (e.g., the commitment offense and history prior to incarceration) to support the denial of parole. In doing so, the Court ruled that continuing to rely on those factors that can never be change, such as the commitment offense, where there is no proof of continuing bad conduct to support a finding of current threat to the public offended due process. Id. at 941.

As stated by the Board, "the psychological report dated May 4, 2007, by Dr. Richard Starrett, he basically does support your paole and assesses you a low risk overall risk for violence and to potentially recidivate a low risk." (TR 101-102.) In Thomas v. Brown, 2006 U.S. Dist. LEXIS 94460, 11-12 (D. Cal. 2006) the court there looked at the current psychological evaluation and emphasizing the currency of the potential threat, faulted the Governor for relying on an old psychological evaluation and ignoring a more current one. (Thomas v. Brown, supra, *24.)

State law also support the same conclusion that continued reliance on a stale crime without regard to changes undergone by the prisoner since committing the crime is improper. In In re Ramirez, (2001) 94 Cal.App.4th 549, 573, the Court concluded that the Board can not rely on the crime alone because

3

INSERT A

psychological and programming facts are to be considered as favorable to parole. The paroling authority must do more than merely commend Petitioner for his programmatic achievements while in prison. They must actually consider these factors "as circumstances tending to show suitability for parole." Id. at 571-72.

Recent California Court of Appeal cases agree. In re Lawrence (2007) 59 Cal.Rptr.3d 537, 558, ruled that an inmate guilty of a murder committed under significant stress (a love triangle) thirty years ago could not be relied on for a parole denial when the inmate had no history of prior crimes or a history of violent crimes or assaultive behavior. In re Lawrence, supra, concluded that such past history in light of supportive psychological examinations and two decades of exemplary incarceration was not indicative that the inmate posed an unreasonable risk to society, and accordingly she was deserving of a parole date.

In another recent published Court of Appeals decision, In re Barker (2007) 59 Cal.Rptr.3d 746, 766-768, the appellate court ruled that 29 year old crime was not ground for a parole denial when the inmate had a minimal criminal history (one arrest), a clean prison record, participated in numerous self-help programs, and supportive psychiatric evaluation.

Here however, the Board tries to resuscitate a 25 year old crime that says nearly nothing about the present dangerousness of Petitioner. When the age of the crime contrasted against Petitioner's present gains, it is apparent that the crime does not show that the Petitioner continues to pose a threat to society. To the contrary, if anything, the crime shows that Petitioner was a teenage boy who made profoundly poor choices while under the influence of of his peers, that are no longer part of his moral lexicon. His rehabilitated character which differs both in mind and skill set markedly demonstrated by

4

INSERT A

his disciplinary free prison record of 12 years, and with no violence other than the commitment offense.

The regulations upon which the Board relied provides one example of when a crime is especially heinous, atrocious, or cruel. That is, when it is carried out in a dispassionate and calculated manner, such as "an execution-style murder." (CCR-15 § 2402, subd. (c)(1)(B).) Nowhere in the CCR-15 does a definition of what constitutes an execution-style murder and according to California Penal Code § 190.2 subd.(14), for defendant to be punished for committing a murder in "especially heinous, atrocious, or cruel" manner a jury must find this element to be true (See Penal Code § 190.4). Petitioner's crime does not measure up to an "execution-style murder," and therefore it was arbitrary to characterize it as such.

California courts share a rightfully cautious reluctance to label crimes as being committed with callous disregard or being especially heinous so as to preserve the strong meaning of such terms. See In re Ernest Smith, (2003) 144 Cal.App.4th 343 (while shooting the victim three times in the head is "callous," it is not particularly egregious); In re Mark Smith, (2003) 109 Cal.App.4th 489 (crime not egregious despite facts that victim was shot twice by inmate, before inmate ordered crime partner to drown victim); In re Scott, (2004) 119 Cal.App.4th 871, 890-892 (crime not egregious despite shooting done in presence of child); In re Elkins, 144 Cal.App.4th 475, 480-481, 496-499 (2006), the petitioner there beat a friend with a bat until he was dead. He did this while his friend was asleep. He dumped the body down the side of a hill. ("Some evidence" did not support the decision denying suitability); In re Cooper, 153 Cal.App.4th 1043 (2007) (killing wife with sledgehammer by hitting her in the neck five or six times, and her suffering for 20 to 30 minutes before dying was not especially egregious); In re Barker, 151

INSERT A

Cal.App.4th 346, 353-354, 372-375 (2007) (triple murder, helping a friend kill his father, mother, and grandfather, striking the grandfather on the head three or four times with a chisel and then shooting him in the head with rifle was not sufficient to support a finding of unsuitability); McQuillion v. Duncan, (9th Cir. 2002) 306 F.3d 895, (double murder with father-son proprietor tied up and executed during culmination of spree of robberies not sufficiently egregious to deny parole).

While it may be permissible for the Board to ignore the fact that the lawful judgment was only of the second degree, if the Board is going to re characterize the crime as being in the first degree (See TR 89-97: Board discussion with District Attorney and Petitioner's appointed counsel), they must employ the "detailed standards" (In re Dannenberg (2005) 34 Cal.4th 1061,) applicable to first degree murder after Petitioner has served such time that he is eligible for parole had his conviction actually been of the higher degree. As affirmed by the Sixth Appellate District: "It should be self evident that after an inmate has served the equivalent of 25 years, whether his actions were more than minimally necessary for a second degree conviction is no longer the appropriate question. The Board's position, that inmates who were only convicted of second degree may forever be denied parole based on some modicum of evidence that their acts rose to the level of first, without acknowledging the fact that they have already served the time for a first, should be seen as so ridiculous that simply to state it is to refute it." (In re Weider (2006) 145 Cal.App.4th 570, 582-583.) In the instant case, Petitioner has served a term equivalent to 38 years, which is equivalent to two first degree murder convictions.

At the time of his 2007 denial, Petitioner had been incarcerated for over 25 years. He has been eligible for parole for over fifteen years. With good-

6

INSERT A

time credit, he is now four years beyond the maximum aggravated term for first degree murder in the matrix guidelines. The matrix in which Petitioner falls under, CCR-15 § 2402 (c), places his term at a range from 16 years to 21 years. The maximum is 21 years minus four months for each year for good behavior pursuant to CCR15 § 2290 - is a term of approximately 10.66 years to 14 years. Petitioner has now fulfilled his sentence and parole term once he is found suitable. (See CCR15 § 2345 and § 2410; In re Ernest Smith, ___ Cal.App.4th ___, 2007 WL 1267483.)

In conclusion, the ultimate directive to the Board by Penal Code § 3041; California Code of Regulations, Title 15 § 2400 and the decided cases, is to make a determination as to whether or not Petitioner would now pose an unreasonable risk of danger to society if he is paroled.

Had the Board fairly and impartially reviewed the relevant and reliable information available to it, rather then pick and chose that which suited its predetermination to deny parole and ignore the rest, the Board would have reached a different conclusion. (See Exhibit C, Parole Plans.)

There is not "some evidence" on the record to support a finding that conservation of the public safety requires Petitioner to be incarcerated for a more lengthy period.

The Board's decision makes a mockery of the legislative declaration that life prisoners are "normally" entitled to receive a parole date shortly before they first become eligible for parole. In re Scott, 119 Cal.App.4th 871, 894 (2004).

Wherefore, the court must grant the petition and order the Board to reverse its decision and release petitioner immediately.

7

INSERT B

Ground 2

THE BOARD OF PAROLE HEARINGS IS ESTOPPED FROM CLAIMING THAT
PETITIONER'S MURDER WAS AN ESPECIALLY HEINOUS, ATROCIOUS, AND
CRUEL ONE THAT CONSTITUTED SOME EVIDENCE THE HE CURRENTLY POSED
AN UNREASONABLE RISK TO PUBLIC SAFETY IF RELEASED ON PAROLE.

On February 24, 2005, the Los Angeles Superior Court held that "[t]here
is no evidence in the record that Petitioner's offense was more aggravated
or violent than ordinarily shown in the commission of second degree murder.
Thus, there is no evidence to support the Board's conclusion that the offense
demonstrated an exceptionally callous disregard for human suffering." The Court
also found that there was no evidence to support unsuitability because of his
prior criminal record, or a history of unstable or tumultuous relationships
with other, or that he has failed to sufficiently or that his parole plans
are unrealistic. (Exhibit B, Court Order of February 24, 2005.) However, the
court upheld the Board's 2005 decision on the grounds that "there is 'some
evidence' Petitioner is unsuitable because he lacks sufficient insight into
the circumstances of the crime and could therefore, benefit from additional
participation in self-help programming." (Id.) Since then, however, Petitioner
had participated in self-help programs and gained insight into the circumstances
of the crime. Staff psychologist, Richard Starrett, Ph.D, held in his recent
report that: "His insight, acceptance, and responsibility and expressing remorse
seem appropriate. There continues to be a discrepancy between the inmate's
account the file account that will not be reconciled. Even with his discrepancy,
he is in the low range." (Exhibit C, Parole Plans, "Circumstances Tending to
Show Suitability.

The Board did not appeal the Court Order of February 24, 2005. The evidence
before the Board in 2007 shows that the lack of danger posed by Petitioner
at the time is buttressed by reference to the other regulatory factors that
guide the determination of present dangerousness. Petitioner meets all eight
of the regulatory suitability factors that apply to male prisoners under

8

INSERT B

California Code of Regulations, title 15, section 2402, subdivision (d).
Petitioner (1) has no juvenile record other than the commitment offense (TR
100); (2) has a stable social history; (3) been involved in AA and NA since
1995; (4) disciplinary free since 1995 with no history of violence; (5) no
adult criminal history; (6) realistic parole  plans, including family support
and job offer; (7) shown signs of remorse and indicated he understood the
magnitude and nature of the offense and accepted responsibility for the offense;
(8) his psychological evaluations had been positive and indicated a low
probability of violence if released. (TR 31-72.)

The Board based its reason to deny parole on factors that were already
adjudicated and found not to be supported by some evidence or not listed in
the guidelines indicating unsuitability. The Board stated, in pertinent part:

> The offense was carried out in a manner demonstrating
> exceptionally callous disregard for human suffering. (TR 99)
> ... Sir you have no prior criminal history and your
> institutional behavior in the last seven years has been
> commendable. ... I want to commend you in your programming...(TR
> 100)... And in recent years, you haven't had any 115's. You
> haven't had a 115 since your 1995 possession of marijuana and
> the five that you've have had total do not include any violence.
> ... your clean and sober date was in 1995,... As the
> psychological report dated Mat 4, 2007 by Dr. Richard Starrett,
> he basically does support your parole and assesses you a low
> risk overall risk for violence and to potentially recidivate
> a low risk. As your parole plans, you do appear to have
> substantial parole plans for local and southern California,
> that would be for the San Francisco Bay Area or Los Angeles
> area. You have been given an invitation to join the Walden
> House program... Also your sister, Pamela Bullock, has offered
> her support, including residence, and your brother Lamont Thomas
> has also offered his support, including residence. You do have
> a job offer in San Jose that you presented to this board. You
> clearly have marketable skills, including as Machinist,
> Upholsterer and Forklift Operator. As to Penal Code 3042
> responses, response indicate opposition to a finding of
> suitability, specifically by the District Attorney of Los
> Angeles County. Sir, it was impressive to this Panel that you
> said in one of your final statements, 'that was me, picking
> random victims and reaping hell on them.' And then you also
> said it's all in giving -- we feel that your programming in
> recent years has shown that that is in deed what it's about
> for you. We feel that you are on the right path and that your

9

INSERT B

> self-help and programming has been relatively recent compared
> to the number of years you've been incarcerated. It is all
> about actions speaking louder than words, and we feel that
> you need to continue that positive programming for another
> year. We know you've been told this before, but we feel it
> is still important for you to do that. (TR 101-103)... I was
> very close to voting in your favor on this, a very close call.
> There a lot of positive things here in the record about you....
> And my concern often is when I see somebody who shows up to
> the Board and there's been a big change, am I really looking
> at a person who changed or am I looking at somebody who is
> giving us a sales pitch. Is this just short-term sort of a
> sales pitch, short-term effort on your part or is it really
> a change. (TR 110.)

Section 3041, subdivision (b) of the Penal Codes provides a release date

must be set "unless [the Board] determines that the gravity of the current

convicted offense or offenses, or the timing and gravity of current or past

convicted offense or offenses, is such that consideration of the public safety

requires a more lengthy period of incarceration for this individual...." As

demonstrated by the Board's own statements and the relevant reliable information

provided by prison staff and letters of support from the community, there is

no evidence to support the Board's decision and the only evidence that may

be used to deny parole has already been determined to not support a denial

of parole by the Superior Court and by the Board's own admissions.

Petitioner has suffered and continues to suffer the most grievous harm

in a free society short of loss of life: The loss of liberty through

imprisonment by the State. Despite his long-standing showing of suitability

for parole under the applicable legal standards, he has now been retained in

custody nearly 16 years beyond his MEPD. The writ of habeas corpus is designed

to effect speedy and efficacious relief for illegal confinement without

protracted and complicated litigation. (See, e.g., Stafford v. Briggs (1980)

444 U.S. 527, 63 L.Ed.2d 1, fn. 3 (dis. opn. of Stewart J) ["'The Great Writ'

... thus must be administered flexibly to insure it serves its purpose"]; see

also Fay v. Noia (1963) 372 U.S. 391, 399.) In this case the appropriate

INSERT B

flexible administration of the writ would be to release Petitioner to supervised parole pending final resolution of these proceedings and once resolved, order Petitioner discharge from parole

For the foregoing reasons, the Court should grant the petition and order Petitioner released from prison immediately without parole. Petitioner surpassed the matrix guidelines for even the most egregious first degree murder described in the guidelines. (See CCR-15 § 2402 (c), § 2290, § 2345, and 2410; see also In re Ernest Smith, ___Cal.App.4th___, 2007 WL 1267483.)

Dated:                                              Respectfully submitted;


                                                    James Thomas
                                                    Petitioner in Pro Se

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

Do you have an attorney for this petition?    Yes __ No _X_

If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on 6/3/08
Date

X _Jame Thomas_
Signature of Petitioner

( rev. 5/96)

9

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of:                )
                           )
                           )
_____)

CDC Number C-70569

JAMES THOMAS

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

SEPTEMBER 25, 2007

2:13 P.M.

PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
Bill Keenan, Deputy Commissioner

OTHERS PRESENT:

James Thomas, Inmate
John Stringer, Attorney for Inmate Thomas
Alexis DelaGarza, Deputy District Attorney
Correctional Officer(s), Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of
_____ Yes         Transcript M

SHERRY FULLF

FOOTHILL TRANSCRIPTION

INDEX

Page

Proceedings ............................................... 1

Case Factors ............................................. 10

Pre-Commitment Factors ................................... 21

Post-Commitment Factors .................................. 31

Parole Plans ............................................. 56

Closing Statements ....................................... 79

Recess ................................................... 97

Decision ................................................. 98

Adjournment ............................................. 111

Transcriber Certification ............................... 112

--oOo--

1

1          **P R O C E E D I N G S**

2          **PRESIDING COMMISSIONER BRYSON:**  This is the tenth

3     Subsequent Parole Consideration Hearing for James Thomas,

4     CDC Number C, Charles, 70569.  Today's date is September

5     25, 2007, and the time is 1413.  We're located at San

6     Quentin State Prison.  This inmate was received August 2nd

7     of 1983, from Los Angeles County.  The life term began

8     August 2nd of 1983, with a minimum eligible parole date of

9     January 4, 1992.  Charging in Case Number A, Adam,

10    624051, Count One, the controlling offense Penal Code

11    187, Murder Second, with Penal Code 12022A, Armed with a

12    Firearm, to wit a gun, for which the inmate received a

13    life term of 16 years to life.  This hearing is being

14    recorded.  For the purposes of voice identification, each

15    of us will state our first and last names, spelling the

16    last name.  When it's your turn, sir, after you spell

17    your last name please state your CDC Number.  I will

18    start and go to my left.  Sandra Bryson, B-R-Y-S-O-N,

19    Commissioner, Board of Parole Hearings.

20         **DEPUTY COMMISSIONER KEENAN:**  Bill Keenan,

21    K-E-E-N-A-N, Deputy Commissioner.

22         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Alexis

23    Delagarza, D-E-L-A-G-A-R-Z-A, Deputy District Attorney,

24    Los Angels County.

25         **ATTORNEY STRINGER:**  John Stringer,

1    S-T-R-I-N-G-E-R, attorney.

2         **INMATE THOMAS:**  James Thomas, T-H-O-M-A-S.

3         **PRESIDING COMMISSIONER BRYSON:**  And you're CDC

4    Number, sir?

5         **INMATE THOMAS:**  C-70569.

6         **PRESIDING COMMISSIONER BRYSON:**  Thank you, and I

7    note for the record we have two correctional peace

8    officers in the room who are here for security purposes.

9    And, sir, I need to swear you in, will you raise your

10   right hand, please?  Do you solemnly swear or affirm that

11   the testimony you give at this hearing will be the truth,

12   the whole truth and nothing but the truth?

13        **INMATE THOMAS:**  Yes.

14        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

15   Commissioner Keenan, is there any confidential material

16   in the file, and if so, will it be used today?

17        **DEPUTY COMMISSIONER KEENAN:**  There's a

18   confidential file, but it doesn't appear to contain

19   anything relevance.  So, it won't be considered today.

20        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  I'm

21   passing the Hearing Checklist marked Exhibit 1 to your

22   attorney, sir, to ensure that we're all proceeding with

23   the same set of documents.  And when you're ready,

24   Counsel, do you have those documents?

25        **ATTORNEY STRINGER:**  Defense has those documents,

3

1    Commissioner.

2         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

3    when you're ready, does the District Attorney have all

4    the documents as well?

5         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I do, thank

6    you.

7         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  Are

8    there any additional documents to be submitted, Counsel

9    beyond the ones that we have in the file before the

10   hearing?

11        **ATTORNEY STRINGER:**  Yes, Commissioner.  My client

12   has prepared a portfolio of his parole plans in addition

13   to the hearing brief already submitted to the Panel and I

14   have copies for both Commissioners and I provided the

15   district attorney with a copy also.

16        **PRESIDING COMMISSIONER BRYSON:**  Thank you very

17   much.  All right, sir, can you please read the ADA

18   Statement in front of you aloud?

19        **INMATE THOMAS:**  Yes.

20             "The American's with Disabilities Act, ADA,

21             is a law to help people with disabilities.

22             Disabilities are problems that make it

23             harder for some people to see, hear,

24             breathe, talk, walk, learn, think, work or

25             take care of themselves than it is for

4

```
1              others.  Nobody can be kept out of public
2              places or activities because of a
3              disability.  If you have a disability, you
4              have the right to ask for help to get ready
5              for your BPT Hearing, get to the hearing,
6              talk, read forms and papers, and understand
7              the hearing process.  BPT will look at what
8              you are asking for to make sure you that you
9              have a disability that is covered by the ADA
10             and that you have asked for the right kind
11             of help.  If you do not get help or if you
12             don't think you got the kind of help you
13             need, ask for a BPT 1040 Grievance Form.
14             You can also get help to fill it out."
15         PRESIDING COMMISSIONER BRYSON:  Thank you, sir.
16   Do you understand what you read?
17         INMATE THOMAS:  Yes.
18         PRESIDING COMMISSIONER BRYSON:  All right.  The
19   record reflects that on June 19, 2007, you signed BPT
20   Form 1073, the Reasonable Accommodation Notice and
21   Request in accordance with the provisions of the
22   Americans with Disabilities Act.  Disability is defined
23   under the ADA, and that shows that you have no
24   disabilities that were identified.  From the file review,
25   you have a reading level of 12.9.  You don't wear
```

5

1    glasses.  Do you have good eyesight?

2         **INMATE THOMAS:**  Yes.

3         **PRESIDING COMMISSIONER BRYSON:**  All right, good

4    for you.  You're very fortunate.  And you don't appear to

5    have any hearing difficulties; is that correct?

6         **INMATE THOMAS:**  That's correct.

7         **PRESIDING COMMISSIONER BRYSON:**  All right, and you

8    don't appear to have any mobility issues getting into the

9    hearing room today; is that correct?

10        **INMATE THOMAS:**  That's correct.

11        **PRESIDING COMMISSIONER BRYSON:**  All right.  Have

12   you ever been involved in Triple CMS or EOP Programs?

13        **INMATE THOMAS:**  No.

14        **PRESIDING COMMISSIONER BRYSON:**  Have you ever

15   taken psychotropic medications either in prison or on the

16   street?

17        **INMATE THOMAS:**  No.

18        **PRESIDING COMMISSIONER BRYSON:**  All right.  Do you

19   suffer from any disability you think may prevent you from

20   participating in today's hearing?

21        **INMATE THOMAS:**  No.

22        **PRESIDING COMMISSIONER BRYSON:**  All right.

23   Counsel, do you concur?

24        **ATTORNEY STRINGER:**  I do, Commissioner.

25        **PRESIDING COMMISSIONER BRYSON:**  This hearing is

6

1    being conducted pursuant to Penal Code Sections 3041 and
2    3042 and the Rules and Regulations of the Board of Parole
3    Hearings governing parole consideration hearings for life
4    inmates.  The purpose of today's hearing is to consider
5    your suitability for parole.  In doing so, the Panel will
6    consider the number and nature of the crimes for which
7    you were committed, your prior criminal and social
8    history, and your behavior in programming since your
9    commitment.  The Panel has had the opportunity to review
10   your central file.  You will be given the opportunity to
11   correct or clarify the record.  The Panel will consider
12   your progress since your commitment, your counselor's
13   reports, psychological reports, and any other relevant
14   information.  Any change in parole plans should be
15   brought to the Panel's attention.  The Panel will reach a
16   decision today and inform you whether or not it finds you
17   suitable for parole and the reasons for its decision.  If
18   you are found suitable for parole, the length of your
19   confinement will be explained to you.  Nothing that
20   happens here today will change the findings of the court.
21   The Panel is not here to retry your case.  The Panel is
22   here for the sole purpose of determining your suitability
23   for parole.  Do you understand?

24        **INMATE THOMAS:**  Yes.

25        **PRESIDING COMMISSIONER BRYSON:**  This hearing will

7

1    be conducted in three phases.  I will discuss with you

2    the crime for which you were committed, your prior

3    criminal and social history.  Commissioner Keenan will

4    discuss with you your progress since your commitment,

5    your counselor's report, and your psychological

6    evaluation.  I will then discuss with you your parole

7    plans and any letters of support or opposition that may

8    be in the file.  Once that is concluded, the Panel and

9    then the District Attorney, and then your attorney will

10   be given the opportunity to ask you questions.  Questions

11   from the District Attorney should be asked through the

12   Chair and you will direct your answers to the Panel.

13   Next, the District Attorney and then your attorney and

14   then you will be given an opportunity to make a

15   statement -- final statement regarding your parole

16   suitability.  Your statement should address why you feel

17   you are suitable for parole.  The Panel will then recess,

18   clear the room and deliberate.  Once the deliberations

19   are completed, the Panel will resume the hearing and

20   announce the decision.  The California Code of

21   Regulations states that regardless of time served, a life

22   inmate shall be found unsuitable for and denied parole,

23   if in the judgment of the Panel, the inmate would pose an

24   unreasonable risk of danger to society if released from

25   prison.  You have certain rights.  Those rights include

8

1    the right to a timely notice of the hearing.  Were you

2    given timely notice of this hearing, sir?

3              **INMATE THOMAS:**  Yes.

4              **PRESIDING COMMISSIONER BRYSON:**  You have the right

5    to review your Central File.  Were you given the

6    opportunity to review your Central File?

7              **INMATE THOMAS:**  No.

8              **PRESIDING COMMISSIONER BRYSON:**  You were not?

9              **INMATE THOMAS:**  No.

10             **PRESIDING COMMISSIONER BRYSON:**  Commissioner,

11   could you check the file?  It says he was given the

12   opportunity to -- well, on November 27, 2005, which is

13   not timely for this hearing.

14             **ATTORNEY STRINGER:**  February '07 -- '06.

15             **PRESIDING COMMISSIONER BRYSON:**  Counsel, do you

16   wish to review this file?

17             **ATTORNEY STRINGER:**  Can I have 30 seconds --

18             **PRESIDING COMMISSIONER BRYSON:**  You certainly can.

19             **ATTORNEY STRINGER:**  Thank you.  Will we go off

20   record at this point?

21             **PRESIDING COMMISSIONER BRYSON:**  We'll go off

22   record, thank you.  The time is now 1422.

23                      **(Off the Record)**

24             **DEPUTY COMMISSIONER KEENAN:**  And we are back on

25   record.

9

1          **PRESIDING COMMISSIONER BRYSON:** And the time is

2    now 1424. Counsel, did you have an opportunity to review

3    the file and interview your client?

4          **ATTORNEY STRINGER:** I did, Commissioner.

5          **PRESIDING COMMISSIONER BRYSON:** All right.  Thank

6    you. And sir, I understand that you wish to waive and

7    continue with this hearing; is that correct?

8          **INMATE THOMAS:** Yes.

9          **PRESIDING COMMISSIONER BRYSON:** All right, all

10   right. So, the inmate is waiving his right for some

11   review. You also have a right to present relevant

12   documents, which you are doing here today, and you also

13   have the right to be heard by an impartial Panel. Do you

14   have any evidence that the Panel before you cannot be

15   impartial, sir?

16         **INMATE THOMAS:** No, I don't.

17         **PRESIDING COMMISSIONER BRYSON:** You will receive a

18   copy of the Panel's written tentative decision today.

19   That decision will become effective within 120 days. It

20   is also subject to review by the governor. A copy of the

21   tentative decision and a copy of the transcript will be

22   sent to you. The Board has eliminated its appeal

23   process. If you disagree with anything in today's

24   hearing, you have a right to go directly to the court

25   with your complaint. You are not required to admit your

10

1    offense or discuss your offense if you do not wish to do

2    so.  However, this Panel does accept as true the findings

3    of the court and you are invited to discuss the facts and

4    circumstances of the offense if you desire.  The Board

5    will review and consider any prior statements you have

6    made regarding your offense in determining your

7    suitability for parole.  So basically, it's very simple,

8    just tell the truth.  Counsel, are there any preliminary

9    objections?

10    **ATTORNEY STRINGER:**  We're ready to proceed,

11    Commissioner.

12    **PRESIDING COMMISSIONER BRYSON:**  Will the inmate be

13    speaking with the Panel?

14    **ATTORNEY STRINGER:**  He will.

15    **PRESIDING COMMISSIONER BRYSON:**  All right.  I'm

16    going to read into the record the offense as set forth in

17    the most current Board report we have, which is January

18    2007, and this is prepared by K.W. McLean, M-C-L-E-A-N,

19    Correctional Counselor I.  Beginning on Page 1, as to the

20    offense summary from the Los Angeles County probation

21    officer's report dated September 15, 1982.

22                "On June 14, 1982, James Fitzgerald Thomas,

23                age 16, and an unidentified accomplice

24                approached the victim, Daniel Calvia

25                (phonetic), on the stairs on a pedestrian

1           foot bridge.  Thomas grabbed the victim and
2           demanded money.  A scuffle ensued between
3           the victim, Thomas, and the accomplice when
4           the victim refused to comply.  A witness,
5           the victim's daughter, identified Thomas as
6           the man who shot her father once in the
7           right side of his chest area.  The
8           assailants fled as the victim and his
9           daughter ran towards a nearby Laundromat.
10          The victim collapsed and died in the
11          Laundromat's parking lot."
12     Sir, did you know your co-partner in this crime?
13          **INMATE THOMAS:**  Briefly.  It wasn't a longstanding
14     relationship.  I'd only known him for maybe a month or
15     so.
16          **PRESIDING COMMISSIONER BRYSON:**  You knew him for a
17     month or so?
18          **INMATE THOMAS:**  Yes.
19          **PRESIDING COMMISSIONER BRYSON:**  Were you in a gang
20     together?
21          **INMATE THOMAS:**  No.
22          **PRESIDING COMMISSIONER BRYSON:**  So, under what
23     circumstances did you know this other person?
24          **INMATE THOMAS:**  We had a mutual acquaintance.
25          **PRESIDING COMMISSIONER BRYSON:**  I see.

12

1        **INMATE THOMAS:**  So, when we came together, he

2    would come from one direction, I would come from another

3    one.  But, we'd all meet at a particular place where we

4    considered my so-called friend's house, and we'd just

5    have him come over there.  He was introduced to me as a

6    friend of his and that's how we actually met.  We hung

7    out a few times together.

8        **PRESIDING COMMISSIONER BRYSON:**  And pull robberies

9    together?  Is that -- was that part of your itinerary as

10   well?

11       **INMATE THOMAS:**  No.

12       **PRESIDING COMMISSIONER BRYSON:**  No?

13       **INMATE THOMAS:**  No, that was the first one we

14   attempted.

15       **PRESIDING COMMISSIONER BRYSON:**  Was this the first

16   robbery you ever did at all?

17       **INMATE THOMAS:**  No.

18       **PRESIDING COMMISSIONER BRYSON:**  But now, you're

19   representing that you weren't in a gang, but you hung out

20   with certain guys.  How does that -- maybe you could

21   elaborate on that a little bit.

22       **INMATE THOMAS:**  Well, some of the guys I hung out

23   with, I grew up with.  I met them through elementary

24   school.

25       **PRESIDING COMMISSIONER BRYSON:**  Okay.

13

1      **INMATE THOMAS:** And so, some of them got involved
2  in gangs and some of them I met through school who were
3  involved in gangs. I never, because I didn't live in the
4  neighborhood anymore -- me being involved in a gang and
5  trying to go back to my old neighborhood where I actually
6  lived at, that wasn't going to work out. So, I just
7  never got involved in it because I wanted to be able to
8  move around without people harassing me, you know what I
9  mean? Asking me what gang I was in. So, it was safer.

10     **PRESIDING COMMISSIONER BRYSON:** Yes. So, what did
11 you answer?

12     **INMATE THOMAS:** It was safer not to be involved.

13     **PRESIDING COMMISSIONER BRYSON:** Well, it was safer
14 for you.

15     **INMATE THOMAS:** Yes.

16     **PRESIDING COMMISSIONER BRYSON:** Okay. Not
17 necessarily safer for the rest of the public though, as
18 this crime shows.

19     **INMATE THOMAS:** Right.

20     **PRESIDING COMMISSIONER BRYSON:** Okay. Was this a
21 group of guys that you did robberies with -- other
22 members of which you did robberies?

23     **INMATE THOMAS:** No, it was just a couple of my
24 friends. Actually, when we were growing up, you know, at
25 13 years old, something like that --

14

 1          **PRESIDING COMMISSIONER BRYSON:** Okay.

 2          **INMATE THOMAS:** -- you take a lot more --

 3          **PRESIDING COMMISSIONER BRYSON:** Okay.

 4          **INMATE THOMAS:** It was just to get a little extra

 5    money and we actually did a couple more growing up.

 6          **PRESIDING COMMISSIONER BRYSON:** Okay.

 7          **INMATE THOMAS:** And these were guys I considered

 8    to be my friends, and so in order to be in, I went right

 9    along with it, even though I wasn't in dire need of

10    financial gain or anything. You know, my family was

11    doing pretty well because of my father. But, in order to

12    be in, wherever the crowd went, so did I.

13          **PRESIDING COMMISSIONER BRYSON:** I see, I see.

14    And, was it just the two of you that did the commitment

15    offense?

16          **INMATE THOMAS:** Yes.

17          **PRESIDING COMMISSIONER BRYSON:** I see. Did you

18    ever divulge this gentleman's name to anyone?

19          **INMATE THOMAS:** I never knew his personal name,

20    his God-given name.

21          **PRESIDING COMMISSIONER BRYSON:** Did you know his

22    handle?

23          **INMATE THOMAS:** Yes, that I did.

24          **PRESIDING COMMISSIONER BRYSON:** You gave that up?

25          **INMATE THOMAS:** Yes, and according to some of the

15

1    transcripts, the detective identified him as Craig

2    Whitfield (phonetic).

3    **PRESIDING COMMISSIONER BRYSON:**  Okay.

4    **INMATE THOMAS:**  I don't know where to look as far

5    as the investigation.

6    **PRESIDING COMMISSIONER BRYSON:**  We're going to

7    talk about your social history in a little bit, but right

8    now, just in order to discuss the crime, maybe you

9    could -- because there's not a lot of information here.

10   It's pretty brief and maybe you could help us to fill it

11   out a little bit as far as, how did you come to hatch

12   this plan and how did it go down the way it did?

13   **INMATE THOMAS:**  It wasn't any plan.

14   **PRESIDING COMMISSIONER BRYSON:**  All right.

15   **INMATE THOMAS:**  That I know of.  I came over there

16   looking for a friend of mine and I sat on his porch

17   because he wasn't home at the time and he just happened

18   to come over also.  So, we sat there waiting for him.

19   Our original friend showed up, and while sitting there,

20   we were talking about a bunch of nothing and so the idea

21   of money came up.  I wanted to get some money and I'm

22   looking at him -- looking up to him.  So, I thought,

23   okay, sure.  Why not?  So, we decided we'd go and try to

24   find somebody and I would grab him and hold him while he

25   looked in their pockets.  And so, we went off looking for

16

1    a victim.

2         **PRESIDING COMMISSIONER BRYSON:**  And so, was this
3    victim just an opportunistic random?

4         **INMATE THOMAS:**  Yes.

5         **PRESIDING COMMISSIONER BRYSON:**  All right.  How
6    old do you think this gentleman was?

7         **INMATE THOMAS:**  I didn't know.  I had no idea.
8    However, me being 16, he looked to like an elderly
9    gentleman.

10        **PRESIDING COMMISSIONER BRYSON:**  Okay.

11        **INMATE THOMAS:**  Somebody I felt like I could
12   handle and I could hold if I was there next to him.

13        **PRESIDING COMMISSIONER BRYSON:**  And how old,
14   approximately in some range, was his daughter?

15        **INMATE THOMAS:**  I never saw her.

16        **PRESIDING COMMISSIONER BRYSON:**  You never saw her?

17        **INMATE THOMAS:**  No.  No, that's what I've been
18   attempting to explain.  Maybe in my excitement or
19   whatever, but I know when we came across the bridge and I
20   saw him, he was alone, and that was the reason we
21   actually chose him, because he was by himself.  I never
22   saw a young little -- a young girl or a baby or anything.
23   Because when that was brought to my attention, I had no
24   idea what they were talking about.  I never saw her.

25        **PRESIDING COMMISSIONER BRYSON:**  Okay, and were you

17

1    both armed?

2             **INMATE THOMAS:** No.

3             **PRESIDING COMMISSIONER BRYSON:** Were you armed?

4             **INMATE THOMAS:** No.

5             **PRESIDING COMMISSIONER BRYSON:** So, was your

6    partner armed?

7             **INMATE THOMAS:** Yes.

8             **PRESIDING COMMISSIONER BRYSON:** And did you know

9    that?

10            **INMATE THOMAS:** No. It was my understanding it

11   was going to be -- I was going to grab him, he was going

12   to go into his pockets and we were going to run. That

13   was the gist of our plan.

14            **PRESIDING COMMISSIONER BRYSON:** Okay. So, you saw

15   him coming across the bridge toward you; is that correct?

16            **INMATE THOMAS:** No, it was across the street on

17   the bridge that crossed the boulevard, it was what do you

18   call it -- it was a footbridge.

19            **PRESIDING COMMISSIONER BRYSON:** Okay.

20            **INMATE THOMAS:** And it's from one side of the

21   boulevard to the other, and we seen him walking across

22   the top and there's about a four or five foot wall. So,

23   we see him and we chose him.

24            **PRESIDING COMMISSIONER BRYSON:** Okay. So, what

25   did you do then?

18

1      **INMATE THOMAS:** While he was coming down, I looked
2   to catch him before he actually came all the way down.
3   So, I ran across the street and caught him at the last
4   few steps and when I grabbed him from there, he gave up a
5   struggle and we started going down past the last few
6   stairs. And so, in our struggle, my crime partner came
7   up and all of a sudden, pow, and everybody ran. That was
8   the last time I saw him.

9      **PRESIDING COMMISSIONER BRYSON:** So, did you rob
10  him after he got shot?

11     **INMATE THOMAS:** No. Once the noise went off,
12  everybody ran different directions.

13     **PRESIDING COMMISSIONER BRYSON:** Okay. Did you get
14  together with your crime partner again?

15     **INMATE THOMAS:** No.

16     **PRESIDING COMMISSIONER BRYSON:** Did you ever see
17  him again?

18     **INMATE THOMAS:** No. Actually, I was afraid to go
19  back to the neighborhood. So, I didn't really go back
20  over there again.

21     **PRESIDING COMMISSIONER BRYSON:** How did you learn
22  that he died?

23     **INMATE THOMAS:** I seen it on the news.

24     **PRESIDING COMMISSIONER BRYSON:** And how were you
25  apprehended?

19

1        **INMATE THOMAS:**   The detective called my mother and

2   asked if I could come down for some questioning.

3        **PRESIDING COMMISSIONER BRYSON:**   Had you said

4   anything to anyone after the crime?

5        **INMATE THOMAS:**   No.

6        **PRESIDING COMMISSIONER BRYSON:**   So, you had not

7   said anything to your mother or anyone?

8        **INMATE THOMAS:**   No.

9        **PRESIDING COMMISSIONER BRYSON:**   Okay.   Did they

10   arrest you then, when you went down there for

11   questioning?

12        **INMATE THOMAS:**   Yes.

13        **PRESIDING COMMISSIONER BRYSON:**   Commissioner

14   Keenan, do you have any questions about the crime?

15        **DEPUTY COMMISSIONER KEENAN:**   None, thank you.

16        **PRESIDING COMMISSIONER BRYSON:**   Sir, is there

17   anything you'd like to add about this crime that would

18   help us understand what you were doing at that time?

19   You'll have many more opportunities to speak and we will

20   talk about your social history, but just about the crime

21   itself to clarify what went on.

22        **INMATE THOMAS:**   The only thing that I've been

23   really wanting to get across is the child.

24        **PRESIDING COMMISSIONER BRYSON:**   Okay.

25        **INMATE THOMAS:**   I never saw her.   I really never

1    saw her and that's the absolute truth.  Because, like I
2    said before, because we assumed that he was alone, or I
3    assumed he was alone, is the reason that we chose him.
4    And my mindset at that time, even if he had a child with
5    him, that wasn't brought to my attention so that would
6    of, at the time, made me shy away from that, especially
7    having a child.  And so, that's why when they told me, I
8    just, you know what I mean?  So, that's the biggest thing
9    I want to get across.  I didn't see the little girl.  I
10   didn't see her.

11        **PRESIDING COMMISSIONER BRYSON:**  Okay.  Were you
12   afraid during it?

13        **INMATE THOMAS:**  Absolutely.

14        **PRESIDING COMMISSIONER BRYSON:**  Okay.  You don't
15   have a juvenile arrest record apparently.

16        **INMATE THOMAS:**  No.

17        **PRESIDING COMMISSIONER BRYSON:**  And you were 16 at
18   the time of this arrest.  So, this is your only arrest of
19   note.  Your family background, we have that you were born
20   in L.A.

21        **INMATE THOMAS:**  Yes.

22        **PRESIDING COMMISSIONER BRYSON:**  And you're natural
23   parents James Thomas and May (phonetic) Thomas.  Now,
24   they were divorced in 2003 apparently.  Is that correct?

25        **INMATE THOMAS:**  It was before that.

21

1        **PRESIDING COMMISSIONER BRYSON:** It was before

2    that? Okay. No that's -- I'm sorry, that's your marital

3    status. You were married --

4        **INMATE THOMAS:** Yes.

5        **PRESIDING COMMISSIONER BRYSON:** -- and divorced.

6        **INMATE THOMAS:** Yes.

7        **PRESIDING COMMISSIONER BRYSON:** Not your parents.

8    Okay. So, your parents did eventually divorce, though?

9        **INMATE THOMAS:** Yes.

10       **PRESIDING COMMISSIONER BRYSON:** Okay. Was it

11   while you were still living at home?

12       **INMATE THOMAS:** Yes.

13       **PRESIDING COMMISSIONER BRYSON:** What effect did

14   that have on you?

15       **INMATE THOMAS:** Actually, at the time I was too

16   young when they separated. I was very young.

17       **PRESIDING COMMISSIONER BRYSON:** I see.

18       **INMATE THOMAS:** However, (inaudible). And so, we

19   used to have, you know, mother and father doing things,

20   going on between them. So, I would go back and forth,

21   back and forth, with my other siblings also. So, I mean,

22   it was a struggle when I was younger as far as that.

23       **PRESIDING COMMISSIONER BRYSON:** What was your

24   relationship with your father? Was it good?

25       **INMATE THOMAS:** Yes. It was good. He used to

22

1    whoop me, but it was good -- as far as a good

2    relationship, yeah.

3         **PRESIDING COMMISSIONER BRYSON:** And how about with

4    your mother?

5         **INMATE THOMAS:** Great.

6         **PRESIDING COMMISSIONER BRYSON:** Okay. Do you

7    still have both of them?

8         **INMATE THOMAS:** No.

9         **PRESIDING COMMISSIONER BRYSON:** Oh. Sorry about

10   that. Okay, did your mother ever remarry?

11        **INMATE THOMAS:** No.

12        **PRESIDING COMMISSIONER BRYSON:** Okay. Now this

13   says that you, in fact, got married. Let's talk first

14   about your high school. How far did you get in school?

15        **INMATE THOMAS:** Tenth grade.

16        **PRESIDING COMMISSIONER BRYSON:** Why'd you drop

17   out?

18        **INMATE THOMAS:** I wasn't going. I mean, I left

19   the neighborhood. At the time, I just felt as though I

20   just wanted to go and just do what I wanted to do, you

21   know. And consequently, which led me to hang out with

22   the wrong crowd. You know, my father would come and he

23   would enroll me back in school, but I would rebel again

24   after going for maybe two or three months just to get him

25   off my back and I would get back out again.

23

1    **PRESIDING COMMISSIONER BRYSON:**  Okay.

2         **INMATE THOMAS:**  And I just was really caught up in

3    between the cycle of being with him and there was no one

4    around that would -- that established with me and then

5    going back to my mother and having this whole different

6    moral understanding of what's right and what's wrong and

7    so, I'd try to come up with a reasonable in between.

8         **PRESIDING COMMISSIONER BRYSON:**  Okay.

9         **INMATE THOMAS:**  Which was my understanding, take

10   it from here, take it from there and that kind of led me

11   into a lot of different things in our relationship.

12        **PRESIDING COMMISSIONER BRYSON:**  Okay.  So, how did

13   you come to meet Tracy Michelle Bryson (phonetic)?

14        **INMATE THOMAS:**  I met her through one of my

15   friends I had in here.  We used to frequent the

16   (inaudible), we both were.

17        **PRESIDING COMMISSIONER BRYSON:**  I see.

18        **INMATE THOMAS:**  We used to pray together.

19        **PRESIDING COMMISSIONER BRYSON:**  I see.

20        **INMATE THOMAS:**  And he's talking about his wife,

21   you know, I'd like you to meet here (inaudible).

22        **PRESIDING COMMISSIONER BRYSON:**  I see.  And did

23   you have any children?

24        **INMATE THOMAS:**  No.

25        **PRESIDING COMMISSIONER BRYSON:**  Okay.  And then

1    the divorce. Was it because of your incarceration?

2        **INMATE THOMAS:** Yes, and she had two children who

3    were growing up and we were just under too much trying to

4    deal with it.

5        **PRESIDING COMMISSIONER BRYSON:** Okay.

6        **INMATE THOMAS:** So, we discussed it and came to

7    terms.

8        **PRESIDING COMMISSIONER BRYSON:** Okay, I

9    understand. Do you have any communications with her

10   today?

11       **INMATE THOMAS:** No.

12       **PRESIDING COMMISSIONER BRYSON:** You've never been

13   in the military. You received your G.E.D. in 1986.

14       **INMATE THOMAS:** Yes.

15       **PRESIDING COMMISSIONER BRYSON:** And where was

16   that?

17       **INMATE THOMAS:** In Deuel.

18       **PRESIDING COMMISSIONER BRYSON:** Deuel?

19       **INMATE THOMAS:** Tracy, in the Deuel Correctional

20   Facility.

21       **PRESIDING COMMISSIONER BRYSON:** Okay, and now this

22   says that you helped your father deliver newspapers and

23   worked in the family stores.

24       **INMATE THOMAS:** Yes.

25       **PRESIDING COMMISSIONER BRYSON:** Your father owned

25

1    stores?

2         **INMATE THOMAS:** Yes, he had a family market with

3    his brothers.

4         **PRESIDING COMMISSIONER BRYSON:** I see.

5         **INMATE THOMAS:** And back then, you had to help the

6    family with the business.

7         **PRESIDING COMMISSIONER BRYSON:** Yes.

8         **INMATE THOMAS:** Well, he had subleased

9    newspapers -- to newspaper for paper routes.

10        **PRESIDING COMMISSIONER BRYSON:** I see.

11        **INMATE THOMAS:** So we were distributing newspapers

12   in stores and also had paper routes, drops.

13        **PRESIDING COMMISSIONER BRYSON:** Okay. Now this

14   says that you smoked weed prior to the life crime but

15   denied you were intoxicated at the time of the life

16   crime. Is that case? Were you under the influence at

17   the time of the crime?

18        **INMATE THOMAS:** No.

19        **PRESIDING COMMISSIONER BRYSON:** And how about your

20   substance abuse. Do you feel that you have a problem

21   with substance abuse?

22        **INMATE THOMAS:** At this point in my life, no.

23   Thank God. I've been working on that for the past few

24   years. The past ten years I really focused on my

25   addiction. Because at the time of the crime, even though

26

1    I wasn't intoxicated I really didn't think I had a
2    problem then either. And so that cycle continued and it
3    continued and I never looked at it. I thought it was
4    something I could control. I found that the more
5    understanding I got, the more I came to understand that I
6    was actually addicted, you know. Irregardless of how
7    less I smoked or whatever, because I always looked at
8    myself as not being addicted because it's just marijuana.
9    It's nothing (inaudible) found their story was similar to
10   mine as far as the process and I started going
11   (inaudible) 12 Steps.

12            **PRESIDING COMMISSIONER BRYSON:** Okay.

13            **INMATE THOMAS:** And from there I got into NA and
14   AA and I even shyed from there because I thought it was a
15   Christian-based self-help group. That was my excuse.
16   Once I got there, I got to see that it was just people
17   who were struggling. I find myself in here so I
18   frequently went every week to NA and AA also, and I came
19   to understand I needed a little bit more than that. So
20   got me a sponsor. If I can get somebody to help me work
21   through some things and better understand and so my
22   sponsor told me about the ARC (phonetic) Program and I
23   went through a 16-week comprehensive drug treatment
24   program and it's extensive. One-on-one counseling, group
25   therapy, rehab prevention, life skills, it was very

1    extensive. And from there, once I was able to get into a
2    group and actually start helping people, I could see that
3    not only was I being helped by being there, but I could
4    also help others. Because for some reason, when you're
5    in a group of people and people start talking to you, you
6    start to hear things that you want to express, but you
7    really don't know how. And you hear it and you identify
8    and so it taught me a great deal about myself related to
9    my addition, which was the biggest thing. And from there
10   I was able to actually help myself and talk to my family
11   and apologize for some of the things I had done to them
12   when I thought I was in my right mind. And actually I
13   was in an addictive state and so I talked to my father
14   before he passed and I let him know what it was. He
15   thought it was his fault. You know, regardless of what
16   he'd done, I still went that way and I had to let him
17   know it wasn't his fault, it was all me. It was things
18   that I had done that I couldn't come to grips with, even
19   though he was telling me what I needed to do, I was
20   talking to him, I still chose to make this a part of my
21   life. And through that, I got caught up in a bunch of
22   things that he warned me about, but it didn't matter, I
23   chose it. So we talked and I gave him understanding of
24   why I did what I did and then I apologized and to my
25   mother and my family and all that came through me dealing

28

1    with my addiction.

2         **PRESIDING COMMISSIONER BRYSON:**  The other

3    robberies, what were they like?  Talk about that, how

4    many --

5         **INMATE THOMAS:**  Just a couple, same thing.  I was

6    the grabbing person and we would run off.

7         **PRESIDING COMMISSIONER BRYSON:**  Were you the

8    person that did the grabbing most of the time?  Any arms

9    involved at all, ever?  So did you have any weapons?

10        **COMMISSIONER KEENAN:**  I'm sorry.  I didn't hear

11   that answer.  I know the tape didn't get it.

12        **INMATE THOMAS:**  No, sir.

13        **COMMISSIONER KEENAN:**  Okay.  Thank you.

14        **PRESIDING COMMISSIONER BRYSON:**  Did you own a gun

15   or have one?

16        **INMATE THOMAS:**  No.

17        **PRESIDING COMMISSIONER BRYSON:**  Any other kinds of

18   weapons?

19        **INMATE THOMAS:**  No.

20        **PRESIDING COMMISSIONER BRYSON:**  Did you ever do

21   any burglaries?

22        **INMATE THOMAS:**  I took a lawnmower from a garage.

23        **PRESIDING COMMISSIONER BRYSON:**  And did you sell

24   it?

25        **INMATE THOMAS:**  Yeah.

29

1    **PRESIDING COMMISSIONER BRYSON:** And what else have
2    you done, criminally?

3    **INMATE THOMAS:** That's it.

4    **PRESIDING COMMISSIONER BRYSON:** Now did you do
5    those other robberies under the influence?

6    **INMATE THOMAS:** No, however I do think that it was
7    for the intent to go and hurt somebody, because when we
8    would discussed it I'm sure that that was part of -- part
9    of (inaudible).

10    **PRESIDING COMMISSIONER BRYSON:** How about your
11    mother? You talked about your understanding that you had
12    with your father. How about your mom?

13    **INMATE THOMAS:** My passed while I was still going
14    through the program.

15    **PRESIDING COMMISSIONER BRYSON:** And what about
16    siblings? Do you have brothers and sisters?

17    **INMATE THOMAS:** Yes.

18    **PRESIDING COMMISSIONER BRYSON:** Can you talk about
19    those, sir?

20    **INMATE THOMAS:** They were -- live out of state --

21    **PRESIDING COMMISSIONER BRYSON:** Oh.

22    **INMATE THOMAS:** When my mother passed -- my sister
23    lived with my Auntie down in Louisiana and my other
24    sister lived with my father.

25    **PRESIDING COMMISSIONER BRYSON:** Okay. Any

30

1   brothers?

2          **INMATE THOMAS**:  One.  Lamont.  That's my older

3   brother and Bernard (phonetic).  However, in '85 he left.

4          **PRESIDING COMMISSIONER BRYSON**:  Would you say that

5   again?  I'm trying to understand.

6          **INMATE THOMAS**:  They left Los Angeles --

7          **PRESIDING COMMISSIONER BRYSON**:  Right.

8          **INMATE THOMAS**:  -- to go to Louisiana and see my

9   sister, but he never made it.

10         **PRESIDING COMMISSIONER BRYSON**:  And what happened,

11  he disappeared?  I'm sorry.  And you said there was

12  another older brother --

13         **INMATE THOMAS**:  Yes.  No, my father had another

14  son.

15         **PRESIDING COMMISSIONER BRYSON**:  I see.

16         **INMATE THOMAS**:  Stepbrother.

17         **PRESIDING COMMISSIONER BRYSON**:  Are you in touch

18  with him?

19         **INMATE THOMAS**:  Yes.

20         **PRESIDING COMMISSIONER BRYSON**:  How's he doing?

21         **INMATE THOMAS**:  He's doing great.  He lives in the

22  Los Angeles area.

23         **PRESIDING COMMISSIONER BRYSON**:  Do you communicate

24  with him?

25         **INMATE THOMAS**:  Yes.

31

1        **PRESIDING COMMISSIONER BRYSON:** All right. If
2    you'll turn your attention now to Commissioner Keenan,
3    he'll talk about your post-conviction factors.

4        **COMMISSIONER KEENAN:** Okay. Now, we'll focus on
5    the Board report that was prepared for this hearing by
6    K.W. McLean, and starting in the area under custody
7    history, it notes that you were received in CDC back in
8    '83 at California Institution for Men and then you
9    transferred to DVI and then to CMC East, then here. Last
10   turn was 11/29/05. There's a listing of your self-help
11   and therapy activities. Since your last hearing, you
12   have two -- let me see if it's noted here in the Board
13   report, 4/6/06, certificate of complete -- I'm sorry,
14   certificate of commitment, San Quentin's TRUST program.
15   5/1/06, certificate of completion, Work Place Essential
16   Skills, PIA. You have several laudatory chronos, just by
17   date. And since the last hearing, you have 4/17/06,
18   7/3/06, 10/18/06 -- laudatory chronos. A total of five
19   CDC 115's. The last one was in '95 -- 10/24/95. The
20   correctional counselor lists 18 128A's, the last one
21   5/31/2000. And in the report it notes that,

22            "Thomas shows insight and expressed remorse
23            for his participation in the crime,
24            recognizes the trauma he inflicted on the
25            child of the victim and the victim's family.

| | |
|---|---|
| 1 | He's very active in participating in self- |
| 2 | help and therapy programs. He has been |
| 3 | active in AA, NA, Impact, Reach, TRUST, and |
| 4 | Developing a Positive Attitude group. He's |
| 5 | making a noticeable effort to take part in |
| 6 | any programs available to him. Thomas' work |
| 7 | reports reflect he's a good worker and he is |
| 8 | well organized. His reports reflect above |
| 9 | average to exceptional gradings. He's |
| 10 | completed vocational training in Upholstery, |
| 11 | certified Forklift Operator, certified |
| 12 | Customer Service Specialist, and has many |
| 13 | other employable skills. Thomas has |
| 14 | indicated he is willing to obtain any kind |
| 15 | of employment that is available to him. |
| 16 | Prior to release he could benefit from |
| 17 | remaining disciplinary free and continuing |
| 18 | to be involved with various substance abuse |
| 19 | groups in which he is now active." |
| 20 | And the attached post-conviction progress reports |
| 21 | notes that you're currently working in PIA.  Still |
| 22 | there? |
| 23 | **INMATE THOMAS:**  Yeah. |
| 24 | **COMMISSIONER KEENAN:**  Okay.  And notes your |
| 25 | participation in NA, AA, and Impact.  And this is all in |

1     '06 and '07.  Narcotics Anonymous and for Impact, and
2     notes 12/31/06 AA, laudatory chrono from Reach -- Project
3     Reach.  Okay.  Also in '05, PIA, AA, and NA, Reach, and
4     Impact participation, average to exceptional work habits
5     noted, that dates back to '05.  Okay.  Now, also I do
6     want to note that under self-help and therapy activities,
7     there are quite a few programs listed prior to your last
8     hearing.  I'll read through some of these, spanning from
9     '86 up to 10/3/05.  Acceptance into the Apprenticeship
10    through Stockton JATC, what is that?

11            **INMATE THOMAS**:  A Machinist program.

12            **COMMISSIONER KEENAN**:  Okay.  7/29/86, received
13    high school equivalency certificate.  7/17/92, eight-week
14    Substance Abuse Therapy.  2/27/02, certificate from PIA
15    Upholstery -- I don't know if I'd call that a
16    self-help therapy activity, but okay.  There's I think
17    there's a -- just sort of a positive (inaudible).  Okay,
18    4/30/02, certificate of completion, Forklift Operation;
19    7/1/02 to present, Reach; 7/3/02 to present, NA; 7/3/02
20    to present, AA; 9/1/02, Literacy Program; 11/22/02, Basic
21    Infectious Disease Training; 8/10/01 to 7/31/03 Milati?

22            **INMATE THOMAS**:  Yes, Milati.

23            **COMMISSIONER KEENAN**:  Milati Islamic program;
24    11/5/03, certificate of proficiency, Furniture Upholster;
25    12/17/03, certificate of achievement, Project Reach;

1    5/10/04, Decision Making and Problem Solving; 5/10/04,

2    Effective Communication; 6/7/04 and 7/6/04, Hazardous

3    Materials certificate; 5/04, certified Customer Service

4    Specialist; 10/5/04, certificate -- certificate of

5    certification, Customer Service Specialist; 2/2/05 to

6    present, Developing a Positive Attitude; 3/12/05 to

7    present, TRUST Fellows; 5/23/05 to present, the Impact

8    Program; 7/10/05, a certificate of completion for What is

9    a Man, Project Impact; 9/28/05, Inmate Employability

10   Program; 10/3/05, certificate of completion,

11   Relationships, Project Impact.  Okay.  And I did notice

12   in the C-File, 7/13/07, there's a laudatory chrono from

13   James Brown and John R. Bailey and that's from the

14   Getting it Right, Contributing to Community curriculum

15   sponsored by Volunteers of America, Bay Area, and

16   activated by Project Choice.  Okay.  And you're certified

17   to assist participants through Journal Five, Change Plan,

18   Develop Strategies for Change, Pre-contemplation stage,

19   Criminal Behavior and Denial, Contemplation Stage -- a

20   whole listing here.  What does this focus on?

21        **INMATE THOMAS**:  It's Project Choice.  Basically,

22   they came in and talking with the youth or young men out

23   of HOPE and they set up a curriculum of five journaling

24   quotes where they teach responsible safety, time

25   management, personal growth -- and so what you do out

1    there is you'll find probably five different chronos for
2    each book --
3        **COMMISSIONER KEENAN:** And I have those, 120 hours
4    of training. Is that for each book?
5        **INMATE THOMAS:** Yes.
6        **COMMISSIONER KEENAN:** Okay. So you went up to
7    book five?
8        **INMATE THOMAS:** Yes.
9        **COMMISSIONER KEENAN:** Okay. And then 6/30/07 from
10   Laura E. Bowman and that's for your AA participation and
11   notes that you've been attending,
12           "Demonstrated sincere dedication in
13           attending the group sessions and
14           interacting with members of that group in a
15           mature manner. His attendance reflects his
16           willingness to face his addiction, as well
17           as participating in his own recovery ,and
18           he's to be commended for his commitment and
19           desire for self-improvement."
20   And let's see, a chrono from the Reach Program, April 9
21   '07 from W. Reeves, Supervisor of Academic Instruction.
22   And notes that you have actively participated as a tutor
23   with Project Reach, Reach for Education Achievement and
24   Change with Help. That was throughout the first quarter
25   of '07. It's a literacy program. And you've shown a

36

1    sincere desire to helping fellow inmates expand their
2    academic knowledge and you're commended for your efforts.
3    Laudatory chrono, April 9 of '07,

4            "Inmate Thomas participated in an August 29,
5            '06 donation of $500 to provide 45 uniforms
6            for a low-income children from the West
7            Contra County Unified School District.  This
8            is a joint effort between San Quentin
9            TRUST -- which means Teaching Responsibility
10           Utilizing Sociological Training for the
11           development of incarcerated men from the
12           City of Richmond, and Richmond (inaudible)
13           Association.  Donations were matching
14           commitments from the Richmond Police
15           Department, community leaders, and
16           businesses.  The University of San Francisco
17           donated an additional $600 for school
18           supplies.  These donations brought the total
19           amount raised to more than $8,000.  Inmate
20           Thomas should be commended for showing
21           himself an asset to the community."
22   That's from Reverent A. Shoemake (phonetic).
23           **INMATE THOMAS:**  Yes.
24           **COMMISSIONER KEENAN:**  Okay.  Another chrono from
25   Laura Bowman about your NA participation.  Another

37

1    positive laudatory chrono there from Project Impact, from

2    Colette Carol (phonetic). That's dated 3/5/07. You're

3    an active participant in session five, Conflict

4    Resolution of Impact, 16-week workshop on Violence

5    Prevention with 100 percent attendance. Topics focused

6    on Defining Conflict Resolution, Peaceful Reentry After

7    Conflict, Effective Resolution Techniques and the

8    Advantages of a Violent-Free Environment. Okay. You are

9    to be commended for your participation in that, it says.

10   There's another one on 1/30/07 from the same person.

11   That's session four, a different session. And from K.J.

12   Williams, Captain, AA participation, this is 12/31/06.

13   Okay. Commending you for your participation there,

14   that's in AA. And the same person, your participation in

15   NA, that's also dated 12/31/06. And 4/4/06, Colette

16   Carol again, session 3 of Impact program. Laudatory

17   chrono from Dr. G. Mendez, Executive Director for

18   participation in -- you facilitated module one, sessions

19   one through three of the TRUST for the Development of

20   Incarcerated Men. 10/30/06, again from Colette Carol,

21   session two of the Impact program, you participated in

22   that. And Session one also from her, that was on

23   10/2/06. Okay. On January 4, '07, Deborah Sheldon. You

24   were a tutor for Project Reach in the fourth quarter of

25   '06 and this is a positive chrono for you. K.J.

1    Williams, 12/31/06, again talking about NA.  I thought I
2    saw one on that date from that person.  All right.
3    Deborah Sheldon, laudatory chrono on October 18 '06.
4    Inmate Thomas has actively participated as a tutor for
5    Project Reach again.  K.J. Williams, 9/30/06, NA
6    participation; 9/30/06 from K.J. Williams, Lieutenant, AA
7    participation.  Okay.  And from K.J. Williams, 8/21/06
8    you participated in meetings on the New Leaf on Life.
9    Okay.  Workshops for understanding of housing,
10   understanding physiological evaluations, open dialogue.
11   Workshops were conducted and facilitate by Dr. Elaine
12   Leader (phonetic), Dean of Sonoma State University,
13   Sociology Department.  You are to be commended for your
14   attendance, sharing with the group, as well as commitment
15   for self-improvement and growth.  Positive chrono on
16   7/3/06 for your work as a tutor for Reach; 6/30/06 more
17   about your NA and AA, you have two chronos there.
18   Actually, I have four chronos from the same person, K.J.
19   Williams again.  Okay and then participated in session
20   five, Impact's 16-week workshop on 6/19/06 with Colette
21   Carol.  Reverend Steven A. Barber (phonetic), Catholic
22   Chaplain, 5/29/06, commended for commitment as a
23   candidate for the Kyros (phonetic) Men's Retreat, 36
24   hours retreat.
25            "Subject actively participated in sharing

1              experiences with outside community

2              volunteers working on a retreat.  Retreat

3              consisted of many talks and discussions in

4              small groups where subject, other

5              participating inmates, and volunteers took

6              turns sharing life stories, strengths and

7              weaknesses.  Topics also included

8              meditations and discussions based on the

9              practice of Christianity, life experiences

10             of Jesus Christ.  Those who completed the

11             Kyros retreat are expected to be active in

12             Kyros programs hereafter and to be a role

13             model in their daily lives."

14   To be commended for your willingness to make a commitment

15   toward renewal of your life at this Kyros retreat.  Okay.

16   5/22/06, session four, Impact.  There's 4/17/06, more of

17   the Impact program.  You went all through that again in

18   that time period?

19        **INMATE THOMAS:**  It was like eight sessions, so

20   I've only gone through four so far.  That's why you keep

21   seeing chronos come back up.

22        **COMMISSIONER KEENAN:**  Okay, 4/17/06, from

23   Deborah Sheldon, more work as a tutor, project Reach;

24   3/31/06, AA participation; 3/31/06, NA participation.

25   3/27/06, more work in the Impact program; 2/6/06, Impact

1    program. Okay, on 12/30/05, NA; 12/30/05, AA. Laudatory
2    chrono again for the TRUST program. All right.
3    Dr. G. Mendez, along with other people. Participated
4    in -- actually, you know what -- okay. That's all since
5    your last hearing, okay. So a bit more than was noted in
6    the Board report, quite a bit more.

7        **INMATE THOMAS:** Yes. The Board report was done
8    when I was supposed to go to the Board in January of this
9    year.

10       **COMMISSIONER KEENAN:** Okay.

11       **INMATE THOMAS:** They gave me -- even though I've
12   had three different Board hearings -- I mean dates
13   scheduled.

14       **COMMISSIONER KEENAN:** Okay. I have several
15   certificates here. There's the high school equivalency,
16   that's back in '86. Some of these, I already commented
17   on, but I have the certificates here. I think I've
18   commented on them all, actually. Workplace Essentials,
19   Volunteers of America; what is this about, this
20   Volunteers of America, 120 hours facilitator training in
21   Getting it Right?

22       **INMATE THOMAS:** Project Choice. You discussed it
23   earlier.

24       **COMMISSIONER KEENAN:** Oh, okay. Here's the
25   certificate for the Fork Lift Operation - Operator, that

1    was back in '02, 4/30/02. Certified Customer Service
2    Specialist that was October 5 '04. Certificate of
3    proficiency, as a Furniture Upholster, that was on
4    11/5/03, 2400 hours plus. Here's something I don't quite
5    understand, okay. The PIA certificate of proficiency has
6    2400 hours plus, right? Then you have the certificate
7    for occupational title and classification; James Thomas,
8    Assistant Lead Man Upholster. It says hours, it's like
9    13,455, dated earlier than that, 2/27/02.

10         **INMATE THOMAS:** Well one went to Sacramento, and
11   one was just given by Superintend PI -- so they only give
12   you so many that went over to Sacramento, they went back
13   from the time I started up to the present date.

14         **COMMISSIONER KEENAN:** Oh, okay. All right. Same
15   type of work? Furniture Upholstery.

16         **INMATE THOMAS:** Yeah.

17         **COMMISSIONER KEENAN:** And also I note that your
18   skill level is listed as skilled which is the highest
19   ranking. Okay. And Basic Infectious Disease Training,
20   completion of that 11/22/02. Certificate of excellence
21   for special efforts made helping your peers advance their
22   academic skills, Sheldon -- okay, project reach. Another
23   certificate from Project Reach, December 17, '03. You
24   worked with them. January 5, '05 another certificate
25   from Project Reach. Tenth day of July of '06, module

42

1    one, What is a Man, that's through Project Impact.

2    Certificate of completion.  Module four, relationships,

3    Project Impact, 10/3/05.  Module two, violence

4    prevention, Project Impact, the 26th of March of '07,

5    completed that.  Certificates from Keep the Trust.

6    Member in good standing, I guess, that's what this is

7    about.

8            **INMATE THOMAS:**  Yeah.

9            **COMMISSIONER KEENAN:**  Participation in Trust.  I

10   don't see a date on it.  And there's a couple of them.

11   There's one on April 6th of '06, commitment to that

12   program, the Trust Program.  And you have two letters

13   here from PIA.  One is November 6, of '07 --

14           **INMATE THOMAS:**  Yeah, November '07.

15           **PRESIDING COMMISSIONER BRYSON:**  We're not done

16   yet.

17           **COMMISSIONER KEENAN:**  Thank you.  Okay.  That

18   should be '06, right.  I have two from November 6 of '06.

19   Okay.  From two different people.  One is from R. Roran,

20   Supervisor.  He says,

21                "This letter is to acknowledge performance

22                and attitude of inmate James Thomas, Board

23                of Prison Hearings appearance February of

24                '07.  I've known inmate Thomas for eight

25                years and in that time I've come to know

```
 1              him, inmate Thomas carries himself in a
 2              very respectable manner and that he would
 3              treat staff members and inmates alike in
 4              the same manner.  Being assigned to PIA,
 5              Prison Industry Authority, I've had a lot
 6              of opportunity to work closely with many
 7              inmates as a Desk Assembly and Wood Chair
 8              supervisor.  I have the opportunity to
 9              observe many behaviors and I have been in
10              corrections for 11 years.  As a lead man,
11              inmate Thomas is critical in the day-to-day
12              operations of the various tasks in the area
13              of desk assembly and other areas with the
14              prison industries' complex.  Mr. Thomas has
15              proven to be highly efficient and
16              professional in the performance of his
17              duties.  He's extremely knowledgeable in
18              the vast area of compound and parts and he
19              has continuously worked to reach a level of
20              high proficiency.  Mr. Thomas has
21              demonstrated a desire and a willingness to
22              help Prison Industries meet their
23              schedules.  Mr. Thomas is a very conscious
24              person -- "
25    I assume he means conscientious.
```

44

1          **INMATE THOMAS**:  Yes.

2          **COMMISSIONER KEENAN**:  Okay.

3               " -- person who has proven to work well

4          under pressure situations and changing

5          conditions.  He continuously refines his

6          skills and demonstrates his excellent sense

7          of leadership and teamwork.  Mr. Thomas has

8          a unique way of being able to prioritize

9          his time and duties to ensure the most

10         effective use of time.  His professionalism

11         is continually demonstrated when working

12         with staff and fellow inmates.  Mr. Thomas

13         realizes the importance of integrity,

14         accountability and responsibility as it

15         applies to him as well as his fellow inmate

16         workers.  He is an excellent example of

17         someone who has applied and prepared

18         himself for reintegration into our society

19         by his strength of character and job

20         skills, sense of professionalism, and

21         excellent work habits.  Should you have any

22         questions regarding inmate Thomas, please

23         feel free to contact me at -"

24    And there's a number.  And he has also from PIA,

25    J. Robinson, Correctional Officer.

45

1           "This letter is to acknowledge that Thomas'
2           positive attitude and character of inmate
3           James Thomas for the Board of Prison
4           Hearings for January '07. I have known
5           inmate Thomas for 13 years and first became
6           acquainted with inmate Thomas in '94 when I
7           was the custody officer for PIA. At that
8           time, Mr. Thomas carried himself in a very
9           respectable manner and he treated staff and
10          inmates alike, which is why I am moved to
11          write this letter. Over the years,
12          Mr. Thomas has proven to be a multi-tasking
13          individual. He's always been helpful and
14          self-motivated. I have observed him
15          function in many work positions and always
16          grows to be a leader in that position.
17          Mr. Thomas' character is unquestionably
18          among those whom I much respect for -- have
19          much respect for. And his relationship
20          with staff and inmates always remained
21          professional and pleasant. I believe that
22          the qualities that this individual
23          possesses would be very beneficial to
24          society and specifically his community when
25          released. During these years I've observed

46

1               Mr. Thomas' development and intent -- and
2               intensive on-the-job training and I feel
3               that Mr. Thomas is an excellent example of
4               someone who has the necessary skills to
5               integrate back into society.  In observing
6               Mr. Thomas' demeanor, people skills and PIA
7               work record, I believe he has the skills
8               needed to be a productive and responsible
9               citizen.  As a correctional officer of over
10              20 years, I commend this individual on his
11              abilities, positive attitude, and ambition.
12              Should you have any questions, feel free to
13              contact me."

14   Okay.  I know you have a book you've prepared.  Some of
15   this is overlapped as I go from section to section.  And
16   I'm not sure if I'm missing anything or if you feel that
17   there's something I need to highlight that I haven't
18   talked about.

19          **INMATE THOMAS:**  For the most part, you've covered
20   pretty much everything, however, that was for the benefit
21   of -- if there's anything left out, then I put everything
22   together just in case, sectioned it all so if you ever
23   wanted to go back, you'd know exactly where to go, where
24   to reference.

25          **COMMISSIONER KEENAN:**  Okay.  All right.  And I

1    don't often see these books assembled like this.  It's
2    quite nice, it's nice to see that somebody cares enough
3    to actually keep all their paperwork together, arrange it
4    in a nice orderly fashion.  I'll have a C-File this thick
5    and somebody will say, well, it's in there somewhere.

6          **INMATE THOMAS**:  Yeah.  That was the purpose of
7    making --

8          **COMMISSIONER KEENAN**:  This is much nicer.  Okay.
9    All right.  We're going to move over to psychiatric
10   report and this is authored by Richard Starrett,
11   S-T-A-R-R-E-T-T, Contract Forensic Psychologist, dated
12   5/4/07.  And he notes that there were certain questions
13   proposed by the most recent November '06 BPH, Board of
14   Parole Hearings, and that he was to address the
15   following:

16              "Prisoner's violence potential to the
17              community, significance of alcohol and
18              drugs as it relates to commitment offense,
19              and an estimate of prisoner's ability to
20              refrain from use/abuse of same when
21              released, the extent to which prisoner has
22              explored the commitment offense in
23              identifying the underlying causes and the
24              need for further therapy programs while
25              incarcerated."

48

1    The Axis II didn't render an opinion.  There was an
2    assessment of your mental status, I didn't see any
3    problems noted.  He notes there was a slight impairment
4    in short-term memory.  Under institutional programming,
5    he goes over various topics, most of which we've covered.
6    Says you were in PIA as a Warehouse Manager, you've been
7    there for 13 years.  Also worked in a shoe factory.
8    Again you told me most of your jobs resulted in being a
9    supervisor level or foreman.  Inmate's work ratings have
10   been -- always been above average.  You've been in AA and
11   NA for the last five years.  You started getting
12   substance abuse treatment back in '97.  It's been a total
13   of about seven years of treatment.  Currently in a number
14   of self-help groups, including the TRUST group for four
15   years, Impact group for three years, Choice for three or
16   four months, ARC for the last six months.  Inmate started
17   doing self-help in 2000.  Has completed about 15 to 20
18   groups.  Inmate is active in his religion and they meet
19   weekly.  Sound accurate?

20          **INMATE THOMAS**:  Yeah.

21          **COMMISSIONER KEENAN**:  Okay.  Under insight, self-
22   assessments, he notes that you report what your strengths
23   are, that you understand yourself, you're outgoing,
24   willing to listen, understands other people's situations.
25   Inmates weaknesses; continues to be his addiction,

49

1    procrastination, and he continues to build his character.
2    That was something you told him or something --
3         **INMATE THOMAS**:  Yes, something I told him.
4         **COMMISSIONER KEENAN**:  Okay.  It says,
5              "Inmate takes pride in realizing he has an
6              addiction problem and being able to help
7              others.  The inmate's biggest change is
8              that he's learned to love other people and
9              describes himself as a selfish person
10             prior."
11   The doctor talks about your parole plans, finds them to
12   be feasible and appropriate.  Talks about the crime, your
13   understanding of the life crime.  Excuse me.  He goes
14   through the underlying facts, which are basically as
15   you've told us here today.  Also notes,
16             "When asking the inmate about the loss of
17             life and effect on the victim's family, the
18             inmate states it took a long time to look
19             at this issue.  He said he lost his mother
20             and for the first time realized the
21             devastating effect the loss of a family
22             member can have on a family.  He says this
23             is a ripple effect.  It happens when
24             there's a loss like this.  He was the
25             breadwinner of the family, he had small

| | |
|---|---|
| 1 | children. His daughter had to be raised |
| 2 | without him, his wife had to become a |
| 3 | single mother and provide for her family. |
| 4 | This must have affected the family for |
| 5 | years. When asking the inmate how one |
| 6 | makes restitution for something like this, |
| 7 | the inmate states, 'Well, we try to give |
| 8 | back and help someone else. There's |
| 9 | nothing that I can do for the family |
| 10 | directly, I'm trying to make positive |
| 11 | impact in other areas and trying to make |
| 12 | amends for what I did.' When asking the |
| 13 | inmate how he changed so that something |
| 14 | like this would not happen again, he said |
| 15 | 'I understand what I've done the |
| 16 | consequences. I look at the big picture |
| 17 | now and look at the impact on people. I'm |
| 18 | positive and I've changed my mindset. I |
| 19 | take responsibility for my actions and take |
| 20 | other people's perspective into account.' |
| 21 | I asked the inmate what corrective action |
| 22 | he's taken; the inmate states, 'I talked |
| 23 | about the crime, I try to help others and I |
| 24 | allow people to help me.' When asking the |
| 25 | inmate about the discrepancy between the |

| | |
|---|---|
| 1 | file account and his account, in which the |
| 2 | victim's daughter says he was the shooter, |
| 3 | the inmate says 'I take responsibility for |
| 4 | the crime.  I never saw the young child |
| 5 | with him.  At the time I was scared, |
| 6 | excited and got caught up in the moment. |
| 7 | She may have been mistaken.'  The inmate |
| 8 | goes on to say 'I was the one who ran up |
| 9 | and grabbed him, but I didn't have the |
| 10 | gun.'  The inmate states 'his crime partner |
| 11 | never got caught.  I gave them a |
| 12 | description, but an arrest wasn't ever |
| 13 | made.' |

14  Mental health concerns or personality disorders, the
15  doctor notes there are no serious mental -- there's no
16  serious mental illness, however the inmate meets the
17  diagnostic criteria for other substance abuse.  He has
18  used both alcohol and drugs.  Axis I:  Other Substance
19  Abuse, in remission.  Axis II:  Personality Disorder NOS
20  Diagnosis.  Okay.  Axis V:  Global Assessment of
21  Functioning of 80, that would be on a scale of 1 to 100.
22  Previous evaluation summaries.  It goes over past
23  evaluations by other evaluators.  In '03 you were viewed
24  as a low risk for violent behavior.  In '82 -- I'm sorry,
25  '03 low risk for violent behavior.  In '02, average to

Case 3:08-cv-02938-JSW    Document 1    Filed 06/12/2008    Page 74 of 102

1   low -- average to low average degree of risk for violent
2   behavior when compared to average inmates.  Back in '98,
3   you were assessed when compared to an average inmate as
4   having a potential for violence that was probably below
5   average.  And I won't go back over all of them.  There's
6   a list of them going back to '84.  Then there's a section
7   on violence risk assessment and conclusions.  And he goes
8   over several tests, years, and just to note some of this.
9   The HRC-20 used to rate inmates records and current
10  interview for level of risk for future violence, and
11  concludes the overall potential for future violence is in
12  the low range.  Based on historical and social factors,
13  clinical insight factors and risk factors when compared
14  to similar inmates.  The LS/CMI, recidivism was ranked as
15  low.  Overall risk assessment, inmate's potential for
16  future violence is in the low range when compared to
17  similar inmates.  Inmates' general recidivism is low.
18  Psychopathic -- inmate's psychopathy is low or at the 7.9
19  percentile.  Talks about significance of alcohol and
20  drugs as it relates to the commitment offense and an
21  estimate of prisoners ability to refrain from the use or
22  abuse of the same when released, and he states,
23          "The inmate began using both alcohol and
24          marijuana at a young age.  Neither alcohol
25          nor drugs were involved in the controlling

| | |
|---|---|
| 1 | offense.  He had no arrests in this area. |
| 2 | The inmate understands the problems from |
| 3 | his use was due to family problems, |
| 4 | fighting between his parents and his |
| 5 | mother's friends using drugs.  He was also |
| 6 | looking for acceptance among his friends in |
| 7 | dealing with family stress.  The inmate |
| 8 | readily acknowledges his substance abuse |
| 9 | was a problem.  He has been clean and sober |
| 10 | now for 11 years.  He understands the steps |
| 11 | and understands the lifelong need for |
| 12 | treatment.  The inmate states he has taken |
| 13 | corrective action by admitting and telling |
| 14 | other people what he was going through.  He |
| 15 | shares his story and he lives with the |
| 16 | consequences of his actions.  It is |
| 17 | recommended that the inmate continue in |
| 18 | ongoing substance abuse treatment while |
| 19 | incarcerated and that it be an intrical |
| 20 | part of his parole plans." |
| 21 | Okay, then the doctor talks about the extent which the |
| 22 | inmate has explored the commitment offense and comes to |
| 23 | terms with the underlying causes.  It says, |
| 24 | "The inmate can identify a number of |
| 25 | reasons why he was getting into trouble as |

1          a youth, although never arrested.  He liked
2          looking for attention and being a class
3          clown.  He has identified the causes for
4          his use of alcohol and drugs, as discussed
5          in the prior section.  The inmate
6          recognizes that in the controlling case he
7          was trying to impress this guy from the
8          neighborhood.  He was seeking acceptance.
9          It was not for money, except for the crime
10         partner.  He willingly discusses the
11         discrepancy between the file account and
12         his account.  He states that he was not the
13         shooter, but clearly takes responsibility
14         for his behavior and being there.  He
15         expresses remorse.  It is unlikely that a
16         requirement for further exploration of the
17         incident offense would produce a more
18         significant behavioral change for positive
19         or social nature in the inmate."
20   Okay.  The need for further therapy programs while
21   incarcerated, another topic the doctor talks about.  It
22   says,
23         "The inmate does not currently present as a
24         candidate for noteworthy change as a result
25         from psychotherapy, from which he was been

55

```
1               precluded by virtue of his general
2               population status.  It is recommended that
3               he continue in self-help, substance abuse
4               treatment, and his religion."
5      And finally the section on the Axis II diagnosis and
6      opinion.
7               "The inmate meets the diagnostic criteria
8               for personality disorder, NOS with
9               antisocial traits.  The inmate began
10              getting into trouble and using drugs at a
11              young age, culminating in this controlling
12              case at the age of 16.  He also has had
13              multiple disciplinaries while in prison
14              during 1995.  He, however, does not have
15              multiple arrests prior to age 15, thus does
16              not qualify for a conduct disorder, nor
17              does he have a diverse adult arrest
18              history, antisocial personality disorder.
19              Despite the inmate's past antisocial
20              traits, all three-risk assessments scored
21              him in the low risk.  Inmate's level of
22              psychotropic is low or at the 7.9
23              percentile with the personality traits in
24              the 1.4 percentile and past antisocial
25              traits at the 30.7 percentile.  Inmate's
```

1               overall potential for future violence is in

2               the low range.  Past historical antisocial

3               factors, clinical insight factors, and risk

4               factors when compared to similar inmates,

5               inmate's general recidivism is low."

6       Is there anything you'd like to say about that report?

7               **INMATE THOMAS:**  No, sir.

8               **COMMISSIONER KEENAN:**  Okay.

9               **PRESIDING COMMISSIONER BRYSON:**  All right.

10      Thanks.  Did you get a chance to review that report?

11              **INMATE THOMAS:**  Yes.

12              **PRESIDING COMMISSIONER BRYSON:**  Okay.  As to your

13      plans for parole.  As to a residence, I see that you have

14      letters from Walden House and that would be one of your

15      plans, transition housing.

16              **INMATE THOMAS:**  Yes.

17              **PRESIDING COMMISSIONER BRYSON:**  Where would that

18      be?  In San Francisco or L.A.?

19              **INMATE THOMAS:**  They have one in each.

20              **PRESIDING COMMISSIONER BRYSON:**  Right.

21              **INMATE THOMAS:**  And so I was planning to keep my

22      parole in Northern California, not to go back to Los

23      Angeles County because most of my resources and people

24      that I know are up here.  I've been up here almost all of

25      my incarceration.

1      **PRESIDING COMMISSIONER BRYSON:**  I see.  And I see
2  that in your letters and that's why I'm asking.

3      **INMATE THOMAS:**  Yeah.

4      **PRESIDING COMMISSIONER BRYSON:**  We do have a 2006
5  letter from Walden House.  Is that the most current one
6  on this --

7      **INMATE THOMAS:**  Yes.

8      **PRESIDING COMMISSIONER BRYSON:**  Okay.  And this is
9  as of October 2006.

10      **INMATE THOMAS:**  Yes.

11      **PRESIDING COMMISSIONER BRYSON:**  And it says that
12  you have been found to be an acceptable candidate for
13  entry to the Walden House Substance Outpatient Use
14  program upon his completion for the residential program.

15      **INMATE THOMAS:**  Yes.

16      **PRESIDING COMMISSIONER BRYSON:**  And were you --
17  you want to add something to that?

18      **INMATE THOMAS:**  Well, no, my sister, she talked to
19  the Director in January.

20      **PRESIDING COMMISSIONER BRYSON:**  All right.  Let me
21  look at that as well.  Okay.  This is from your sister,
22  January 4, 2007, and we do have another letter from her
23  I'm aware of we'll be going over in a moment.  But Pamela
24  Bullock, B-U-L-L-O-C-K, your sister.  She says she's been
25  in constant contact with you.  She's married, mother of

1    two living in the Lancaster, California area and she said
2    she works at Countrywide Financial.  My family and I are
3    members of the Desert Church and you've complied with all
4    the requirements to meet parole.  She says that you are a
5    candidate for entering the Walden House in the San
6    Francisco area and she says,
7                "I spoke to Lee Boone, B-O-O-N-E,
8                personally, he's in the opinion that James
9                is ready for reentry to society.  Wayne
10               Garcia (phonetic)—"
11   And this is the letter we do have a copy of,
12               "Wayne Garcia of Walden House, James would
13               be welcome there also.  I spoke with him
14               directly."
15   And let me give that back to you, it's the original.  All
16   right.  And that does appear to be a good plan for you.
17   We also have a character reference letter that's written
18   by Lee Boone, who's a registered addiction specialist,
19   reentry coordinator for Walden House.  He talks about
20   assisting you to stay on the right track, that you would
21   utilize a six-month to a year program in either San
22   Francisco or L.A. Walden House residential program.  And
23   it says,
24               "Mr. Thomas will be provided one-on-one
25               counseling, able to utilize a support

59

1           network, positive directions equals change

2           and also the volunteer for positive

3           directions equals change assisting me with

4           the homeless project and involving him in

5           other projects such as mentoring the

6           youth."

7    Very good.  There's other materials as well regarding

8    scheduling and activities.  Also, I note that you put

9    together a resume, which is excellent.  One page is

10   excellent, sometimes we see five pages, but the one page

11   is definitely superior and gets people's attention.  It's

12   very well done.  And then we have a job offer from a

13   Mr. Stan Keller, K-E-L-L-E-R, of January 11, 2007.  He's

14   the principal owner of California Building and

15   Development.  It says he's been in the construction

16   industry for over 20 years.

17           "My company does projects in commercial as

18           well as residential fields.  We are

19           currently working on remodels, room

20           additions and tenant improvements.  We're

21           also capable of building from ground up.

22           Our office is located in San Jose,

23           California."

24   He met you when he was involved with Fitland (phonetic)

25   Ministries and you performed a play and thought your

60

1    attitude referenced change, you were very sincere. He
2    feels that you'll be an asset and he says we would be
3    working in various parts of the Bay Area since projects
4    are not in just one set place. We also have a character
5    reference letter from James Brown, Project Manager of
6    Volunteers of America. This is in Alameda. It talks
7    about project Choice, it was reviewed by Commissioner
8    Keenan earlier. And he talks about your being a
9    facilitator for Project Choice. Now you're a facilitator
10   for a couple different programs, aren't you?

11         **INMATE THOMAS:** Yes.

12         **PRESIDING COMMISSIONER BRYSON:** All right. What
13   do you do as a facilitator for Project Choice?

14         **INMATE THOMAS:** We teach the books that we have,
15   plus we go through the training as far as the journaling
16   books, which talks about the book and so my job is to
17   actually take the book, get in front of the class and
18   actually go over the materials with the class and what
19   helps a lot is my background, because I deal with
20   gentleman from 19 to 25 that we actually work with.
21   Because they're just getting started, they're going back
22   to the street, we try to show them how the thinking that
23   they have and the value that they use when they're out
24   there led them here. And so in order to change what
25   you're going to get in the future, you have to change

1    your thinking. And we try to show them the thinking in
2    the situation that got them into trouble and have them
3    actually look at what it was that they did wrong. We
4    explain it to them, let them explain it to us, and then
5    walk through it with them, and I give them my story and
6    show them how, you know, from here, how I led myself to
7    here, and it didn't take long, from 13 or 14 years old to
8    16 years old. And this is where I've been for the past
9    25 years. And so not to get caught up in that cycle. I
10   go over my story and my thinking errors and so they're
11   more susceptible to look at things, and to walk through
12   because a lot of it is personal information and so they
13   go over and talk to another inmate than they are to
14   (inaudible), so that's what they use us for, there's four
15   of us and we take the time to go over the materials with
16   them.

17            **PRESIDING COMMISSIONER BRYSON:** Okay. And you are
18   a facilitator for TRUST program.

19            **INMATE THOMAS:** Yeah.

20            **PRESIDING COMMISSIONER BRYSON:** And that's
21   different, right?

22            **INMATE THOMAS:** No, not necessarily. What it is,
23   it just caters to everyone instead of being a specific
24   age range or -- the TRUST is for incarcerated men. We
25   basically go through the same thing, but we have three

1   sessions prayer sessions, lifestyle, behavior, integrate
2   to parole, what we're going to do once we leave here.
3   And it's the same thing. Our approach is looking at your
4   values, comparing those with the TRUST values and seeing
5   how they managed, how they weigh up, because we believe
6   that lifestyle and your behavior stems from your values.
7   And so if your values are street values then you can
8   expect your behavior to be street behavior. And so if
9   you change that -- your values, then you can dictate the
10  way your life will continue to be in the future. But you
11  have to have good values.

12      **PRESIDING COMMISSIONER BRYSON:** How successful do
13  you think the program is?

14      **INMATE THOMAS:** As of now, it's looking pretty
15  good, because we've had about four clients leave and
16  they're all pretty successful.

17      **PRESIDING COMMISSIONER BRYSON:** And no returns, is
18  that right?

19      **INMATE THOMAS:** Not at all. And they're all doing
20  well. We keep in constant contact with them, they're
21  doing well.

22      **PRESIDING COMMISSIONER BRYSON:** Okay. We have a
23  letter from a Dr. Gary A. Mendez Jr., that's M-E-N-D-E-Z,
24  February 6th of 2007 and this is the National TRUST, the
25  development of African American, and he writes that he's

1    supporting your release. Feels you've been a value to
2    members working the TRUST and turning liabilities into
3    assets and he talks about the plan for you at a Walden
4    House in L.A. or San Francisco and he says he will assist
5    him in getting employment through our community partner,
6    Volunteers of America. And then we have a letter from
7    Carlene Gepner, G-E-P-N-E-R, dated 15th of September 2006,
8    from Goodwill Industry talking about they don't have the
9    training -- we don't do the training ourselves, she says,
10   and you can come in and then they'll tell you what's
11   available at that time and there's a metro brochure.
12   Then we have other brochures as well. We have a letter
13   from - that I was alluding to earlier, your sister
14   Pamela Bullock, dated December 12th, 2006, talking about
15   how successful you've been on the inside and she says you
16   always have a place to stay within my home, with my
17   family. My husband and I have a home and we are also
18   willing to find him employment as well as to help him
19   will all things associated to reentering to society. So
20   that would be in Southern California?

21          **INMATE THOMAS:** Yes.

22          **PRESIDING COMMISSIONER BRYSON:** Okay. So you're
23   sort of planning for either possibility. Okay. Then we
24   have a letter from your brother Lamont Thomas,
25   L-A-M-O-N-T. This is dated November 9th of 2006. He

1    writes as your brother.  He says,

2              "Since the passing of our father, I've made
3              it my duty to make sure my brother has a
4              safe and secure home to return to when he is
5              released from Walden House.  I've even moved
6              from the City of Lancaster to the City of
7              Los Angeles in order to be in accordance
8              with Board of Prison Terms' request.  I want
9              you to know I'll do everything in my power
10             to ensure my brother is successful in
11             staying out of prison and out of trouble.
12             I've only know, all of my life, my brother
13             as a prison, and states it's time for me to
14             know him as my brother helping me deal with
15             life out there in the real world.  Without
16             our father to guide me, I'm going to need my
17             big brother to show me how to be a good man
18             and responsible person."

19   He talks about the unforgivable act that you committed
20   and he feels its time for him to take custody of you.  We
21   have also have a letter from Dr. Kimberly D. Richmond
22   (phonetic) November 17, 2006 in supporting your request
23   for parole.  She says,

24             "I have known James for nearly three years
25             in my capacity as sponsor and Executive

65

```
1                Advisor for the San Quentin TRUST for the
2                development of incarcerated men."
3    She talks about the TRUST.
4                "I know him as a strong and respectful
5                person with considerable conviction.  I do
6                not believe he poses no threat, he's paid
7                his debt to society."
8    She's also a professor of Sociology and Criminology at
9    the University of San Francisco and she says,
10               "I am well-versed in the challenges faced
11               by inmates when they reenter society upon
12               parole."
13   And that's why she became a sponsor for the TRUST.  She
14   says,
15               "I've seen James's involvement and
16               commitment, not only to the mission of the
17               TRUST and its classes, but to make a
18               positive change in his own life and the
19               life of others."
20   And it talks about the various programs in which you
21   participated.  She feels you have been transformed from a
22   liability to an asset.  And we have a September 14, 2007
23   letter from Michael A. Lacson, L-A-C-S-O-N, Case Manager
24   for Volunteers of America.  And he says,
25               "I'm a case manager coach providing
```

1          prerelease services to young men
2          transitioning from the California
3          Department of Corrections, San Quentin
4          facility, into their respective
5          communities. We offer job placement,
6          mental and physical health for long-term
7          support, etcetera."
8     It talks about how you got clients to move beyond their
9     past destructive experiences.
10         "I've spent countless hours with Mr. Thomas
11         observing him during our classes, one-on-
12         one sessions and interactions in the
13         general population and sponsor meetings.  I
14         believe Mr. Thomas has made significant
15         changes and is very determined to make a
16         positive new beginning of his life if given
17         the opportunity."
18    It says you've been a model client, you're true to your
19    word, has dramatically reshaped his way of thought and
20    outlook on life.  This is a letter from (inaudible).  We
21    have a letter of support from Dr. Arnold Chavez,
22    C-H-A-V-E-Z, December 5, 2006.  He is a member of the
23    TRUST fellowship.  He says he met you more than four
24    years ago and talks about the health fair that was
25    conducted here.  And he says that you should be viewed

67

1    in a positive light and parole consideration.  Now there

2    is a closing statement here which you may elect to read

3    or we can take into submission during our deliberations

4    and you can speak otherwise.  Now have I missed any

5    parole plans?

6        **INMATE THOMAS:**  No, you haven't missed any.  The

7    only thing I'd like to add is Volunteers of America would

8    drop me off another letter about housing, however,

9    something happened in the fax -- the fax other day and it

10   had to go out, I'm not sure if it made it back in or not,

11   but there was another letter of acceptance.

12       **PRESIDING COMMISSIONER BRYSON:**  I see.  And where

13   would that be?

14       **INMATE THOMAS:**  In Hayward.

15       **PRESIDING COMMISSIONER BRYSON:**  In Hayward, okay.

16   I see.

17       **INMATE THOMAS:**  Yeah.

18       **PRESIDING COMMISSIONER BRYSON:**  All right.

19       **INMATE THOMAS:**  (inaudible)

20       **PRESIDING COMMISSIONER BRYSON:**  Okay.  All right.

21   Commissioner, did you have any issues that needed to be

22   discussed?

23       **COMMISSIONER KEENAN:**  I did want to ask you a

24   couple more things and thank you.  Looking at some of the

25   past documents going through the C-File, I saw you

68

1    completed the Hazardous Materials Course, right?

2         **INMATE THOMAS:**  Yes.

3         **COMMISSIONER KEENAN:**  Also CAT X (phonetic)

4    program?

5         **INMATE THOMAS:**  Yes.

6         **COMMISSIONER KEENAN:**  Okay.  How long was that?

7         **INMATE THOMAS:**  In 1991.

8         **COMMISSIONER KEENAN:**  Was that a year program or

9    what?

10         **INMATE THOMAS:**  The CAT X was only 90 days, three

11    months.

12         **COMMISSIONER KEENAN:**  Oh, 90 days, okay.  All

13    right.  And I also saw a reference in -- oh, here it is.

14    One of the earlier Board reports, it mentions commended

15    for completing the Vocational Machine Shop.  Did you

16    actually complete the Vocational Machine Shop?

17         **INMATE THOMAS:**  Yes.

18         **COMMISSIONER KEENAN:**  Okay.

19         **INMATE THOMAS:**  That's what led me into the

20    apprentice program.

21         **COMMISSIONER KEENAN:**  You wouldn't happen to

22    have -- is there a certificate in here on that?

23         **INMATE THOMAS:**  No, it got lost in my travels.

24         **COMMISSIONER KEENAN:**  Because I didn't see it --

25         **INMATE THOMAS:**  Yeah.

69

1        **COMMISSIONER KEENAN:** -- in the file.

2        **INMATE THOMAS:** It should be a chrono or something
3    in there indicating --

4        **COMMISSIONER KEENAN:** Yeah. I'm sort of -- once I
5    saw that, I sort of was scrambling around in here and
6    looking for it in here and I'm not -- do you remember
7    approximately when it was?

8        **INMATE THOMAS:** I think 1986.

9        **COMMISSIONER KEENAN:** In '86, okay. Well, I do
10   see a chrono in -- let's see, 3/15/87 where actual work
11   consisted of Vending Machine Operator, I don't know if
12   that would be it, but it says --

13       **INMATE THOMAS:** That was after.

14       **COMMISSIONER KEENAN:** It was after. Okay. It
15   says inmate Thomas has multiple skills and knowledge on
16   that one.

17       **INMATE THOMAS:** I was working as a Machinist then.

18       **COMMISSIONER KEENAN:** You're saying in '86, huh?

19       **INMATE THOMAS:** In '85, '86 I was a Machinist.

20       **COMMISSIONER KEENAN:** Metal Shop, work supervisor
21   report, Laborer. Vocational Educational, okay, Machine
22   I, '86. Mr. Thomas in enrolled in the apprentice
23   program --

24       **INMATE THOMAS:** Yeah.

25       **COMMISSIONER KEENAN:** -- he continues to show

1    increased interest in the trade, displays leadership
2    potential and is very cooperative. His academic skills
3    are increasing. He's a good student. He is employable.
4    Then right before that, 12/30/85; he is not yet
5    employable.

6         **INMATE THOMAS:** It was a 2400-hour course.
7    Because of the apprenticeship program, I stayed
8    significantly over until the program ceased to be funded.

9         **COMMISSIONER KEENAN:** Would it be fair to say you
10   have entry-level skills?

11        **INMATE THOMAS:** Yes.

12        **COMMISSIONER KEENAN:** Okay. Also you claim to
13   complete Vocational Electronics, yet there's nothing to
14   confirm that, but I did see you participated in
15   Vocational Electronics, though.

16        **INMATE THOMAS:** Yes.

17        **COMMISSIONER KEENAN:** Okay. How long were you in
18   that program?

19        **INMATE THOMAS:** I think a year and a half, but
20   they shut the class down. So, in that process, I didn't
21   complete the entire course, it was on a certain area,
22   small appliances, they certified me as -- the students
23   would enroll in specific areas.

24        **COMMISSIONER KEENAN:** Okay. I'm not sure I
25   remember that, but I thought I made mention of eight

71

1    achievement certificates.  Does that sound approximately
2    right?
3         **INMATE THOMAS:**  I think it was that maybe.
4         **COMMISSIONER KEENAN:**  Okay.  Do you feel like you
5    picked up any marketable skills?
6         **INMATE THOMAS:**  Definitely.
7         **COMMISSIONER KEENAN:**  I see you worked as a
8    welder.
9         **INMATE THOMAS:**  Yes.
10        **COMMISSIONER KEENAN:**  And you worked in the
11   Machine Shop.  What do you tend to be working on in
12   vocational program?  What are your marketable skills
13   you'd say you picked up?
14        **INMATE THOMAS:**  I'm a Machinist, entry level.
15        **COMMISSIONER KEENAN:**  Okay.
16        **INMATE THOMAS:**  And I can work small appliances in
17   Electronic Shop.  Also I have a customer service
18   certificate, I can drive a forklift and I can do -- they
19   had a forklift operator over there.
20        **COMMISSIONER KEENAN:**  And clearly upholstery?
21        **INMATE THOMAS:**  Yes, and upholstery.
22        **COMMISSIONER KEENAN:**  All right.  I think that's
23   it for questions.
24        **PRESIDING COMMISSIONER BRYSON:**  All right.  So is
25   there a vocational certification in place or is there --

72

1       **COMMISSIONER KEENAN:** It's in PIA, he has many,
2  many hours.

3       **PRESIDING COMMISSIONER BRYSON:** All right. Okay.
4       **COMMISSIONER KEENAN:** He's skilled, the highest
5  rank they have.

6       **PRESIDING COMMISSIONER BRYSON:** What's your clean
7  and sober date?

8       **INMATE THOMAS:** The day I got that 115 is when I
9  stopped and I never could pin it back to the actual date
10 that they caught me, but from that day forward, I give
11 myself 11 and a half years is what I've been giving
12 myself. And from that day forward, when they scared me
13 to death, because you know, and I was in the yard doing
14 work, they come out and put a little poof on me and so I
15 was outside and so they scared be to death. What
16 happened, when the officer talked to me, and he showed me
17 the consequences, he said don't you know what happens
18 when you get caught like this, that's -- so regardless of
19 what you've done up to this point or whatever you're
20 going to do for the next five years, you're going to pay
21 for this and that's when.

22      **PRESIDING COMMISSIONER BRYSON:** Okay. What makes
23 you a different man today than you were when you
24 committed this crime?

25      **INMATE THOMAS:** At that time I was thinking from

73

1    the mindset of a 16-year old and somebody who just wanted
2    to be seen and be acknowledged.  Not by what I've done,
3    who I was, just for the mere fact I was there and so I
4    was a person who he led me, not so much astray, but I
5    could even be led in a positive way, but I chose to go on
6    a negative -- that gave me more life.  To take the mind
7    of a 13-year old, and the time now is a 42-year old, you
8    know, now I'm teaching that mind of a 13-year old, the
9    consequences of their actions.  And then I didn't look at
10   the consequences, it was just immediate pleasure, what
11   was going to happen right now, what I was going to get
12   out of this right now and that was the end of my mind.
13   That's where it cut off at.  I didn't go any further
14   after looking at what were the consequences, what were
15   the damages, all those things, but rather it was only
16   about me and my own personal self-worth and what I want.
17   It didn't matter what anybody else wanted.  Today, it's
18   about everybody else.  I look at myself and I consider
19   everyone else around me.  Before I'd taken an action,
20   what's going to be the potential outcome.  We have what
21   we refer to as a mental movie in your mind, before you
22   take an action, think out the consequences, positive or
23   negative, and when it comes back to you can you say that
24   you are looking at what you put forth in your efforts,
25   and if not -- and those are things I didn't look at.

1      **PRESIDING COMMISSIONER BRYSON:** Now you told us
2   that you grabbed this guy. Did you grab him front on or
3   were you behind him at the time?

4      **INMATE THOMAS:** It was front on.

5      **PRESIDING COMMISSIONER BRYSON:** And that -- you
6   said, too, that the other -- your accomplice fired the
7   gun, boom, and it surprised you.

8      **INMATE THOMAS:** Yes.

9      **PRESIDING COMMISSIONER BRYSON:** Back in the
10  probation officer's report, we have that you grabbed the
11  victim and demanded money and you said that the
12  accomplice surprised you when he shot the victim. It
13  says you wrestled with the victim and that you and the
14  victim tripped on the stairs. You got up and the victim
15  was attempting to stand up when the accomplice told you
16  to move over and then shot the victim. That's a little
17  bit different and that's why I'm concerned because this
18  whole thing, and I've seen it in the other transcripts,
19  and as you must know, this has become the very large
20  elephant in the room.

21     **INMATE THOMAS:** Yeah.

22     **PRESIDING COMMISSIONER BRYSON:** And there's no
23  getting around it, it's a huge issue. Does he understand
24  the nature and magnitude of this crime. And because your
25  account differs radically from the witness, who's a nine-

75

1    year old, who would have no reason to lie, all be it,
2    witness testimony isn't perfect, still this is the issue
3    and we're trying to understand it here today and take it
4    all into consideration. So, which is it? Which account
5    is it here? Did you wrestle and - or what?
6           **INMATE THOMAS:** Yes.
7           **PRESIDING COMMISSIONER BRYSON:** You wrestled.
8           **INMATE THOMAS:** I always stated, when I grabbed
9    him, he was first coming down the stairs --
10          **PRESIDING COMMISSIONER BRYSON:** Okay.
11          **INMATE THOMAS:** -- and I started to catch him at.
12          **PRESIDING COMMISSIONER BRYSON:** Uh-huh.
13          **INMATE THOMAS:** And that's where we got into a
14   conflict. I thought I could grab him and hold him, but I
15   wasn't able to and this is where the conflict ensued in a
16   tussle. And right after that is when my partner came up.
17   I saw him come up from the side and all I heard was a
18   loud bang. I never dispute the fact that him and I
19   wrestled a little bit on the last few stairs, maybe three
20   or four stairs that was left. And after that is when
21   everything just exploded.
22          **PRESIDING COMMISSIONER BRYSON:** Did the -- did
23   your accomplice tell you to move over and then shoot the
24   victim?
25          **INMATE THOMAS:** I don't recall him saying move

1  over. I just recall him coming up. I mean I may have
2  been told to --
3       **PRESIDING COMMISSIONER BRYSON:** This is in your
4  statement, that's why I'm asking now.
5       **INMATE THOMAS:** Yeah.
6       **PRESIDING COMMISSIONER BRYSON:** Well, then my
7  question is, if this was -- if the impact of the firing
8  was felt by you, because you were in very close
9  proximity; is that correct?
10      **INMATE THOMAS:** Yes.
11      **PRESIDING COMMISSIONER BRYSON:** Then you knew that
12  he was hit, that he'd been hit, correct?
13      **INMATE THOMAS:** No. He was no further than you
14  and I --
15      **PRESIDING COMMISSIONER BRYSON:** Okay.
16      **INMATE THOMAS:** -- are to each other, and when you
17  heard the bang, he spun and went that way, and I ran this
18  way and I had no idea he was hit. I had no idea he was
19  hit, because when he took off it didn't seem as though
20  anything was wrong, but then when they told me he had
21  been hit in the arm --
22      **PRESIDING COMMISSIONER BRYSON:** Who told you that?
23      **INMATE THOMAS:** As it explains here and it was
24  said earlier that he was hit in the arm, and the arm went
25  to the chest. When they asked for an autopsy report, in

1    '89.

2    **PRESIDING COMMISSIONER BRYSON:** So you learned

3    that subsequent to the -- quite a bit subsequent to the

4    night. Okay. Does the District Attorney have questions

5    for this hearing?

6    **DEPUTY DISTRICT ATTORNEY DELAGARZA:** I do not.

7    **PRESIDING COMMISSIONER BRYSON:** Counsel, do you

8    have questions of this inmate?

9    **ATTORNEY STRINGER:** I do, thank you, Commissioner.

10   Mr. Thomas, if the Board was to grant you a date and

11   impose a number of conditions on that date, such as you

12   attend NA, that you test regularly for your parole agent,

13   would you comply with each and every one of those

14   conditions?

15   **INMATE THOMAS:** Yes, absolutely.

16   **ATTORNEY STRINGER:** And the marketable skills you

17   have as a Machinist, as a Fork lift Operator, and the

18   Upholstery trade, are those sufficiently up to date that

19   you could obtain employment?

20   **INMATE THOMAS:** Yes.

21   **ATTORNEY STRINGER:** And in reading over the most

22   current psychological evaluation indicates that at the

23   time of the commitment offense you considered yourself a

24   follower, you wanted to impress the people in your

25   neighborhood. How have you changed so that you're not a

78

1    follower now?

2          **INMATE THOMAS:**  Well, through the program that
3    I've been going over now, I'm the one that's been upfront
4    and help others.  I'm not looking for someone to lead me
5    anywhere.  I've studied on my own and I've become
6    comfortable with who I am as a man, where I don't need
7    anyone to lead me anywhere.  I represent my own
8    knowledge, because I'm the one who is going to have to
9    suffer the consequences, and that's something that I've
10   learned for the last 25 years.  It's my actions that I'm
11   responsible for.  I don't need anyone telling me what I
12   need to do, how I need to do it.  I know what's good for
13   me.  And when you tell me right, I acknowledge and
14   recognize that.

15         **ATTORNEY STRINGER:**  Now regardless of how this
16   crime happened, do you realize that the victim's only
17   offense was that he and his family were going to the
18   Laundromat and he was going for a walk while the other
19   child and mother were washing clothes.  Do you ever think
20   about that?

21         **INMATE THOMAS:**  Yes.  All the time.  You know, I
22   look at this world today and a lot of things had taken
23   place and my understanding was an (inaudible) and
24   especially how wild things are and I see victims 42 years
25   old, 50-year-old women, senseless, thoughtless violence

1    and I see myself. These guys, whatever they're doing,
2    that was me picking random victims and reaping hell on
3    them for no reason at all and I saw it then, which is why
4    now I'm doing the best that I can to help deter some of
5    that violence, some of that senseless act being committed
6    on the people on the streets today.

7         **ATTORNEY STRINGER:** So is it fair to say that
8    that's your way of trying to atone for this crime?

9         **INMATE THOMAS:** Absolutely. It's all in here,
10   it's all in here.

11        **ATTORNEY STRINGER:** Thank you, Commissioner.

12        **PRESIDING COMMISSIONER BRYSON:** I would like to
13   invite the District Attorney to make the closing
14   statement.

15        **DEPUTY DISTRICT ATTORNEY DELAGARZA:** Thank you
16   very much. The District Attorney's office of Los Angeles
17   County opposes the granting of a parole date for this
18   inmate. And having said that, I would commend the inmate
19   for the progress that he has made in the last, I would
20   say ten to eleven years. However, because of the life
21   crime and because of some of the gains that he has made,
22   we would submit are recent, we do oppose the granting of
23   a parole date. With respect to the life crime, this --
24   it was robbery murder, and having said that, it was a
25   first-degree murder. The inmate says that he was not the

80

1  shooter, however, the evidence as indicated and the
2  probation report and everything, all the information we
3  have, it is clear that he was in fact the shooter.
4  Today, in speaking to the Panel and looking at some of
5  the prior reports, the inmate makes light of the fact, he
6  didn't know the victim's daughter was there. I don't
7  know what that's supposed to mean. She knew he was
8  there, she saw him and she was very clear in describing
9  to the police what she saw. She said that it was the
10  inmate, she described him, she didn't know him, but she
11  described the inmate as coming up, and when he came up he
12  already had his gun out and he grabbed -- he demanded
13  money from her father and then he grabbed the father and
14  shot him. She said there was a second person who came up
15  after the inmate, but she was clear that it was not the
16  second person who shot, it was in fact the inmate who she
17  saw shoot her father. As far as his time in prison is
18  concerned, he is, as I've indicated, to be commended for
19  the self-help that he's been doing, for the fact that
20  he's been trying with respect to vocational training. It
21  is of concern that he has two 115's involving alcohol,
22  one in '94 and one in '95. And despite that, the records
23  would indicate his involvement with NA did not start
24  until 2002. So basically we have him being fully
25  participant in NA since 2002, so we would submit that

81

1    that is -- these gains that he's made to NA and AA would
2    be recent and that is of concern. The inmate would take
3    credit for the fact that he says that he spoke to the
4    police, however, the police were told by several people
5    it was Rusty who committed the robbery murder and as it
6    turned out the inmate was Rusty. When the police first
7    talked to the inmate, initially he denied it and then
8    after he was confronted with the fact that there was
9    evidence linking him to the crime, he reluctantly
10   admitted he was a participant, but he claimed that it was
11   the second person who was the shooter and commonly what
12   we call the, some other dude did it offense, and that
13   dude can't be identified. He describes him in a generic
14   term; male, Negro, 17 to 20 years old by the name of Doo-
15   Doo (phonetic) and this is not going to exactly assist
16   law enforcement in being able to find the second
17   participant with respect to the robbery, so the inmate
18   can stand before this Panel and say, well, I did
19   everything I could so that you could in fact find that
20   person, but the fact is he did not. He came gave them a,
21   as I said, a general description that could describe many
22   young black men in the neighborhood with a silver cap
23   that could not be found in that location and so his
24   assistance to the police was basically non-existent.
25   When push came to shove, when he could not deny that he

82

1    was involved, he took the lesser course and admitted
2    involvement in the robbery but did not admit that he was
3    in fact the shooter. This is of concern to the District
4    Attorney's Office of Los Angeles County. As I indicate,
5    he is to be commended for the positive, however, the fact
6    that he has not fully taken responsibility for taking a
7    human life is of concern and the fact that his
8    involvement with NA and AA has been recent according to
9    my review of records, he did at one point earlier get
10   involved, but then there was a huge lapse of time and
11   according to my reading, only as of 2002 has he remained
12   a fulltime active participant. For those reasons we
13   oppose a granting of parole date at this point. Thank
14   you.

15   **PRESIDING COMMISSIONER BRYSON:** Thank you. And,
16   Counsel, I'd like to invite you to make a closing
17   statement.

18   **ATTORNEY STRINGER:** Thank you, Commissioner. It's
19   our position that under Penal Code Section 3041(a), my
20   client has now provided exemplary testimony before this
21   Board. The law would require that the Board should
22   normally set a parole release date for him providing for
23   uniform terms for offense of a similar gravity and
24   magnitude with respect to threat to the public. I would
25   submit that my client's second-degree murder conviction

83

1    is no greater or no less than any other second-degree
2    crimes that come before this Board. So the question,
3    second part of 3041 is, does my client, as he sit before
4    you now, pose an unreasonable risk of danger to society
5    or a threat to public safety. So how do we evaluate
6    that. He was 16-years old when he came into this system,
7    so obviously he has grown up within the prison walls.
8    Now certainly there's an old saw at the board, there are
9    some people that make excellent inmates, but whether or
10   not their return to society would be in the best interest
11   of the public, is an open question. So I think you have
12   to evaluate Mr. Thomas as to what he has done in his 24-
13   plus years of incarceration. And his behavior has been,
14   with a few bumps in the road -- a 115 which happens to
15   many people, his behavior has been exemplary to the point
16   where there came a time when he actually turned a corner,
17   decided he was going to program as well as he could, get
18   involved in many different groups, and totally abstain
19   from any type of substance abuse. And the record that
20   has been presented to this Board is replete with that
21   turnaround and involves many, many hours of participation
22   in various groups. He's also upgraded himself
23   educationally and vocationally to the point that he's an
24   accomplished Machinist. He also can operate a forklift
25   and he has skills in Upholstery. These are all

84

1   employment skills that will afford him employment
2   opportunities in the community in these various areas.
3   He also has very good residence plans. He has very good
4   support plans from the many and varied people that have
5   submitted letters to this Board. And they covered the
6   spectrum to the point that he certainly could not fool
7   all of them and these are people both professional and
8   nonprofessional that know him, that have talked with him,
9   joked with him, probably cried with him and know what
10  kind of a person he really is. He's a person that has
11  changed within the institution. Now, however the
12  commitment offense occurred, it was 24 years ago. The
13  current psychological evaluation shows that he has great
14  insight into the devastating effect he had on this
15  family. He knows the victim was the breadwinner of the
16  family, he knows they had small children, and he says
17  this must have affected the family for years. The wife
18  would become a single mother, only God knows what
19  happened to this family, but he knows this horrible
20  effect he had on them, and has tried to atone for that by
21  helping other individuals within the prison system and I
22  think the record shows that he has done that. He's also
23  a participant in Milati Islami, which will again provide
24  him a great support group when he returns to free
25  society. So, the other factor we must look to is what do

85

1    the evaluators say about Mr. Thomas.  The most current

2    evaluation as you've indicated was done by

3    Dr. Richard Starrett in 2007.  Dr. Starrett memorializes

4    previous evaluations that have dealt with violence

5    potential in the free community.  And they go back to

6    1986 and Dr. Starrett says that evaluation of August

7    1986, although diagnosing Mr. Thomas with a conduct

8    disorder in adolescence, says his violence potential

9    outside a controlled setting in the past has considered

10    to be greater than average and in the present is

11    estimated to be decreased.  Going to 1989, that

12    evaluation says his violence potential is rated as below

13    average for this population.  In skipping to

14    December 1991, dangerousness is considered to be no more

15    than average when compared to other inmates.  Again,

16    1991, the inmate is seen as being in the low average

17    range for dangerousness in the free community.  In '92,

18    potential is average to low in the institutional setting

19    and will probably be low in the free world.  Skipping

20    over to June 1998, potential of violence is probably

21    below average assuming his absence from drugs and

22    alcohol.  February of 2002, Mr. Thomas is currently at

23    average to low degree of risk for violent behavior when

24    compared to average inmates.  And in 2003, Mr. Thomas is

25    currently at a low risk of violent behavior.  Now

86

1    Dr. Starrett, as to his insight, which is obviously a

2    critical factor here, I think he has certainly expressed

3    his remorse, but in his insight, Dr. Starrett says his

4    insight, acceptance and responsibility and expressing

5    remorse is appropriate. There continues to be a

6    discrepancy between the inmate's account and the file

7    account that will not be reconciled; even with this

8    discrepancy he is in the low range and that's for future

9    violence. I want to also note for the record that in the

10    legal documents, a portion of the police report indicates

11    that through, I assume, Mr. Thomas' description to

12    others, that suspect number two who was originally called

13    Do-Do or Doo-Doo, was identified as a Craig Whitfield,

14    W-H-I-T-F-I-E-L-D, who is a male Negro, black hair, brown

15    eyes, 6'2", 179 pounds with a date of birth of 12/26/61.

16    They also have an L.A. number for him and CINI number for

17    him. It says detectives are in the process of attempting

18    to connect Whitfield to the case. And that's the only

19    reference we seem to have to Mr. Whitfield and certainly

20    I would request if my client does not get a date today,

21    that further information is provided on this gentleman

22    because this police report seems to be pretty specific as

23    to who he is and this would probably clear up a number of

24    questions the Board may have. Now, Dr. Starrett again in

25    his 2007 evaluation says,

```
1                "The inmate's overall potential for future
2                violence is in the low range on past
3                historical and anti-social factors,
4                clinical insight factors and risk factors
5                when compared to similar inmates.  The
6                inmate's general recidivism is low."
7      One of the documents I'd like to look at are the
8      counselors reports and 4/2004 they were allowed to make
9      an assessment of dangerousness judgments.  And Counselor
10     Tate (phonetic) in July of 2004, who was a veteran
11     counselor at these institutions and knows the inmate
12     well, said,
13               "Considering the subjects age at the time
14               of commitment, the absence of prior
15               criminal history, his institutional
16               behavior and the number of years served,
17               should Thomas be granted parole, I consider
18               him a very low risk in the community."
19     So again, a number of evaluators from different walks of
20     life have seen Mr. Thomas and do not consider him a risk
21     if released to the community.  He's never tried to
22     minimize the life crime, however it occurred.  He has --
23     he's a person who at 16 certainly earned his way into
24     these institutions, but now as a person that sits before
25     you 24 years later, has certainly earned his way out.
```

88

1    Therefore, we would ask and request a date for

2    Mr. Thomas. Thank you.

3         **PRESIDING COMMISSIONER BRYSON:** Thank you.

4    Mr. Thomas. I'd like to give you an opportunity to make

5    a statement regarding your suitability for parole.

6         **INMATE THOMAS:** I've prepared a closing statement,

7    however, you did say that during deliberations, however I

8    could save that for that. I want to cover some issues

9    that were put out there and my response to them. The one

10   thing that I've always done, is I've accepted

11   responsibility for what happened. Not for the part that

12   I played or not for the part that people assume I played,

13   but for everything because it never would have took place

14   if I hadn't participated. So my hands shot that gun and

15   I'm responsible for that and everything that happened

16   that evening. So I take full responsibility for what

17   happened, not just a portion. That was my doing, I did

18   that, and I take responsibility for what happened to his

19   family and his daughter and something that they had to go

20   through over the years. I take responsibility for all of

21   that. I'm not denying there's some discrepancies in

22   statements, and I take responsibility for all of that,

23   because during this time, what difference would it make.

24   If I did it, I'll admit to it. I have to pay it back, so

25   I would accept that. I never thought I minimized my

89

1    part. When they first approached me, of course I was
2    scared, I won't deny it. If you catch a child doing
3    something, the child is going to deny it, he's a child.
4    And it wasn't because they came with this enormous amount
5    of evidence that made me change my statement. They
6    brought the mother in here, she told me to tell the
7    truth, so that's what I did. It wasn't because they had
8    this enormous amount of evidence that showed (inaudible),
9    but as you know the law enforcement did not (inaudible)
10   and that's not what happened. She asked me to tell the
11   truth, and I told the truth. Told what part I played.
12   And over the years I've accepted not just the part I
13   played, but totally responsibility, because I know that
14   it was my fault. I did it. So I'm not minimizing
15   anything. If they never catch up with that gentleman,
16   that's something between him and God. I'll take full
17   responsibility for it because it was me that pushed on. I
18   could have just said no, made a choice. But I didn't. I
19   went along with it and the end result was we ended up
20   taking an innocent man's life. That's my fault. Thank
21   you.

22       **PRESIDING COMMISSIONER BRYSON**: All right. We're
23   going to be in recess for deliberations. The time is now
24   1619.

25                   **(Off the Record)**

1      **PRESIDING COMMISSIONER BRYSON:**  Yes.  We're on
2    record.  The time is 1728 and we called the District
3    Attorney and the inmate's attorney into the room to ask
4    some clarifying questions.  We went through the
5    preliminary hearing transcript and that of the
6    sentencing.  There's some other documentation that we
7    can't read in the arrest reports.

8      **COMMISSIONER KEENAN:**  It's a handwritten
9    document --

10     **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Yeah.  Those
11   are investigative reports of witnesses.

12     **PRESIDING COMMISSIONER BRYSON:**  We can't -- what
13   we find in terms of the daughter's statements --

14     **ATTORNEY STRINGER:**  She changed her testimony.

15     **PRESIDING COMMISSIONER BRYSON:**  Well, what we find
16   is that she was running away at the time the father was
17   shot and didn't see the shooter and she also said she
18   didn't see a gun in either hand that she remembered.  So
19   this is the concern that -- is there any documentation
20   that --

21     **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Well, there
22   are two people who identified the inmate.  If you go
23   through the illegible notes, there is also a young boy
24   who told the police that he saw the inmate.  So there
25   were two people who claim that he was the one with the

91

1    gun.

2         **PRESIDING COMMISSIONER BRYSON:**  Well, wait a

3    minute now.  I'm also fast to say that the young girl him

4    with the gun because she was asked that specifically,

5    so --

6         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Well, I was

7    going based on the police report and in the police

8    report, which was taken right after the incident, she

9    said -- she told the police, and that is a legible

10   report, that she saw -- the first person she saw, she

11   said there were two people, she saw on person walk up

12   first, that was the inmate.  And when the inmate walked

13   up, he had his gun drawn and he demanded money from his

14   [sic] father.  She said at that point there was a --

15   well, as he was standing there with a gun, she says

16   another person comes up, but before he comes up there's a

17   struggle between the guy with the gun and her father and

18   her father gets shot at that point.  That was in the

19   police report.

20        **ATTORNEY STRINGER:**  But in the prelim she says

21   something different when she's under oath.  She didn't

22   see it.  And that was when she was under oath, not when

23   she was sitting with the detective.  That's what counts.

24        **PRESIDING COMMISSIONER BRYSON:**  And what about

25   this other testimony?

1    **DEPUTY DISTRICT ATTORNEY DELAGARZA:** Well, I
2    don't -- I didn't say it was testimony. It was in the
3    statement, I did not have -- I didn't have a copy of the
4    prelim.

5    **ATTORNEY STRINGER:** If you look at the description
6    between the two men though that were supposedly there,
7    they're similar in height and build. This is why I
8    question whether or not --

9    **DEPUTY DISTRICT ATTORNEY DELAGARZA:** They bear no
10   resemblance to - and they don't --

11   **ATTORNEY STRINGER:** Doo-Doo was 6'2" and 175, it
12   doesn't sound like anybody that was there.

13   **DEPUTY DISTRICT ATTORNEY DELAGARZA:** Right, so.
14   Right. Doo-Doo does not bear a resemblance to the
15   description that was given. The Doo-Doo that was
16   arrested.

17   **PRESIDING COMMISSIONER BRYSON:** So he was -- they
18   did --

19   **DEPUTY DISTRICT ATTORNEY DELAGARZA:** He wasn't
20   arrested, excuse me. Basically, through their files they
21   found somebody with Doo-Doo as a nickname and -- but he
22   did not match the description, the physical description
23   that was given by anybody.

24   **PRESIDING COMMISSIONER BRYSON:** So they didn't
25   approach him or question him or anything?

93

1          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I can't
2     answer that, but the lack of information would lead me to
3     believe that --

4          **ATTORNEY STRINGER:**  My point is because the two
5     men that were involved were so similar in height, weight,
6     and physical characteristics and both young, it could be
7     real easy --

8          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  The only
9     thing though is she is very clear that the person who
10    initially walked up and grabbed her father was the one
11    with the gun.

12         **ATTORNEY STRINGER:**  And I'm not saying nine-years
13    old aren't -- but her testimony at prelim when they went
14    through the, you know, it's important to tell the truth,
15    and you know, the usual thing they go through, she was -

16         **DEPUTY COMMISSIONER KEENAN:**  Can I ask a question
17    of the D.A.?

18         **PRESIDING COMMISSIONER BRYSON:**  Yes.

19         **DEPUTY COMMISSIONER KEENAN:**  The two witnesses you
20    talked about, one is the victim's daughter?

21         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Right.

22         **DEPUTY COMMISSIONER KEENAN:**  Okay and we have her
23    testimony in the preliminary hearing transcript.

24         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  And there's
25    also --

94

1        **DEPUTY COMMISSIONER KEENAN:** The other witness,

2 did that other witness testify?

3        **DEPUTY DISTRICT ATTORNEY DELAGARZA:** No, but he is

4 the person who led the police to the inmate.

5        **ATTORNEY STRINGER:** But he was impeached, my

6 understanding is he was impeached.

7        **DEPUTY COMMISSIONER KEENAN:** Why did they not call

8 him as a witness?

9        **DEPUTY DISTRICT ATTORNEY DELAGARZA:** We don't call

10 all witnesses at preliminary hearings.

11        **DEPUTY COMMISSIONER KEENAN:** And that witness

12 specifically said he saw the inmate with a gun?

13        **DEPUTY DISTRICT ATTORNEY DELAGARZA:** Well, I

14 believe so but I'm going to give you the --

15        **DEPUTY COMMISSIONER KEENAN:** And I did have a

16 question about the enhancements. It doesn't allege -- it

17 was never alleged this inmate personally used a firearm.

18        **DEPUTY DISTRICT ATTORNEY DELAGARZA:** Well, it was

19 alleged, but he was allowed to plead guilty to a second-

20 degree murder with a principle one. I mean there was a

21 plea disposition.

22        **DEPUTY COMMISSIONER KEENAN:** That a principle was

23 armed.

24        **DEPUTY DISTRICT ATTORNEY DELAGARZA:** Right.

25        **DEPUTY COMMISSIONER KEENAN:** That wasn't in the

95

 1    initial charging document?  I believe I saw that if that
 2    was how he was charged.
 3          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I believe he
 4    was charged as a first-degree murder and then he was
 5    allowed to plea to a second.  It was a plea disposition.
 6          **PRESIDING COMMISSIONER BRYSON:**  Was her name
 7    Lydia?
 8          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I'm sorry?
 9          **PRESIDING COMMISSIONER BRYSON:**  Was her name
10    Lydia, the little girl?
11          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I think so.
12          **PRESIDING COMMISSIONER BRYSON:**  Oh, no, I'm sorry.
13    I'm looking at - I'm sorry.
14          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  There was a
15    Lydia.
16          **ATTORNEY STRINGER:**  I thought Peter Munia
17    (phonetic) was the --
18          **DEPUTY DISTRICT ATTORNEY DELAGARZA:** No, if you
19    look at the information, he was originally charged with
20    murder with malice or forethought, that'd be a first-
21    degree murder and in count one --
22          **DEPUTY COMMISSIONER KEENAN:**  I'm looking at that.
23          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  But he was
24    allowed to plea -- it was a plea disposition.  Pursuant
25    to a plea disposition, he was allowed to plea to a

96

1   second-degree murder with a principle armed allegation.

2       **DEPUTY COMMISSIONER KEENAN:**  Okay.  Not

3   specifically that he was armed, but that one of the

4   principles was armed.

5       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  That's

6   correct.

7       **PRESIDING COMMISSIONER BRYSON:**  Just for the

8   record I want to point out that a large percentage of the

9   photocopied information here in the police reports is

10  totally unreadable.

11      **ATTORNEY STRINGER:**  I think the other person you

12  were talking about was Peter Mooney (phonetic) with that

13  information that made the arrest.

14      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  There was a

15  statement by Mooney.

16      **ATTORNEY STRINGER:**  But then he -- he had problems

17  at the prelim hearing.

18      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Was his --

19  you have the prelim that he testified at the prelim.

20      **ATTORNEY STRINGER:**  That's in the C-File.

21      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  No, I'm not

22  asking you, I was asking them.

23      **ATTORNEY STRINGER:**  Oh, sorry.

24      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  That's okay.

25  I don't know why the prelim testimony would be in the C-

1    File.

2        **ATTORNEY STRINGER:**  Because this has come up
3    before.

4        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  No.  But what
5    I'm saying though is why would it be in the C-File.  It's
6    public record.

7        **DEPUTY COMMISSIONER KEENAN:**  People's witnesses
8    were Maria Alvia (phonetic) and Sedrig Wilder (phonetic).

9        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Right, so he
10   did not testify.

11       **DEPUTY COMMISSIONER KEENAN:**  Should we go off
12   record --

13       **PRESIDING COMMISSIONER BRYSON:**  Oh, yes.

14       **DEPUTY COMMISSIONER KEENAN:**  -- while we look at
15   the documents.

16       **PRESIDING COMMISSIONER BRYSON:**  Off record.  The
17   time is now 1720.  Or, excuse me 1730.

18                        **R E C E S S**

19                        --o0o--

20

21

22

23

24

25

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **PRESIDING COMMISSIONER BRYSON:**   We are back on

4     the record.   The time is now 1822.   We've reconvened with

5     the decision in the matter of James Thomas.   Sir, the

6     Panel reviewed all information received from the public

7     and in light of the following circumstances, in

8     concluding that you are not yet suitable for parole and

9     would pose an unreasonable risk of danger to society or a

10    threat public safety if released from prison.   And please

11    listen to this decision because we think it's important.

12    This offense was carried out in a cruel, callous manner,

13    which you have acknowledged today.   On June 14th of 1982,

14    you and an unidentified accomplice planned to rob a

15    person you "thought would be easy to handle," and that's

16    a quote.   You approached the victim, Daniel Calvia, a 43-

17    year-old man on the stairs of a pedestrian footbridge.

18    You grabbed the victim and demanded money.   When he

19    refused to comply, he was shot.   The victim's daughter

20    witnessed this attack.   Then the assailants, that was you

21    sir, fled as the victim's daughter ran to a nearby

22    Laundromat.   There was a shooting.   Someone shot the

23    father.   This victim collapsed and died in the

24    Laundromat's parking lot.   This offense was carried out

25    **JAMES THOMAS    C-70569    DECISION PAGE 1        9/25/07**

1    in a manner demonstrating exceptionally callous disregard
2    for human suffering. The postmortem examination was
3    performed on the victim's body by Dr. Sarah Reddy,
4    R-E-D-D-Y, on June 17, 1982 at 1300 hours. She reported
5    that the cause of death was from a single gunshot wound
6    that entered the right rear foreman, exited the right
7    inner forearm, reentered the right bicep, exited the
8    right upper inner quad near the armpit, then entered the
9    right chest in the sixth rib, passing through the right
10   and left lungs. A .38 or 357 projectile was recovered in
11   the left chest cavity. Mr. Wilder, a detective with the
12   Los Angeles Police Department, stated,

13              "The defendant had a reputation for always
14              being around gang members, he did associate
15              with gang members. The victim's nine-year-
16              old daughter is a nervous wreck as a result
17              of the incident. The robbery, murder was
18              committed during peak traffic hours along a
19              busy thoroughfare. The boldness in which
20              the crime was carried out was appalling.
21              The victim's family, especially daughter,
22              who was an eye witness who will carry scars
23              for many years to come. The motive for
24              this crime was indeed very trivial in

25   **JAMES THOMAS   C-70569    DECISION PAGE 2      9/25/07**

100

1           relation to the offense.  It was for
2           robbery."
3    Sir, you have no prior criminal history and your
4    institutional behavior in the last seven years has been
5    commendable.  There was a period of time of adjustment
6    for you and that is what this Panel has weighted, both
7    the seriousness of the crime and the adjustment period.
8    And we're going to address the crime again in one moment,
9    but first I want to commend you on your programming.  It
10   has been extensive, especially recently, relatively
11   recently, since the year 2000, and I will not read
12   everything into the record that was read into the record
13   prior, but I will point out some highlights.  First of
14   all, you do have a high school diploma that you obtained
15   in 1986.  You continue to be a Warehouse Manager, a very
16   responsible position with PIA, Prison Industry Authority,
17   and we have laudatory letters of recommendation from PIA
18   read into the record.  You are certified as a Furniture
19   Upholsterer, you are also a Machinist, you worked in a
20   shoe factory, you worked as a Welder.  You have been
21   certified as having Essential Skills in the Workplace
22   through PIA.  You are also a Forklift Operator and
23   certified Driver.  As to your self-help and therapy, I do
24   have programs commendably in self-help, particularly
25   **JAMES THOMAS    C-70569    DECISION PAGE 3    9/25/07**

1   since the year 2001. And that was the time that you
2   apparently, as my colleague said, kicked it in gear and
3   you really jump started on programming. And you've done
4   outstanding work in Project Reach, laudatory chronos have
5   been read into the file for that. Violence Prevention
6   Program, Reach, Impact, Kyros, the TRUST program, you've
7   been a facilitator in that program. Project Choice, you
8   have a character reference that was provided from that
9   program and Full Circle Addiction Recovering Counseling
10  in 2007. Also continuing involvement in AA and NA. So
11  you have, in recent years, program commendable in self-
12  help. And in recent years, you haven't had any 115's.
13  You haven't had a 115 since your 1995 possession of
14  marijuana and the five that you've have had total do not
15  include any for violence. You have -- 128's are minor
16  compared to 115's, but in aggregate, the Panel does
17  consider them and you've had a total of 18. The last
18  one, again, was in the year 2000. So since the year
19  2000, 2001, that time frame, you have turned around your
20  behavior. You also pointed you're your clean and sober
21  date was in 1995, the date of the last 115 and you
22  explained that very articulately to this Board. As the
23  psychological report dated May 4, 2007 by Dr. Richard
24  Starrett, he basically does support your parole and
25  **JAMES THOMAS    C-70569    DECISION PAGE 4    9/25/07**

1 assesses you a low risk overall risk for violence and to
2 potentially recidivate a low risk. As to your parole
3 plans, you do appear to have substantial parole plans for
4 local and southern California, that would be for the San
5 Francisco Bay Area or Los Angeles area. You have been
6 given an invitation to join the Walden House program and
7 we read that into the record. Also your sister,
8 Pamela Bullock, has offered her support, including
9 residence, and your brother Lamont Thomas has also
10 offered his support, including residence. You do have a
11 job offer in San Jose that you presented to this board.
12 You clearly have marketable skills, including as
13 Machinist, Upholsterer and Forklift Operator. As to
14 Penal Code 3042 responses, responses indicate opposition
15 to a finding of suitability, specifically by the District
16 Attorney of Los Angeles County. Sir, it was impressive
17 to this Panel that you said in one of your final
18 statements, "That was me, picking random victims and
19 reaping hell on them." And then you also said it's all
20 in giving -- we feel that your programming in recent
21 years has shown that that is in deed what it's about for
22 you. We feel that you are on the right path and that
23 your self-help and programming has been relatively recent
24 compared to the number of years you've been incarcerated.
25 **JAMES THOMAS    C-70569    DECISION PAGE 5       9/25/07**

1    It is all about actions speaking louder than words, and
2    we feel that you need to continue that positive
3    programming for another year. We know you've been told
4    this before, but we feel it is still important for you do
5    that. Because, it is relatively recent, not to you, but
6    in comparison to what you did as far as the crime and the
7    weight of what happened to you when you first came in.
8    Albeit, you were a young 16-year old and you have
9    basically bootstrapped yourself to where you are and we
10   feel you need another year to continue that positive
11   programming. Do not get any more 128's or 115's.
12   Continue with your self-help and earn positive chronos.
13   And I'd like to ask Commissioner Keenan to address the
14   matter that we did some research on, because this whole
15   issue of the shooting, which we know is a discrepancy
16   from your accounts and what are also being put forth as
17   who was the shooter. So, Commissioner Keenan, would you
18   like to address that?

19        **DEPUTY COMMISSIONER KEENAN:** Yes. I noted
20   initially that the way this crime is charged there was an
21   enhancement that a principle in the offense had a
22   firearm. Not that you personally used a firearm, but a
23   principle in the offense used a firearm. And then
24   focusing on the preliminary hearing transcript, you have
25   **JAMES THOMAS   C-70569   DECISION PAGE 6        9/25/07**

1    the testimony of the victim's daughter and a detective

2    who took statements from you.  Focusing on the testimony

3    from the victim's daughter, there appears to be some

4    conflicting information.  And I'm going to read through

5    about three pages of her testimony, almost three, on

6    direct examination.  Okay.  This is the D.A. questioning.

7    You saw the boys crossing the street, yes --

8         **PRESIDING COMMISSIONER BRYSON:**  Excuse me would

9    you please --

10        **DEPUTY COMMISSIONER KEENAN:**  Page nine.

11        **PRESIDING COMMISSIONER BRYSON:**  Please identify

12   who the speaker is, each line.  I think that's important

13   for the transcriptionist.

14        **DEPUTY COMMISSIONER KEENAN:**  Okay.  Maria --

15   statement -- Maria --

16        **PRESIDING COMMISSIONER BRYSON:**  You can reference

17   her as the daughter.

18        **DEPUTY COMMISSIONER KEENAN:**  The daughter, okay.

19   All right.  Okay.  And the D.A. says in questioning:

20        "You saw the boys crossing the street?

21        The daughter:  Yes.

22        The D.A:  And there were two of them?

23        The daughter:  Yes.

24        The D.A:  What happened after you saw them

25   **JAMES THOMAS**   **C-70569**   **DECISION PAGE 7**      9/25/07

```
1              cross the street?

2              The daughter:  They came straight to my dad.

3              The D.A:  Both of them?

4              The daughter:  Yes.

5              The D.A.:  Did either of them do anything to

6              your dad?

7              The daughter:  Yes.

8              The D.A.:  Was anything said by either of

9              them?

10             The daughter:  I don't know.

11             The D.A.:  What was the very first thing you

12             remember happening when they came over to

13             where you and your dad were?

14             The daughter:  They told -- the boy told my

15             dad to give him the money or they'd shoot.

16             The D.A.:  Did your dad say anything?

17             The daughter:  He said no.

18             The D.A.:  Then what happened?

19             The daughter:  He ran and then the boy that

20             had the gun shot my dad.

21             The D.A.:  Look back a little in time,

22             Maria.  Did you see either of those boys

23             touch your father anywhere?

24             The daughter:  I don't remember.

25   JAMES THOMAS    C-70569    DECISION PAGE 8      9/25/07
```

```
1          The D.A.:  Did either of the boys do
2          anything to his shirt?
3          The daughter:  Grabbed it.
4          The D.A.:  When was his shirt grabbed, was
5          it before or after the statement was made?
6          The daughter:  Before.
7          The D.A.:  So what was the first thing you
8          remember one of the boys doing?
9          The daughter:  I don't remember.
10         The D.A.:  You were with your father on the
11         bridge?
12         The daughter:  Yes.
13         The D.A.:  And you recall one of the boys
14         saying what about money?
15         The daughter:  To give him the money or he'd
16         shoot.
17         The D.A.:  The boy that said that, was that
18         the boy that you say shot your father?
19         The daughter:  Yeah.
20         The D.A.:  Did the boy that said that, did
21         he grab your father anywhere?
22         The daughter:  Yeah.
23         The D.A.:  Where did he grab him?
24         The daughter:  Right here.
25   JAMES THOMAS    C-70569    DECISION PAGE 9    9/25/07
```

```
1              The D.A.:  Indicating in the upper chest
2         area, your Honor."
3    That's Mr. Kimmel, that's the D.A.
4         DEPUTY DISTRICT ATTORNEY DELAGARZA:  James Kimmel.
5         DEPUTY COMMISSIONER KEENAN:  Oh, okay.
6         "The court:  Yes.
7         The D.A.:  Did he grab your father's shirt?
8         The daughter:  Yes.
9         The D.A.:  Did he -- did anything happen to
10        this shirt?
11        The daughter:  No.
12        The D.A.:  After he grabbed your father
13        where you have shown us, did your father do
14        anything?
15        The daughter:  He ran.
16        The D.A.:  Did you also run?
17        The daughter:  I ran first.
18        The D.A.:  Your father followed you?
19        The daughter:  Yes.
20        The D.A.:  Is that when you saw your father
21        shot?
22        The daughter:  Yeah.
23        The D.A.:  You say besides the one boy,
24        there was another boy?
25   JAMES THOMAS   C-70569   DECISION PAGE 10    9/25/07
```

```
1                The daughter:  Yes.

2                The D.A.:  What do you recall him doing?

3                The daughter:  I don't know.

4                The D.A.:  Did he just stand there?

5                The daughter:  Yes."

6    Okay.  Now, I'll move on to Page 14 in the transcript

7    where the defense attorney, that would be Mr. Stavin

8    (phonetic), is cross-examining her.  Okay.  I'll start on

9    line seven.

10               "Mr. Stavin:  Did he grab your father -- I'm

11               sorry.  Let me restate that.  When he

12               grabbed your father did he actually get a

13               hold of his shirt?

14               The daughter:  Yes.

15               Mr. Stavin:  Did you see that happening?

16               The daughter:  Yes.

17               Mr. Stavin:  When he grabbed your father's

18               shirt, did your father say anything else?

19               The daughter:  No.  He just ran.

20               Mr. Stavin:  Your father got away from the

21               boy and started running?

22               The daughter:  Yes.

23               Mr. Stavin:  You had already then started

24               running yourself?

25    JAMES THOMAS    C-70569    DECISION PAGE 11    9/25/07
```

# EXHIBIT A



# PAROLE PLANS FOR 2007 / 2008

## James Thomas Jr.

## TABLE OF CONTENTS

**Section 1:** Circumstances Tending to Show Suitability

**Section 2:** Institutional Accomplishments

**Section** 3: Staff Letters of Support

**Section 4:** Primary and Secondary Housing/Parol Plans

**Section 5:** Letters of Employment

**Section** 6: Letters From Family and Friends

**Section 7:** Letter of Apology/Closing Statement

JAMES THOMAS
C-70569, 3N-07 UP
SAN QUENTIN STATE PRISON
SAN QUENTIN, CA 94974

## STATE OF CALIFORNIA, BOARD OF PAROLE HEARINGS

In the Matter of the Life Term Parole ) CDC No: C-70569
Consideration Hearing of: ) **HEARING MEMORANDUM**
)
**JAMES THOMAS** ) Hearing Date:
_____ ) Hearing Time:

### OVERVIEW

Mr. Thomas is 42 years old, and is serving a 16 years to life sentence for second degree murder committed on June 14, 1982, when he was then 16 years old. He has remained free from any serious disciplines since 1995, and before that 1991. As can be seen from the psychological evaluation of Richard Starrett, Ph.D., PhD., CA License # PSY-1368, Contract Psychologist, reflects on Mr. Thomas' positive programming efforts and states, "The inmate is in the low range in his risk management. He has been able to handle compliance, stress and destabilizers well while in the institutional setting. His parole plans are feasible. The inmate's overall potential for future violence is in the low range of past historical antisocial factors, clinical insight factors and risk factors when compared to similar inmates." "The inmate's overall potential for future violence is in the low range when compared to similar inmates. The inmate's general recidivism is low."( See, **Exhibit A**, Psychological Evaluation of 5-4-2007.)

### COMMITMENT OFFENSE

As typical with young teenage boys involved in second degree murders, this case involved the attempt to rob for money. The victim resisted and a

1.

struggle between Mr. Thomas and the victim progressed until his accomplice pulled out a gun and shot the victim. This version of the commitment offense is part of the record in the change of plea, and plea agreement. The California Superior Court has found that "There is no evidence in the record that [Mr. Thomas's] offense was more aggravated or violent than ordinarily shown in the commission of second-degree murder. Thus, there is no evidence to support the Board's conclusion that the offense demonstrated an exceptionally callous disregard for human suffering. (See, **Exhibit B**, Los Angeles Superior Court Order, dated Feb. 24, 2005.)

## PSYCHOLOGICAL EVALUATION

The psychological evaluation of May 2007 states that Mr. Thomas' "does not have a negative attitude, no active mental health symptoms, and is not impulsive." Mr. Thomas "has had a very good response to treatment. His insight, acceptance, and responsibility and expressing remorse seem appropriate. There continues to be a discrepancy between [Mr. Thomas's] account the file account that will not be reconciled. Even with his discrepancy, he is in the low range." Mr. Thomas' overall potential for future violence is in the low range on past historical antisocial factors, clinical insight factors and risk factors when compared to similar inmates."

The psychological evaluation of May 2007 indicates a continued low propensity for violence. In May 1982, Mr. Thomas was diagnosed with Conduct Disorder, in adolescence. No violent potential for the free community. In 1986, Mr. Thomas violence potential outside a controlled setting was estimated to be decreased. In 1989, his violence potential was rated as below average for this population. Mr. Thomas' continued to be rated as "a low risk for violence behavior," since 1982 to 2007.

2.

## PRIOR PAROLE BOARD HEARINGS AND/OR RECOMMENDATIONS

In November 2006, Mr. Thomas received a one-year denial. Mr. Thomas is in 100% compliance with the Board's recommendation and would have a smooth transition into the community. There appears to be no reliable evidence that Mr. Thomas is unpredictable or a threat to others.

## DETERMINATION OF SUITABILITY

Specific factors are applicable to the Board's decisions as set forth in Penal Code section 3041 and the Board regulations in California Code of Regulations, Title 15, section 2402.

The overreaching consideration is "public safety" and, as stated in subdivision (b) of Penal Code section 3041, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses or the timing and gravity of the current or past convicted offense or offenses, is such that **consideration of public safety** requires a more lengthy period of incarceration for this individual ..." [emphasis added].

The factors required to be considered by the Board are, for the most part, specified in section 2402 of Title 15 of the California Code of Regulations, which consists of four subdivisions.

Subdivision (c) specifies six non-exclusive factors tending to show unsuitability, the relative importance of which is 'left to the judgment of the panel," but must be supported by "some evidence" and are as follows:

1. Committed Offense - If the prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(a) If multiple victims were attacked, injured or killed in the same or separate incidents. In this case, there was one victim who was killed. As there was a plea agreement and this was a stipulated factor during sentencing,

3.

that is the most reliable evidence for purpose of reaching any factual
conclusion.

(b) The offense was carried out in a dispassionate and calculated
manner, such as an execution-style murder. "There is no evidence in the record
that [Mr. Thomas'] offense was more aggravated or violent than ordinarily shown
in the commission of second-degree murder. Thus, there is no evidence to support
the Board's conclusion that the offense demonstrated an exceptionally callous
disregard for human suffering." (**Exhibit B**. Superior Court Order, dated Feb
24, 2005.)

(c) The victim was abused, defiled and/or mutilated before, during
or after the offense. The victim was shot one time by Mr. Thomas' crime partner.
During Mr. Thomas' change of plea and sentencing, the District Attorney and
Court accepted Mr. Thomas' statement the he did not have a gun or that he shot
the victim. There is no evidence of abuse or mutilation.

(d) The motive for the crime is inexplicable and very trivial in
relation to the offense. Essentially all murderers are inexplicable or trivial
in relation to most events that lead up to a killing. If this were a sole basis
for parole, no one in prison for murder would ever be paroled.

2. Previous Record Violence - "[T]here is insufficient evidence that
[Mr. Thomas] has a previous record of violence within the meaning of the
statute." (**Exhibit B**, Superior Court Order, fn. 2.)

3. Unstable Social History - "[T]here is no evidence [Mr. Thomas] has
a history of 'unstable or tumultuous relationships with others.'" (**Exhibit
B**, p. 2.)

4. Sadistic Sexual Offense - This is not applicable to Mr. Thomas.

5. Psychological Factors - There is no reliable evidence that Mr. Thomas
had any history of mental problems related to the offense or otherwise and

4.

has been rated to be a low risk to public safety.

6. Institutional Behavior  - Mr. Thomas has not engaged in any serious misconduct since 1995. This is not to be overlooked in an environment where it is quite easy to get written up purely by accident.

Subdivision (d) of section 2402 is a converse of subdivision (c) that specifies nine factors tending to show **suitability** for release, leaving the importance to be attached to the judgment of the panel. The specified factors are:

1. No Juvenile Record — Mr. Thomas does not have a previous record of violence. His first arrest was for this case, at the age of 16.

2. Stable Social History — Mr. Thomas had a stable family relationship prior to being incarcerated and has continued to have one during his incarceration.

3. Signs of Remorse p As seen from the psychological evaluation, Mr. Thomas' "insight, acceptance, and responsibility and expressing remorse seen appropriate."

4. Motivation for Crime — Mr. Thomas' had no motivation for participating in the death of the victim. It was the classic attempted robbery involving a crime partner who had a weapon and shot the victim.

5. Battered Women's Syndrome — This does not apply.

6. Lack of Criminal History - Mr. Thomas lacks any significant criminal history of violent crimes.

7. Age- Mr. Thomas is currently 42 years old, which reduces the probability of recidivism.

8. Understanding and Planning for the Future — Mr. Thomas has made numerous plans for his release. "[T]here is no evidence [Mr. Thomas'] parole plans are unrealistic." (**Exhibit** B, Superior Court Order, p 2.)

5.

## INSTITUTIONAL BEHAVIOR

Mr. Thomas has programmed and matured through his many years of incarceration. Fortunately, he has taken advantage of self-help, educational and vocational programs.

The commitment offense that has placed Mr. Thomas in prison for over two and one-half decades involves killing a man with a gun. The commitment offense has been deemed by the Los Angeles Superior Court as one that provides "no evidence" that Mr. Thomas' "offense was more aggravated or violent than ordinarily shown in the commission of second-degree murder. Thus, there is no evidence to support the Board's conclusion that the offense demonstrated an exceptionally callous disregard for human suffering." (**Exhibit B.**) To simply focus and rehash the commitment offense, as is typical of most letters the Board is accustomed to seeing from law enforcement agencies, is unfair and runs contrary to the rehabilitative goals exposed by the prison system and could result in a due process violation. The test is not whether some evidence support the reasons cited by the Board for denying parole, but whether some evidence indicates that the release on parole would unreasonably endangers public safety. There is not "some evidence" of a nexus between the commitment offense and Mr. Thomas' present dangerousness from the psychological evaluation or the counselor report to support that. Rather, the contrary, Mr. Thomas is stated to be a low risk. Mr. Thomas has also included the self-help and educational programs in which he has been involved attached hereto as **Exhibit C** and made a part hereof.

## CONCLUSION

Mr. Thomas understands that there is a personal and human element involved in the Board's determination of suitability for parole. This is the ultimate purpose and responsibility of the Parole Board. Mr. Thomas simply asks that

6.

you weigh all factors in your decision on this very serious matter. Mr. Thomas looks forward to this hearing.

Dated:                                    Respectfully submitted,

                                          *James Thomas*

                                          James Thomas
                                          Inmate CDC # C-70569

# EXHIBIT A

## PSYCHOLOGICAL EVALUATION
## FOR THE BOARD OF PAROLE HEARINGS
## AUGUST 2007 SUBSEQUENT CALENDAR
## FORENSIC ASSESSMENT DIVISION
## SAN QUENTIN STATE PRISON

## I.  IDENTIFYING INFORMATION

| | |
|---|---|
| **Inmate Name:** | **Thomas, James** |
| **CDC Number:** | **C-70569** |
| **DOB** (*Current Age*): | **12-13-1965** (*currently 42 years old*) |
| **Controlling Offenses:** | **PC §187, Murder Second Degree** |
| **Date of Offenses** (*Age at time*): | **06-14-1982** (*then age 16)* |
| **Sentence:** | **16 years to Life** |
| **County of Commitment:** | **Los Angeles County** |
| **Date Entered into CDCR:** | **08-02-1983** |
| **Date Received at San Quentin State Prison:** | **04-28-1993** |
| **Classification Score:** | **19** |
| **CDCR Forensic Evaluator:** | **Richard Starrett, Ph.D., Ph.D.** |
| **Date of Evaluation:** | **05-04-2007** |

## II.  SOURCES OF INFORMATION

The inmate's Central File (C-File) and Unit Health Record (UHR) were reviewed.  He was interviewed for the purpose of the current evaluation on May 4, 2007.  He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Parole Hearings (BPH) to assist in determining his suitability for parole.  The inmate appeared to understand the nature and purpose of the evaluation, and the possible consequences of the interview to the best of the inmate's ability.  Unless otherwise indicated, the inmate agreed to participate in the interview.  For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist.  Also, it is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication.  This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate.

This current report is an addendum for update to the BPH, and only information relevant to the current assessment, and more recent to prior reports, will be addressed.  The report from February 8, 2002, written for the BPH Subsequent Hearing should be consulted for any questions or concerns regarding background information unless clarified otherwise below.

## III.  QUESTIONS POSED BY MOST RECENT (NOVEMBER 2006) BPH

After the inmate's 2006 BPH hearing, the panel subsequently submitted BPH Form 1000(a) requesting an updated psychological assessment of the inmate to include:

1) The prisoner's violence potential in the free community;

2) The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released;

3) The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes; and,

4) The need for further therapy programs while incarcerated

5) The Axis II and render an opinion.

## IV.  INTERVIEW INFORMATION

At the outset of the interview for the purpose of this report to the Board of Parole Hearings, the planned focus was to update any information relative to the most recent full evaluation, as well as to deal with any unexamined issues relative to intrapersonal functioning at the time of the index offense.

Mr. Thomas is a 42-year-old divorced African American male of Islam faith.  The inmate was oriented to person, place and time.  He was alert and cooperative.  His simple registration was intact; however, there was a slight impairment in short-term memory. He could only remember two of three words across time.  His simple abstract thinking and mathematical ability was intact.  His complex problem solving was intact.  He appeared to understand proverbs.

At the current time, he denies any problems with depression, anxiety, mood swing, or symptoms of a mood disorder.  He denies any auditory or visual hallucinations, and evidenced no symptoms of either delusional or paranoid thinking.  He denies any eating or sleeping problems.  He denies any mental health problems as a child.  He denies any suicidal or homicidal thinking.

INSTITUTIONAL PROGRAMMING:  The inmate entered California Department of Corrections on August 2, 1983.  He has served 24 years.  The inmate's classification score, as of March 21, 2007, was 19.  His classification score has been below 20 since 1989.  The inmate received five (5) CDC-115 disciplinaries, with the most recent in 1995.  He has received (19) CDC-128's with the most recent in 2000.  The inmate has had one (1) disciplinary for substance abuse in 1995 and one (1) for sex offense in 1991.  The inmate dropped out of school in the 11th grade in the community.  The inmate has received his GED while incarcerated.  The inmate has vocational training in machine shop, electronics, upholstery, custom service license and forklift driving.  The inmate currently works in PIA as a warehouse manager.  He has been employed there for 13 years.  The inmate also worked in the shoe factory.  The inmate states that most of his jobs have resulted in him being at supervisor level or a foreman.  The inmate's work ratings have always been above average. The inmate is currently in AA and NA and has been for the last five years.  The inmate

started getting treatment for substance abuse in 1997. The inmate has a total of about seven years in treatment. The inmate is currently in a number of self-help groups, including the Trust group for four years, Impact group for three years, Choice for three to four months, and ARC for the last six months. The inmate started doing self-help in 2000. He has completed about 15 to 20 groups. The inmate is active in his religion and they meet weekly.

INSIGHT / SELF ASSESSMENT: The inmate reports that his personal strengths are that he understands himself now, he is outgoing, he is willing to listen, and he understands other people's situations. The inmate's weakness continues to be his addiction, procrastination, and he continues to build his character. The accomplishment that he takes the most pride is in realizing that he had an addition problem and dealing with it and helping others. The inmate's biggest change is he has learned to love other people. He describes himself as a selfish person prior.

PAROLE PLANS IF GRANTED A RELEASE: The inmate's parole plans are the same as the last Board. He plans to parole to San Francisco, live at Walden House and everything is provided for him. He already has a sponsor there. He has made community contact. The inmate's parole plans are feasible and appropriate.

INMATE UNDERSTANDING OF LIFE CRIME: The inmate was charged with PC §187, Murder Second Degree.

Summary of the Crime: The following is a summary of the Los Angeles County Probation Officer's Report dated September 15, 1982:

On June 14, 1982, James Fitzgerald Thomas, age sixteen, and an unidentified accomplice approached the victim, Daniel Calvillo, on the stairs of a pedestrian footbridge. Thomas grabbed the victim and demanded money. A scuffle ensued between the victim, Thomas, and the accomplice when the victim refused to comply. A witness, the victim's daughter, identified Thomas as the man who shot her father once in the right side of his chest area. The assailants fled, as the victim and his daughter ran toward a nearby laundromat. The victim collapsed and died in the laundromats parking lot.

Prisoner's Version: In the summer of 1982 Thomas left his home going to visit some of his teenage friends. Once at their residence, he found that they were not home. Thomas sat on steps at their apartment waiting for them to return.    As he was sitting there, another acquaintance of his arrived at the apartment. They sat and talked for a while and some how the subject of money came up. After further discussion on how to get money, Thomas agreed to assist the accomplice with robbing someone. Thomas and his friend walked around looking for someone that they thought would be easy to handle. They spotted a man walking along a footbridge. He appeared to be alone, so Thomas and his friend thought that between the two of them they should be able to handle the man.

Thomas and his friend came up with the plan that Thomas would run up to the man and grab a hold of him just as he exited the bridge and hold him while his accomplice would go through his pockets. However, once Thomas grabbed the man, they both fell to the ground.

The man, Daniel Calvillo, put up more of a fight than Thomas thought he would. Thomas' accomplice attempted to help, however Thomas and the man somehow got to their feet and were still fighting when the accomplice pulled out a gun and everything seemed to go quiet and then Thomas heard a gun shot. All three of them, Thomas, his accomplice, and the victim, ran in different directions. Thomas ran home, thinking at the time that it was just a robbery gone sour and no one got hurt. It was about a month later that the police showed up at his home and arrested him and the rest of the story is on record.

The inmate states he first began getting into trouble about the age of 13. He was having problems in the community around this time and he began using alcohol and drugs around the age of 15. His first arrest was for this case, at the age of 16. The inmate has never been in juvenile hall. He has no adult arrest, other than the controlling case.

When asking the inmate why he started getting into trouble, the inmate states he was looking for attention and he was always the "class clown."

The inmate states that around the time of the crime, he was still living at home. He was going to school and attending. He was working with his father. He was smoking marijuana around this time and hanging out with some friends that were getting into trouble. Some of his friends were gang members.

When asking the inmate why he committed this crime, the inmate states that he was trying to impress this guy because he was an important guy in the neighborhood. "I was seeking acceptance from him. I was trying to impress others and I was a follower. I didn't really need the money. I had all the money I needed from the family and I was working."

When asking the inmate where the weapon came from, the inmate states the accomplice had the weapon. He had no prior experience with weapons and had never fired a gun prior to this case. The inmate continues to deny that he used a weapon.

When asking the inmate about the loss of life and the effect on the victim's family, the inmate states it took him a long time to look at this issue. He said he lost his mother and for the first time, realized the devastating effect the loss of a family member can have on a family. He said, "There's a ripple effect that happens when there's a loss like this. This man was the breadwinner of the family. He had small children. His daughter had to be raised without him. His wife had to become a single mother and provide for the family. This must have affected the family for years."

When asking the inmate how one makes restitution for something like this, the inmate states, "You try to give back and help someone else. There's nothing that I can do for the family directly. I'm trying to make a positive impact in other areas. I'm trying to make amends for what I did."

When asking the inmate how he has changed so that something like this would not happen again, he said, "I understand what I've done and the consequences. I look at the big picture

THOMAS, James    C-70569    4    SAN QUENTIN    AUGUST 2007 BPH

now and look at the impact on people. I'm positive and I've changed my mindset. I take responsibility for my actions. I take other people's perspective into account."

When asking the inmate what corrective action he has taken, the inmate states, "I talk about the crime. I try to help others and I allow people to help me."

When asking the inmate about the discrepancy between the file account and his account, which the victim's daughter says that he was the shooter, the inmate states, "I take responsibility for the crime. I never saw the young child with him. At the time, I was scared, excited and caught up in the moment. She may have been mistaken." The inmate goes on to say, "I was the one that ran up and grabbed him, but I didn't have the gun." The inmate states his crime partner never got caught. "I gave them a description, but an arrest wasn't ever made."

MENTAL HEALTH CONCERNS OR PERSONALITY DISORDERS: The inmate has no serious mental illness; however, the inmate meets the diagnostic criteria for Other Substance Abuse. He has used both alcohol and drugs. He began using about the age of 15. The inmate has been clean and sober for about 11 years. The inmate also meets the diagnostic criteria for Personality Disorder NOS with antisocial traits. The inmate began getting into trouble and using drugs at a young age culminating in his controlling case at the age of 16. He also has had multiple disciplinaries while in prison through 1995. He however does that have multiple arrests prior to age of 15 thus does not qualify for Conduct disorder, nor does he have a diverse adult arrest history (Antisocial Personality Disorder).

## V.   DIAGNOSTIC IMPRESSION

| Axis I: | 305.90 | Other Substance Abuse, in remission. |
|---------|--------|--------------------------------------|
| Axis II: | 301.9 | Personality Disorder Nos Diagnosis. |
| Axis III: | V71.09 | No Diagnosis. |
| Axis IV: | | Incarceration for life term. |
| Axis V: | | GAF: 80 |

## VI.   PREVIOUS EVALUATION SUMMARIES

A Mental Health Evaluation dated January 21, 2003 diagnosed the inmate with Cannabis Dependence, in institutional remission; Personality Disorder, Not Otherwise Specified, with Antisocial Traits. The author concludes it is his opinion to a reasonable degree of mental medical probability that Mr. Thomas is currently at a low risk of violent behavior.

A Mental Health Evaluation dated February 8, 2002 diagnosed the inmate with Chronic Disorder, adolescent onset; Cannabis Dependence, in institutional remission. The author concludes that Mr. James Thomas is currently at average to low average degree of risk for violent behavior when compared to average inmates.

A Psychological Evaluation dated June 1998 diagnosed the inmate with Conduct Disorder, in adolescence undifferentiated type; Cannabis Dependence. The author concludes, compared

to the average inmate, his potential for violence is probably below average, assuming his abstinence from drugs and alcohol.

A Psychological Evaluation dated May 1, 1995 does not diagnose the inmate. No risk assessment was conducted.

A Psychological Evaluation dated December 28, 1993 does not diagnose the inmate. No risk assessment was conducted.

A Psychiatric Evaluation dated October 27, 1992 does not diagnose the inmate. His violence potential is average to low in the institutional setting and will probably be low in the free world.

A Diagnostic Unit Evaluation dated December 1991 does not diagnose the inmate. The inmate is seen as being in the low average range for dangerousness in the free community.

A Category X Psychological Testing Report dated December 1991 diagnosed the inmate with Conduct Disorder, in adolescence undifferentiated; Cannabis Dependence. The author concludes his current level of dangerousness is considered to be no more than average when compared to other inmates.

A Category X Psychological Council dated October 10, 1991 diagnosed the inmate with Conduct Disorder, in adolescence; Cannabis Dependence.

A Psychological Evaluation dated September 19, 1990 diagnosed the inmate with Cannabis Dependence; Conduct Disorder. No risk assessment was conducted.

A Psychiatric Evaluation dated February 2, 1990 diagnosed the inmate with Conduct Disorder, in adolescence; Marijuana Dependence.

A Psychological Evaluation dated August 1989 diagnosed the inmate with Conduct Disorder. His violence potential is rated as below average for this population.

A Psychological Evaluation dated August 1986 diagnosed the inmate with Conduct Disorder, in adolescence. His violence potential outside a controlled setting, in the past, has considered being greater than average and in present, is estimated to be decreased.

A Psychological Evaluation dated May 2, 1984 diagnosed the inmate with Conduct Disorder, in adolescence. No violence potential for the free community.

## VII.    VIOLENCE RISK ASSESSMENT/CONCLUSIONS

The Board of Parole Hearings' questions will be addressed for each issue presented, as noted in an earlier section of this report.

1) *The prisoner's violence potential in the free community;*

The current research literature indicates that an empirically based approach to is the most reliable and valid method for assessing risk of future violence. In the present evaluation, two separate assessment guides were used to help estimate this individual's risk for future violence in the community: the Psychopathy Check List – Revised (PCL-R) and the History – Clinical – Risk Management – 20 (HCR-20). The Level of Service/Case Management Inventory (LS/CMI) was utilized as an objective assessment of the inmate's likelihood for general recidivism. The data for scoring these instruments were obtained from information derived in both the inmate interview and the files reviewed. These measures are widely used and are supported by years of research in the risk assessment field. They have been cross validated with various forensic populations, including United States males in correctional settings; however, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The evaluator has taken these factors into consideration in determining how much weight to allot each of the measures and in formulating an overall estimate of risk for future violence in the community. Estimates of risk for violence will be presented categorically: low, moderate, or high.

PCL-R: The PCL-R was used to rate the inmate's records and current interview on the level of psychopathy. The inmate's level of psychopathy is low or at the 7.9 percentile with his personality traits at the 1.4 percentile and past antisocial traits at the 30.7 percentile.

HCR-20: The HCR-20 was used to rate the inmate's records and current interview for level of risk for future violence.

Historical: In rating this individual on the historical factors that predict future violence, the inmate would rate in the low range in his propensity for future violence. There are some elevations on this scale, due to the inmate's age, being involved in unstable relationships, being a limited substance abuser, and having a less serious maladjustment problem with no arrest.

Clinical/Insight: In rating the inmate on this factor, the inmate would rate in the low range for propensity for future violence. The inmate does not have a negative attitude, no active mental health symptoms, and is not impulsive. The inmate has had a very good response to treatment. His insight, acceptance, and responsibility and expressing remorse seem appropriate. There continues to be a discrepancy between the inmate's account the file account that will not be reconciled. Even with his discrepancy, he is in the low range.

Risk Management: The inmate is in the low range in his risk management. He has been able to handle compliance, stress and destabilizers well while in the institutional setting. His parole plans are feasible.

The inmate's overall potential for future violence is in the low range on past historical antisocial factors, clinical insight factors and risk factors when compared to similar inmates.

LS/CMI: The inmate was administered the LS-CMI level of service, case management inventory, section 1, general risk. The inmate's general recidivism is low.

OVERALL RISK ASSESSMENT: The inmate's level of psychopathy is low or at the 7.9 percentile. The inmate's overall potential for future violence is in the low range when compared to similar inmates. The inmate's general recidivism is low.

2). *The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released;*

The inmate began using both alcohol and marijuana at a young age. Neither alcohol nor drugs were involved in the controlling case. He had no arrest in this area. The inmate understands the problems for his use was due to family problems, fighting between his parents and his mother's friends using drugs. He was also looking for acceptance among his friends and dealing with the family stress. The inmate readily acknowledges that substance abuse was a problem. He has been clean and sober now for 11 years. He understands the steps and understands the life-long need for treatment. The inmate states he has taken corrective action by admitting and telling other people what he was going through. He shares his story and he looks at the consequences of his actions. It is recommended that the inmate continue in ongoing substance abuse treatment while incarcerated and it be an intrical part of his parole plans.

3). *The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;*

The inmate can identify a number of reasons why he was getting into trouble as a youth, although never arrested. He liked looking for attention and being the class clown. He has identified the causes of his use of alcohol and drugs, discussed in the prior section. The inmate recognizes that in the controlling case, he was trying to impress this guy from the neighborhood. He was seeking acceptance. It was not for money except for the crime partner. He willing discusses the discrepancy between the file account and his account. He states that he was not the shooter, but clearly takes responsibility for his behavior and being there. He expresses remorse. It is unlikely that a requirement for further exploration of the instant offense will produce more significant behavioral changes of a positive or prosocial nature in the inmate.

4.) *The need for further therapy programs while incarcerated.*

The inmate does not currently present as a candidate for noteworthy change as a result of psychotherapy, from which he has been precluded by virtue of his general population status. It is recommended that he continue in self-help, substance abuse treatment and his religion.

5) *The Axis II and render an opinion.*

The inmate meets the diagnostic criteria for Personality Disorder NOS with antisocial traits. The inmate began getting into trouble and using drugs at a young age culminating in his controlling case at the age of 16. He also has had multiple disciplinaries while in prison through 1995. He however does that have multiple arrests prior to age of 15 thus does not qualify for Conduct disorder, nor does he have a diverse adult arrest history (Antisocial Personality Disorder). Despite the inmates past antisocial traits all three risk assessments score him in the low risk. The inmate's level of psychopathy is low or at the 7.9 percentile with his personality traits at the 1.4 percentile and past antisocial traits at the 30.7 percentile. The inmate's overall potential for future violence is in the low range on past historical antisocial factors, clinical insight factors and risk factors when compared to similar inmates. The inmate's general recidivism is low.

*Dr. R Starrett*

**5-4-2007**

Richard Starrett, Ph.D.,Ph.D., CA License # PSY-13628        Date Submitted
Contract Forensic Psychologist
Forensic Assessment
Division/Board of Parole Hearings
California Department of Corrections and Rehabilitation

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA). If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

# EXHIBIT B

ORIGINAL FILED

FEB 24 2005

LOS ANGELES
SUPERIOR COURT
**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

In re,

JAMES THOMAS,

    Petitioner,

On Habeas Corpus

)
)
)
)
)
)
)
)
)
)

Case No.: BH003061
    (A6240451)
ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered Petitioner's Writ of Habeas Corpus filed on December 2, 2004. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Terms ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner is unsuitable for parole. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667; *see* Cal. Code Regs., tit. 15, §2402.)

The Board found Petitioner unsuitable for parole because the commitment offense was carried out in a dispassionate and calculated manner (Cal. Code Regs., tit. 15, §2281 (c)(1)(B)), demonstrated an exceptionally callous disregard for human suffering (Cal. Code Regs., tit. 15, §2402(c)(1)(D), and that the motive for the crime was inexplicable or very trivial (Cal. Code Regs., tit. 15, §2402(c)(1)(E)). The record reflects Petitioner and an unidentified accomplice approached the victim on the stairs of a pedestrian footbridge. Petitioner grabbed the victim and demanded money. A scuffle ensued between the victim and Petitioner's accomplice. Petitioner then shot the victim and ran.[1] The victim died in a nearby parking lot. Therefore, there is "some

---

[1] The victim's nine-year old daughter was with him at the time of the attack. She identified Petitioner as the shooter. Petitioner denies he had a gun or that he shot the victim. He identified his crime partner, who has apparently never been apprehended, as the shooter.

1  evidence" the crime was carried out in a dispassionate and calculated manner and that the motive

2  was inexplicable or very trivial. However, an "exceptional callous disregard for human

3  suffering" means the offense in question must have been committed in a more aggravated or

4  violent manner than that ordinarily shown in the commission of that offense. (See In re Scott

5  (2004) 119 Cal.App.4th 871, at 891.) There is no evidence in the record that Petitioner's offense

6  was more aggravated or violent than ordinarily shown in the commission of second-degree

7  murder. Thus, there is no evidence to support the Board's conclusion that the offense

8  demonstrated an exceptionally callous disregard for human suffering.

9       The Board also found Petitioner unsuitable because of his prior criminal record (Cal.

10  Code Regs., tit. 15, §2402(c)(2)) and prior unstable social history (Cal. Code Regs., tit. 15,

11  §2402(c)(3)). There is no evidence in the record to support either of those conclusions. While

12  Petitioner admitted to having committed two robberies prior to the commitment offense for

13  which he was never arrested, there is no evidence that during those robberies Petitioner inflicted

14  or attempted to inflict serious injury on a victim.[2] (Cal. Code Regs., tit. 15, §2402(c)(2).)

15  Further there is no evidence Petitioner has a history of "unstable or tumultuous relationships with

16  others." (Cal. Code Regs., tit. 15, §2402(c)(3).)

17       The Board also found Petitioner unsuitable because his residential parole plans are

18  "ambiguous" (Cal. Code Regs., tit. 15, §2402(d)(8)) and because he has failed to sufficiently

19  participate in self-help programming (Cal. Code Regs., tit. 15, §2402(d)(9)). Petitioner presented

20  letters from family members both in Los Angeles County and outside of the county that extended

21  offers of a residence upon release. Thus, there is no evidence Petitioner's parole plans are

22  unrealistic. However, the record reflects Petitioner's participation in self-help programming has

23  been relatively recent compared to the number years he has been incarcerated. That appears to

24  have been of significant concern for the Board, in particular because Petitioner's version of the

25

26  [2] Petitioner actually told the Board he committed one "burglary" and one "strong arm robbery." When asked by the
    Presiding Commissioner if that meant he hit somebody Petitioner stated, "no, I just grabbed (inaudible) pocket, you
27  know, (inaudible)." Further, Petitioner denied he committed those crimes at gunpoint. The legal definition of
    robbery includes taking another's property by force. Thus, one can be guilty of robbery without inflicting or
28  attempting to inflict serious injury on a victim. Without additional facts regarding the circumstances of Petitioner's
    past crimes, there is insufficient evidence that Petitioner has a previous record of violence within the meaning of the
    statute.

1  life crime is inconsistent with the version recounted in the probation officer's report. Where

2  guilt is uncontested, Petitioner's version of the events may be "some evidence" he lacks remorse

3  and understanding of the nature and magnitude of the offense. (*See In re McClendon* (2004) 113

4  Cal.App.4th 315, 322.) Thus, there is "some evidence" Petitioner is unsuitable because he lacks

5  sufficient insight into the circumstances of the crime and could therefore, benefit from additional

6  participation in self-help programming.

7      Accordingly, the petition is denied.

8

9

10

11  February 24, 2005



12

13  Clerk to give notice                    DAVID S. WESLEY

14                                          Judge of the Superior Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

# EXHIBIT C





# State of California

# High School Equivalency Certificate

This is to certify that

JAMES F. THOMAS

has met the standards established by the California State Board of Education for successful completion of tests of General Educational Development and is therefore entitled to this high school equivalency certificate.

JULY 29, 1986

*President of the California State Board of Education*

*Superintendent of Public Instruction*

112666



# Certificate of Completion

Proudly made in California
www.pia.ca.gov
CALIFORNIA REPUBLIC
PIA

This is to certify that

## James Thomas

Has successfully completed
the presession training program in

## "Workplace Essential Skills"

Industry: **Furniture**

Institution: **San Quentin State Prison**
CDC # C-0569

Facilitator or Supervisor

Date

General Manager, Prison Industry Authority



Centerforce & California Department of Corrections

# Certificate of Completion

This certificate hereby grants Peer Educator status to

## James Thomas

On this date, November 22, 2002

In recognition of the successful completion of Basic Infectious Disease Training as a requisite for the Inmate Peer Education Program at San Quentin State Prison.

Yolanda Najera, Peer Education Project Coordinator

Lori Rodriguez, Regional Coordinator

Robert Flax, PhD, Community Resources Manager

# Certificate of Achievement

State of California — Department of Corrections

Hereby certifies that

## James Thomas

has successfully completed a training program in

**Fork Lift Operation**

THE GREAT SEAL OF THE STATE • EUREKA • CALIFORNIA

_P.I.A. Administrator_

**April 30, 2002**

Date

_Industrial Supervisor_





# Certified Customer
## Service Specialist

### James F. Thomas - CSSCA533
### San Quentin, California

has succesfully completed the technical examinations and requirements to be universally recognized for competency, ability, and knowledge as a Certified Customer Service Specialist. To be recognized for this honor, practicing technical personnel must pass examinations in product technology understanding and customer-relations decision-making skills with at least a 75% score. They also must accept the CSS Code of Conduct. Only well trained technicians with 'people skills' are able to accomplish this feat. The Electronics Technicians Association takes great pride in presenting this official recognition to the above named expert Customer Service Specialist. His/her name has been published in the High Tech News journal, imbedded in the CSS permanent database, and is available for recognition by officials of the industry. This individual may display the CSS identification items or advertise his level of accomplishment as a technical specialist. Congratulations from ETA officers and members and the electronics industry.

Date of Issue
October 05,
2004



The Electronics Technicians Association, International, Inc.
Greencastle, Indiana

*Richard L. Glass, CETsr*
President, Electronics Technicians Assn. Intl.

ICAC
International Certification
Accreditation Council

# Certificate of Proficiency

This is to certify that

## James Thomas Jr.

*Has achieved proficiency
in the following occupational category:*

Industry: **Wood Products**

Institution: **San Quentin State Prison**
CDC #:   C-70569

| Job Title/Specialty | D.O.T. No. * | No. of Hours |
|---|---|---|
| Furniture Upholsterer | 780.381-018 | 2,400 + |

* US Department of Labor, Dictionary of Occupational Titles

_____
Supervisor

15-5-03
Date

_____
General Manager, Prison Industry Authority



# Nonviolent Communication
# Certificate of Completion

Is awarded to:

## JAMES THOMAS

On Wednesday, November 14, 2007

This certificate is for a total of: 15 Sessions that equal a
total number of: 30 hours of instruction in:

## NONVIOLENT COMMUNICATION (BASIC 1)



W. Reeves
Vice Principal

Sharran Zeleke
Instructor

# Nonviolent Communication
# Certificate of Completion

Is awarded to:

## JAMES THOMAS

On Wednesday, April 09, 2008

This certificate is for a total of:  16 Sessions that equal a
total number of:  32 hours of instruction in:

## NONVIOLENT COMMUNICATION (BASIC 2)

_W. Reeves_
_Vice Principal_

_Carol Chase_
_Instructor_

# Healthy Oakland Urban Male Health Center
## Community Health Institute



having completed the necessary classes on cancer, heart disease, stroke, diabetes, cholesterol, HIV/AIDS and having satisfied all other requirements is hereby declared a

## James Thomas

### Health Advocate

and is awarded this

**DIPLOMA**

with all the honors and privileges pertaining thereto.
In testimony whereof the signatures of Raymond E. Lankford, MSW; Executive Director and H. Geoffrey Watson, MD; Medical Director have been affixed this day, December 17, 2007.

*Raymond E. Lankford, MSW*
**Executive Director**

*H. Geoffrey Watson, MD*
**Medical Director**

HEALTHY OAKLAND
"SAVING LIVES"



# Healthy Oakland Urban Male Health Center
## Community Health Institute

Name: **James Thomas**    Student Identification No. 6598
Graduation Date: December 17, 2007
Diploma Awarded: **Health Advocate**
Grade Point Average: **P**

## STUDENT TRANSCRIPT

**Year:** 2007                              **Semester:** Fall

| Dept. Health | Course No. | Course | Grade | Credit Hrs. |
|---|---|---|---|---|
| | 508 | **Cancer** | P | 3 |

**Year:** 2007                              **Semester:** Fall

| Dept. Health | Course No. | Course | Grade | Credit Hrs. |
|---|---|---|---|---|
| | 509 | **Heart Disease** | P | 3 |

**Year:** 2007                              **Semester:** Fall

| Dept. Health | Course No. | Course | Grade | Credit Hrs. |
|---|---|---|---|---|
| | 510 | **Stroke** | P | 3 |

**Year:** 2007                              **Semester:** Fall

| Dept. Health | Course No. | Course | Grade | Credit Hrs. |
|---|---|---|---|---|
| | 511 | **Diabetes** | P | 3 |

**Year:** 2007                              **Semester:** Fall

| Dept. Health | Course No. | Course | Grade | Credit Hrs. |
|---|---|---|---|---|
| | 512 | **Cholesterol** | P | 3 |

**Year:** 2007                              **Semester:** Fall

| Dept. Health | Course No. | Course | Grade | Credit Hrs. |
|---|---|---|---|---|
| | 513 | **HIV/AIDS** | P | 3 |

Total Credit Hours = 18





# The Art & Science of Building Relationships

*This is to certify that*

## James Thomas

*has completed 10 hours of training in:*

*Introduction to Relationship Enhancement*

Granted: November 5, 2007

Dr. Arnold Chavez
(Authorized Presenter)

Dr. Juanita P. Mendez
(Authorized Presenter)

Dr. Garry A. Mendez Jr.
(Executive Director of the National Trust)

# FULL CIRCLE
## ADDICTION RECOVERY SERVICES
**2625 Alcatraz Avenue #198, Berkeley CA 94705 * 510/652-3311**

Re: **JAMES THOMAS**                    March 2007

To Whom It May Concern:

This is to acknowledge that James Thomas has successfully completed the requirements of Full Circle's Addiction Recovery Counseling (ARC) drug and alcohol treatment program at San Quentin State Prison, San Quentin, California.

We congratulate Mr. Thomas on completing the rigorous 16-week ARC program, which includes 48 classes in the areas of Understanding Addiction, Relapse Prevention, and Life Skills; three group counseling sessions per day; outside self-help meetings, and one-on-one case management sessions.

Full Circle Addiction Recovery Services is proud to have Mr. Thomas as one of our ARC graduates and wishes him well in his ongoing recovery.

Sincerely,

Claire-Elizabeth DeSophia MA, MFT
Program Director, Addiction Recovery Counseling Program
Executive Director, Full Circle Addiction Recovery Services

# Certificate of Achievement

## FULL CIRCLE
### ADDICTION RECOVERY SERVICES
#### CONGRATULATES

# JAMES THOMAS

### ON HIS COMPLETION OF THE

## ARC

#### ADDICTION RECOVERY COUNSELING PROGRAM
#### AT SAN QUENTIN STATE PRISON, MARCH 2007

CLAIRE~ELIZABETH DeSOPHIA MFT, EXECUTIVE DIRECTOR

**FULL CIRCLE ADDICTION RECOVERY SERVICES**
2625 ALCATRAZ AVENUE #198 * BERKELEY CA 94705 * 510/652-3311

# ARC in San Quentin
Official Transcript of Completions

**Final Report**



**ID No.: C70569    Client Name: THOMAS, J.**

**Housing: 3 N 007U**

Intake Date: 9/15/06    TX Start Date: 10/6/06    Program Completion Date: 3/30/07    Exit Date: 3/30/07

| Completion Date | Course No. | Curriculum Description | Units |
|---|---|---|---|
| 10/6/06 | CM01 | Community Meeting | .5 |
| 10/6/06 | LS301 | Nutrition | 1.0 |
| 10/6/06 | PG01 | Group Counseling | 1.0 |
| 10/6/06 | RG01 | Reflection Group | .5 |
| 10/6/06 | RP201 | What is Relapse? | 1.0 |
| 10/6/06 | UA101 | What is Addiction? What is Substance Abuse? | 1.0 |
| 10/13/06 | CM02 | Community Meeting | .5 |
| 10/13/06 | LS302 | Feelings & Self-Esteem | 1.0 |
| 10/13/06 | PG02 | Group Counseling | 1.0 |
| 10/13/06 | RG02 | Reflection Group | .5 |
| 10/13/06 | RP202 | Relapse Prevention Tools | 1.0 |
| 10/13/06 | UA102 | Introduction to 12-Step & Other Self-Help Programs | 1.0 |
| 10/20/06 | CM03 | Community Meeting | .5 |
| 10/20/06 | LS303 | Couples in Recovery | 1.0 |
| 10/20/06 | PG03 | Group Counseling | 1.0 |
| 10/20/06 | RG03 | Reflection Group | .5 |
| 10/20/06 | RP203 | Relapse Triggers & Cravings; PAWS | 1.0 |
| 10/20/06 | UA103 | Sponsorship & Working the Steps | 1.0 |
| 11/3/06 | CM04 | Community Meeting | .5 |
| 11/3/06 | LS304 | Assertiveness & Boundaries | 1.0 |
| 11/3/06 | PG04 | Group Counseling | 1.0 |
| 11/3/06 | RG04 | Reflection Group | .5 |
| 11/3/06 | RP204 | Remembering Consequences | 1.0 |
| 11/3/06 | UA104 | Step One | 1.0 |
| 11/17/06 | CM05 | Community Meeting | .5 |
| 11/17/06 | LS305 | Sex, Drugs & Alcohol | 1.0 |
| 11/17/06 | PG05 | Group Counseling | 1.0 |
| 11/17/06 | RG05 | Reflection Group | .5 |
| 11/17/06 | UA105 | Steps Two & Three | 1.0 |
| 12/8/06 | CM07 | Community Meeting | .5 |
| 12/8/06 | LS307 | Spirituality in Recovery | 1.0 |
| 12/8/06 | PG07 | Group Counseling | 1.0 |
| 12/8/06 | RG07 | Reflection Group | .5 |
| 12/8/06 | RP207 | Stress Reduction & Healthy Living | 1.0 |
| 12/8/06 | UA107 | Effects of Tobacco & Prescription Drugs | 1.0 |
| 12/15/06 | CM08 | Community Meeting | .5 |
| 12/15/06 | LS308 | King Baby | 1.0 |
| 12/15/06 | PG08 | Group Counseling | 1.0 |
| 12/15/06 | RG08 | Reflection Group | .5 |
| 12/15/06 | RP208 | Relaxation Thru Guided Visualization | 1.0 |
| 12/15/06 | UA108 | Brain Chemistry & Addiction | 1.0 |
| 12/22/06 | LS309 | Communication Skills 1: Healthy Communication | 1.0 |
| 12/22/06 | PG09 | Group Counseling | 1.0 |
| 12/22/06 | RG09 | Reflection Group | .5 |
| 12/22/06 | RP209 | Goal-Setting & Time Management | 1.0 |
| 1/26/07 | CM10 | Community Meeting | .5 |
| 1/26/07 | LS310 | Communication Skills 2: Non-Violent Communication | 1.0 |
| 1/26/07 | PG10 | Group Counseling | 1.0 |
| 1/26/07 | RG10 | Reflection Group | .5 |
| 1/26/07 | RP210 | Coping & Refusal Skills | 1.0 |

| Completion Date | Course No. | Curriculum Description | Units |
|---|---|---|---|
| 1/26/07 | UA110 | Other Addictions: Gambling, Sex, Relationships, Debting, Overspending, Food, Etc. | 1.0 |
| 2/2/07 | CM11 | Community Meeting | .5 |
| 2/2/07 | LS311 | Anger Management | 1.0 |
| 2/2/07 | PG11 | Group Counseling | 1.0 |
| 2/2/07 | RG11 | Reflection Group | .5 |
| 2/2/07 | RP211 | Denial & Stinkin' Thinkin' 1 | 1.0 |
| 2/2/07 | UA111 | Addiction & Family Dynamics | 1.0 |
| 2/9/07 | CM12 | Community Meeting | .5 |
| 2/9/07 | LS312 | Grief & Forgiveness | 1.0 |
| 2/9/07 | PG12 | Group Counseling | 1.0 |
| 2/9/07 | RG12 | Reflection Group | .5 |
| 2/9/07 | RP212 | Men's Issues in Recovery | 1.0 |
| 2/9/07 | UA112 | Domestic Violence & Addiction: Cycle of Violence | 1.0 |
| 2/16/07 | CM13 | Community Meeting | .5 |
| 2/16/07 | LS313 | Self-Esteem & Self-Love | 1.0 |
| 2/16/07 | PG13 | Group Counseling | 1.0 |
| 2/16/07 | RG13 | Reflection Group | .5 |
| 2/16/07 | RP213 | Substance Abuse & Criminal Thinking 1 | 1.0 |
| 2/16/07 | UA113 | Addiction & Family (Video) | 1.0 |
| 2/23/07 | CM14 | Community Meeting | .5 |
| 2/23/07 | LS314 | Healthy Living | 1.0 |
| 2/23/07 | PG14 | Group Counseling | 1.0 |
| 2/23/07 | RG14 | Reflection Group | .5 |
| 2/23/07 | RP214 | Substance Abuse & Criminal Thinking 2 | 1.0 |
| 2/23/07 | UA114 | Roles & Rules in Dysfunctional Families | 1.0 |
| 3/2/07 | CM15 | Community Meeting | .5 |
| 3/2/07 | LS315 | Health Realization | 1.0 |
| 3/2/07 | PG15 | Group Counseling | 1.0 |
| 3/2/07 | RG15 | Reflection Group | .5 |
| 3/2/07 | RP215 | Gorski Material | 1.0 |
| 3/2/07 | UA115 | What is Codependency? What is Enabling? | 1.0 |
| 3/9/07 | CM16 | Community Meeting | .5 |
| 3/9/07 | LS316 | Chemical Dependency & Mental Illness | 1.0 |
| 3/9/07 | PG16 | Group Counseling | 1.0 |
| 3/9/07 | RG16 | Reflection Group | .5 |
| 3/9/07 | RP216 | Gorski Material | 1.0 |
| 3/9/07 | UA116 | Chemical Dependency & Mental Illness | 1.0 |
| 3/23/07 | CM17 | Community Meeting | .5 |
| 3/23/07 | LS317 | Motivation in Recovery | 1.0 |
| 3/23/07 | PG17 | Group Counseling | 1.0 |
| 3/23/07 | RG17 | Reflection Group | .5 |
| 3/23/07 | RP217 | Consequences of Addiction | 1.0 |
| 3/23/07 | UA117 | Uppers, Downers, All-Arounders | 1.0 |
| 3/30/07 | CM18 | Community Meeting | .5 |
| 3/30/07 | PG18 | Group Counseling | 1.0 |
| 3/30/07 | UA118 | Denial & Stinkin' Thinkin' 2 | 1.0 |

| | |
|---|---|
| **Total Sessions During Report Period:** | **18** |
| **Total Units Available During Report Period:** | **80.0** |
| **Total Units Completed:** | **80.0** |

C. E. DeSophia MFT

**Claire-Elizabeth DeSophia MFT**
ARC Program Executive Director

**FULL CIRCLE**
**ADDICTION RECOVERY SERVICES**
**2625 Alcatraz Avenue #198, Berkeley CA 94705 * 510/652-3311**

October 11, 2007

This letter is to acknowledge the accomplishments of James Thomas in the planning
and implementation of the successful Recovery Month event, held on September 8,
2007 in the lower yard of the San Quentin Prison. The event required a great deal of
effort, teamwork, responsibility and commitment.

Mr. Thomas demonstrated the ability to coordinate and assist his team members in
dealing with the logistics of putting the event together, as well as effective
communication with the administration of the facility. Mr. Thomas's efforts, dedication
and ongoing focus to the theme of sobriety and support of recovery greatly attributed to
the actualization and success of this event  He was very active  in assisting those who
had questions about the ARC program as well as interacting with the visitors outside the
program. It was evident to me that Mr. Thomas not only demonstrated considerable
growth in his personal pursuit toward sobriety, but has compassion and caring for
assisting others in the process of their own recovery.

Sincerely,

Rick Baez,
Board Member Full Circle Addiction Services
Sponsor, ARC Alumni Association

Enc.



# CERTIFICATE

Of

## Occupational Title and Classification

This is to certify that

*James Thomas*

C-70569

Has been engaged in the following occupational categories:

| TITLE | HOURS | OCCUPATIONAL GROUP* ARRANGEMENT | WORKER TRAIT* GROUP | COMPETENCY LEVEL (1) SKILLED (3) FAMILIARIZATION (2) SEMI-SKILLED (4) UNSATISFACTORY |
|---|---|---|---|---|
| Asst. Leadman Upholsterer | 13,455 | 780 | 684-034 | (1) Skilled |

*Denotes Dictionary of Occupational Title Codes

J. Briese
Industries Manager
Prison Industry Authority
San Quentin State Prison
(415) 454-1460 Ext. 5287

Prison Industry Authority
P.O. Box B
San Quentin, Ca. 95964

February 27, 2002
Date



Volunteers of America
Bay Area

Volunteers of America Bay Area (VOABA)
Project Choice
1601 Harbor Bay Parkway, Suite 150
Alameda, CA 94502


June 22, 2007

To Whom It May Concern:

On June 22, 2007, James Thomas successfully completed 120 hours of facilitator training in the "Getting it Right" curriculum with Project Choice, sponsored by (VOABA). The Getting it Right" curriculum is based on over 15 years of research by Dr. James Prochaska, Dr. Carlo Diclemente, Dr. John Norcross and others about "self-change."

The goal of the Project choice and Volunteers of America Bay Area program is for participants to change criminal behavior. The purpose of this training is to provide Project choice facilitators with an understanding of Biopsychosocial behaviors and it's range of cognitive, emotional behaviors and the cause and effects of irresponsible vs. responsible developmental decision making.

This training provides the trainee with research-based methods designed to promote constructive moral character, positive attitudes, educational and interpersonal skills that enhance personal, social and community safety. Training consisted of a willingness to change irresponsible criminal behavior, and intensive internal/external journaling in a five-book process: Responsible Thinking, Personal Growth, Relapse Prevention, Managing My Life and Change Plan.

The primary outcomes of the Project choice program are designed to help parolees establish a successful parole and continue to live their lives with renewed vigor, a sense of self worth and commitment to being assets to their families and communities.

Mr. Thomas should be commended for his efforts within productive citizenship and his endeavor toward educating himself in the effort to be an asset toward self, family, friends and community.

Sincerely,

James Brown
Program Manager
Project Choice


*A Ministry of Service*

Volunteers of America, Bay Area, Inc., 1601 Harbor Bay Parkway, Suite 150, Alameda, California 94502
Tel: 510.473.0500, Fax: 510.473.9225
http://www.voaba.org



# Volunteers of America Bay Area

## Project Choice

**CERTIFICATE OF COMPLETION**

**Certifies that on this 22nd day of June of 2007**

### James Thomas

Has successfully completed 120 hours facilitator training in the "Getting it Right" curriculum with the Project Choice Program.

John R. Bailey, Jr.
President/CEO

James Brown
Program Manager

# ORGANIZATIONAL ACHIEVEMENTS

## 2004

Black History Month Celebration
Cinco de Mayo Celebration
Independence Day Celebration
"Grave Robber" Presentation
"Hot Dog & Beverage" Give-Away
Save the Children Walk-a-thon
1st TRUST Health Fair
Sponsor Award Social

# AFFILIATE ORGANIZATIONS

National TRUST
University of San Francisco
Sonoma State University
United Players
Hitland Ministries
Yeshua's Second Chance Foundation
Alameda County Health Department
Urban Strategies
KMEL Radio Station
Black and Brown/Thizz Entertainment
Phat Rat Entertainment
California Building and Design

San Quentin State Prison
1 Main Street, San Quentin, Ca 94974
(415)454-1460 (Ext. 5000)
www.keepthetrust.org

# CHANGING Liabilities INTO ASSETS

San Quentin T.R.U.S.T for the
Development of Incarcerated Men


KEEP THE TRUST

San Quentin **T.R.U.S.T.** for the Development of Incarcerated Men

**TRUSTFELLOWS**

Teaching Responsibility Utilizing Sociological Training



# WHO WE ARE

The San Quentin T.R.U.S.T. for the Development of Incarcerated Men is a group of 30 men who have taken on the task of changing liabilities into assets. Our desire is to educate organize and assist incarcerated men to become a vibrant and productive community through an understanding and reawakening to their history, culture and values; as we believe that values determine our lifestyles and behavior. Our goal is to assist men in the positive restoration of self, which will effect a positive change in family and ultimately the community.

The T.R.U.S.T. recognizes that the challenges for a successful re-entry into society require inclusion, equity, education, employment, empowerment and opportunity. Therefore it has been important that we "Build a bridge to the community" that will allow area specific professionals to stimulate and assist the transformation that we must go through, so that our transition to a non-incarcerated life will be a successful one.

# HOW WE DO IT

Since its inception, the T.R.U.S.T. has collaborated with both inside and outside communities through a variety of activities and projects.

## **Workshops:**

In order to assist and prepare incarcerated men to become assets to themselves, their families and their communities, the T.R.U.S.T. with the University of San Francisco and area specific professionals provides a 3 module (The Purging Process, The Trust Value System, Release Plan & Re-entry), 11 session workshop series.

The T.R.U.S.T. believes that for men to make the transformation from a liability to an asset, a three-step process must occur. First, they must address their value system and determine what values lead to behavior that has diminished their possibilities. In so doing, they must purge themselves of the negative value system. Second, they must adopt a new value system that enhances their possibilities. Third, they must determine their community marketability and develop a definitive release plan.

## Culturally Inclusive Celebrations:

Community Outreach yard shows and lectures foster cultural awareness and prompt traditional values. A T.R.U.S.T. sociological theory is that **History + Culture = Values.** We believe that values determine lifestyle and behavior. Cultural events help us to respect and value the story and culture of others. They also help us to reflect on our own culture, and explore how culture affects the individual and how the individual may in turn influence culture.

## Fundraisers:

Fundraisers (***Food Sales*** and ***Walk-a-Thons***) not only provide various food choices to the inmate population, but they also provide the T.R.U.S.T. with the ability to donate to charitable organizations, the Inmate Welfare Fund, and a Victims' Fund. These fundraisers accommodate the T.R.U.S.T. in becoming supportive and participatory in community activities revolving around delinquent youth involved with drugs, gangs, truancy, etc. These sales also provide funds for such activities as T.R.U.S.T. support for alternative schools and individual students in the greater Bay Area.

## Awards Presentations:

The T.R.U.S.T. holds annual awards presentations for both inside and outside community members.    Awards presentations provide acknowledgement to those individuals and organizations that contribute to the causes of community building through the development of incarcerated men.   The presentations also serve to strengthen the bond between the T.R.U.S.T., its partners, and encourage the continuation of community service.

## Health Fairs:

The T.R.U.S.T. believes not only that violence is a health issue, but also that individual health consciousness is essential to a healthy family and community. Thus, the T.R.U.S.T, in conjunction with Alameda County Public Health Department holds an annual Health Fair. The Health Fair stimulates the awareness of the correlation between a healthy body and a healthy mind.     The Health Fairs encourage education, motivation and personal accountability.    They also encourage personal responsibility and the maintaining of an honorable level of integrity that will lead to healthy behavior.

## Richmond Project:

The Richmond Project mission is to respond to the many complicated social problems of the city of Richmond, Ca. by creating and maintaining a continuous and broad working relationship between the incarcerated men from Richmond and elected officials, organizations, community leaders, business owners and citizens.

It is our belief that the cooperation and organization of community members both inside and outside will successfully reduce crime, violence and recidivism. This combination of the inclusion, the proper reintegration of reformed incarcerated men, and reciprocal support will generate economic empowerment, convert community liabilities into assets, and produce a myriad of desired change in the city of Richmond.

## Project Choice:

In Project Choice, the T.R.U.S.T., Volunteers of America, and the City of Oakland, Ca collaborate to ensure the personal development and successful reentry of young men who reside in the city of Oakland. Project Choice provides curriculum facilitated by Trustfellows and upon release housing and employment assistance.

# TRUSTFELLOWS

<u>T</u>eaching <u>R</u>esponsibility <u>U</u>tilizing <u>S</u>ociological <u>T</u>raining



National Director:
Garry Mendez, Ph.D.

Chief Sponsor:
Lt. Sam Robinson

**Executive
Committee**

Chairman:
David Cowan

Vice-Chairman:
Desmond Crockett

Secretary:
Michael Tyler

Treasurer:
Michael Bjorlin

Outside Coordinator:
Ernest Morgan

Sergeant at Arms:
Philip Senegal

Executive Advisor:
Kim Richman, Ph.D.

May 31, 2007

Board of Prison Terms "Chairman"
1515 "K" Street, 6th Floor
Sacramento, CA 95814

Re: James Thomas C-70569

Dear Chairman:

I am writing on behalf of Inmate James Thomas. As the chief sponsor of the San Quentin T.R.U.S.T. for the Development of Incarcerated Men, I have had the opportunity to watch inmate Thomas's activity and progression in the group. The San Quentin T.R.U.S.T. for the Development of Incarcerated Men is an inmate activity group founded in response to recidivism, crime and their causes. The philosophy of the San Quentin T.R.U.S.T. is based on a responsibility not only for oneself and family, but also for the community. A commitment to all people, respect, responsibility, excellence, and integrity are the principles that guide this activity group. With these principles in mind, the San Quentin T.R.U.S.T. seeks to respond to the community's safety issues by addressing the value systems of participants enrolled in their workshops. The T.R.U.S.T., and every Trustfellow is a model of leadership within the institution and an example to the community of potential within the prison system when men have committed to changing their lives. The T.R.U.S.T. has also shown itself to be a leader in vigorous response to familial and community problems through the development of community oriented thought within the incarcerated man. In short, the T.R.U.S.T. is designed to turn liabilities into assets.

James is not just a member, but he is one of the founding members of the T.R.U.S.T. From its inception in December 2003 with the submission of its by-laws, James has had the confidence of its members. Besides the standard expectations of commitment and participation demanded of a Trustfellow in being an agent of change, James serves on the Media committee. In this sensitive position, he is responsible for presenting the public image of the T.R.U.S.T. He has also shown that he has the tact and patience to clearly and accurately express the voice of the T.R.U.S.T. under the pressure of politically charged and difficult questioning. He holds this position because he has proven that he has a comprehensive understanding of public affairs and community concerns – an understanding that a person can have only if he has already made the necessary changes in his own thinking and decision making.

**TRUSTFELLOWS**

Teaching Responsibility Utilizing Sociological Training

Despite his assigned duties, James does not hesitate to be involved in more laborious tasks alongside his fellow members. He has been instrumental in the coordination of our annual Health Fair held in collaboration with the Alameda County Public Health department. He shows his enthusiasm and commitment to the group's vision by participating in many smaller, but no less important tasks. He has been instrumental in the recruitment of other men who desire to live lives of integrity.

James has served the T.R.U.S.T. with passion. He has displayed reliability and dependability in his presence and participation during special events when extra work is needed. His involvement has shown a mutual belief in the T.R.U.S.T. vision of diffusing a new consciousness in all people, and its value system of respect and responsibly. The Board would do well in finding James Thomas suitable for parole.

Sincerely,

Lt. Sam Robinson, (Chief Sponsor)
San Quentin State Prison

Cc:
Correctional Counselor I
San Quentin State Prison
San Quentin, Ca. 94974

KEEP THE TRUST



*Credentials of Certification*

James Thomas

is a duly accredited

*T.R.U.S.T. Faciliitator*

Having met the criteria necessary for certification in the curriculum of the National Trust and the San Quentin T.R.U.S.T. for the Development of Incarcerated Men.

Date: 9/17/07

Garry V. Mendez, Ph.D.
Founder/National Director

# San Quentin TRUST

**This Certificate Is Presented To**

## James Thomas



In honor of this consistent participation and dedication to the San Quentin TRUST for the Development of Incarcerated Men. Through his hard work and commitment, his public service to this program is a constant encouragement to the TRUST participants- inmate, volunteer and staff alike. He embodies the TRUST and its goals by accepting that changes need to occur and this change must start from within.

Dr. Garry Mendez
Executive Director

Dr. Kim Richman
Executive Advisor

# CERTIFICATE OF PARTICIPATION

This is given in recognition of

## MR. JAMES THOMAS

As a member of the San Quentin T.R.U.S.T. for the Development of incarcerated Men, in good standing who has committed to and participated in all T.R.U.S.T., endeavors in furtherance of our mission and vision.

Gary H. Wody
Executive Director

R. G. Williams
Co-Chief Sponsor

Valerie Rose
Co-Executive Advisor

KEEP THE TRUST



# San Quentin T.R.U.S.T.

This Certificate is Presented To

_____ San Quentin TRUST for the
_____ TRUST Fellow, your diligence
_____ the System are greatly appreciated.
_____ family, and our community.

in honor of this continued participation
Development of Incarcerated Men.
and strong commitment to the T.R.U.S.T.
You are an asset to the program

Dr. Kim Richman, Ph.D.
Executive Advisor

Lieutenant Sam Robinson
Chief Sponsor

11/29/0
Date



**nt de Paul**
*Alameda County*

❏ **District Council**
❏ **Food Locker**
❏ **Conference Support**
   9235 San Leandro Street
   Oakland, CA 94603
   Ph: (510) 638-7600
   Fx: (510) 638-8354

❏ **Free Dining Room**
   675 - 23rd Street
   Oakland, CA 94612
   Ph: (510) 451-7676
   Fx: (510) 451-0302

❏ **Visitation Center**
   2260 San Pablo Avenue
   Oakland, CA 94612
   Ph: (510) 444-3790
   Fx: (510) 444-0539

❏ **Champion Guidance Center**
   2280 San Pablo Avenue
   Oakland, CA 94612
   Ph: (510) 444-0263
   Fx: (510) 444-0539

❏ **Retail Services**
   ❏ **Alameda Store**
   ❏ **Oakland Center Store**
   ❏ **Oakland Downtown Store**
   ❏ **Fremont Store**
   ❏ **Livermore Store**
❏ **Auto Donations/Sales**
   9235 San Leandro Street
   Oakland, CA 94603
   Ph: (510) 638-7600
   Fx: (510) 638-8354

■ **Website**
   www.svdp-alameda.org

■ **E-mail**
   info@svdp-alameda.org

December 18, 2006

Dear San Quentin Trust Group.,

On behalf of all of us at the St. Vincent de Paul Free Dining Room, especially those men, women, and children who are the recipients of your generosity would like to appreciate your kindness. We are most grateful for your contribution of Fish, Roast Beef, Hawaiian Chicken, BBQ Beef, Salad and other tasteful food. Your gift will enable us to continue to carry out our mission of serving hot, nourishing meals to all who come to eat at our Dining Room and Satellite sites.

Your thoughtful remembrance of God's Poor is greatly appreciated.

May the God of Peace grant you an abundance of His gifts for your generosity to His Poor.

Sincerely

Nelijah Carminer

Prepared by Nelijah Carminer, Administrative Assistant

Our Federal ID number is 94-1156493. Pursuant to terms of the new Internal Revenue Code, this letter acknowledges your gift, and confirms that our organization did not provide you with any goods or services in Whole or partial consideration for the above contribution.

## ACKNOWLEDGEMENTS

The San Quentin TRUST thanks the following people for making this a successful event:

Robert L Ayers, Jr.- San Quentin State Correctional Facility

Dr. Tony Iton-Director, Alameda County Public Health Department

Lt. Samuel Robinson- San Quentin State Correctional Facility

Dr. Garry Mendez, Jr.- The National Trust for the Development of African American Men

Cristina Sinclaire and the USF Student Volunteers

Dr. Linda Wanek & Staff – Physical Therapy Dept. SFSU/UCSF

Dr. Alexis Parian, Doctor of Chiropractic/Consultant

Dr. Savage, Dr. Donaldson & Students – Life Chiropractic College

Mildred Crear- Black Nurses Association

Tiffany Margetti- WalMart, Oakland

Tamara Perkins, Niroga Institute

Larry Vitale, Samuel Merritt College

Dr. Arnold Chavez, Michael Shaw, & Karie Gaska- Alameda County Public Health Department, Urban Male Health Initiative

And the TRUST Fellows at San Quentin

---

He who has health has hope;
and he who has hope, has everything.
- Arabic Proverb

## BOA ME NA ME MMOA WO
"Help me and let me help you"



The 4th Annual

# San Quentin Health Fair

April 20, 2007

Sponsored by:
**The San Quentin TRUST**
And the
**Alameda County Public Health Department-
Urban Male Health Initiative**

*Leslie Schoenfeld*
HEALTHCARE
FRONTIER
*329 Rheem Blvd. Suite 100*
*Moraga, CA  94556*

May 10, 2007

**Governor Arnold Schwarzenegger**
State Capitol Building
Sacramento, CA  95814

Dear Governor,

On April 20, 2007, the TRUST in combination with the Alameda County Public Health Department conducted its Fourth Annual Health Fair at San Quentin State Prison.

As you know, the TRUST has as its mission to equip men with positive self esteem and to teach inmates that they have assets they can marshal to benefit themselves, their families, and their communities. The San Quentin Health Fair is a milestone event that helps TRUST Fellows achieve these fundamental goals.

This year's Health Fair was a great success with over 500 inmates visiting educational booths, getting basic health tests (blood pressure, cholesterol, glucose), receiving chiropractic assessments, and engaging in healthy lifestyle activities such as yoga. We had a 20% increase in participation compared to last year and the majority of new participants said they attended because they heard how positive the event was in 2006.

We are seeing many of the same inmates attending each year and they continue to track their results year to year using the Personal Health Data Information cards they are given. One encouraging outcome is that we are seeing an improvement in inmate health status. Last year, 98 inmates were screened for glucose, cholesterol, blood pressure, and BMI and of those, 10% had results that were out of normal range. This year, 58 inmates were screened and only 2% of inmates had results that were out of normal range.

Event speakers were inspiring with Dr. Garry Mendez, Jr., Executive Director for the National TRUST for the Development of African American Men, Pastor Raymond Lankford of Voices of Hope Community Church / Healthy Communities, Warden Robert Ayers, and David Cowan, San Quentin TRUST President, effectively moving us with their speeches.

Health Fair exhibitors included Mildred Crear, R.N. and fellow nurses affiliated with the Black Nurses Association, Alameda County Public Health nurses and staff, Alexis Parian and Chiropractic students from Life Chiropractic College West, representatives from Niroga, and Rev. Raymond Lankford furnishing the Healthy Oakland Health Van.

In addition to these first-rate speakers and exhibitors, Warden Robert Ayers of San Quentin State Prison made a formal presentation.  Warden Ayers words demonstrated insight and strong support for building partnerships between prison and civilian communities.

Other notable contributors to the event included:

- Dr. Tony Iton-Director, Alameda County Public Health Department who strongly supported the event through his presence and allocation of staff.

- Lt. Samuel Robinson, San Quentin State Correctional Facility, who worked with event sponsors to coordinate the event.

- Christina Sinclair and the USF Student Volunteers, who staffed health booths.

- The San Quentin TRUST Fellows for orchestrating the event and for living up to the TRUST creed which binds them to responsibility for Self, Family, and Community; and which has as its guiding principle, a commitment to: All People, Excellence, Responsibility, Respect, and Integrity.

- Dr. Arnold Chavez, Michael Shaw, and Karie Gaska, Alameda County Public Health Department, Urban Male Health Initiative, who coordinated the event with TRUST Fellows

- The Alameda County Board of Supervisors for their forward thinking in supporting the involvement of the Alameda County Public Health Department in the San Quentin Health Fair.

In closing, I am a strong supporter of the Health Fair and recommend that an event such as this one be conducted in not only San Quentin, but in all California State Prisons. The San Quentin Health Fair forges a unique partnership between prison and civilian communities that is sorely needed. I am convinced that this emerging bond between prison and civilian communities is the foundation we need to ultimately make all of our cities healthier and safer.

The San Quentin Health Fair is to be applauded, and your support as well as the meaningful contributions made by Health Fair participants are to be greatly acknowledged.

Thank you for a job well done.

Sincerely,

Leslie Schoenfeld MBA/MPH
lschoenfeld@hfrontier.com

HEALTHCARE
FRONTIER


Printed on Recycled Paper



OFFICE OF MAYOR GAYLE McLAUGHLIN

September 11, 2007

Dear Participants in the Richmond San Quentin Project:

Thank you so much for including me as part of your meeting on August 27th.  I was very inspired by your testimonies and commitments to making change, both in your personal lives and in terms of helping our community in Richmond.

I thank you for your great ideas.  You are clearly engaged in thinking how to make a better Richmond.  It will take the work of us all and your input is greatly valued.

I was also impressed with the fact that there is an understanding among you that a person is so much more than the set of experiences he or she has had. Fate and lack of opportunity can put enormous barriers in the way. By reaching out to one another and by holding to good values and a positive and healthy vision for the future we can make the difference needed to build a better Richmond, a better California, and a better world.

I know some of you will be paroled soon and others with be paroled in the years ahead. There is a real possibility of moving back into the community so that you can become a part of the solution.  I applaud you all and encourage each of you to keep up the great work you are doing as part of the Richmond San Quentin Project.

I have discussed with the City Manager many of the ideas that you put forward on how the City can make itself a better place to include better services and opportunities for parolees and better outreach to our youth to help them make the right decisions for their future.  I thank you again for your honest and sincere desire to build the change we need to build.

 I also want to thank Richmond Improvement Association (RIA) and all those associated with the San Quentin TRUST who play a role with linking the Richmond San Quentin Project to the City of Richmond.

Together we will continue to make the difference!

Sincerely,

Gayle McLaughlin
Mayor
City of Richmond

CC: Rev. Andre Schumake

1401 MARINA WAY SOUTH, P.O. BOX 4046, RICHMOND, CA 94804
www.ci.richmond.ca.us

Telephone: (510) 620-6503
Fax: (510) 412-2070



Richmond Improvement Association
Multipurpose Center
432 Barrett Avenue
Richmond, CA 94801



Keep the Trust

*San Quentin TRUST/*
*Richmond Improvement Association*

**Attn: Lt. Sam Robinson**
San Quentin T.R.U.S.T.
San Quentin State Prison
1 Main Street, San Quentin, CA 94974
**Phone: (415) 454-1460 (ext. 5806)**

**Richmond Improvement Association**
**400 Harbor Way**
**Richmond, CA 94802**

Changing Liabilities to Assets
by Building Bridges to the
Community.

# Richmond
# Project



## COLLABORATIONS

Since May 2003 Project IMPACT has collaborated with the California Department of Child Support Services (www.childsup.cahwnet.gov) of Marin & Solano to address child support issues and answer questions. Family Law Facilitators also attend to provide answers to family law related questions.

## FEEDBACK

"I credit the IMPACT program for giving me the tools to become the responsible man, father, son and husband I am today. The group's emphasis on establishing and maintaining integrity is a principle that I credit for keeping me accountable in my marriage and my ministry." ..... *Richard Kevin Kemp, Ex San Quentin Inmate*

"I am 22 years old and hearing from men who have experienced such a life as mine gives me the encouragement and awareness I need to believe in myself that now I can change my life and live a better life" ...... *IMPACT ward N.A. Chaderjian*

"I learned that my life, no matter how bleak or dirty, can be revived by my choices to do what I know is right" ..... *IMPACT ward DeWitt Nelson*

## FOR ADDITIONAL INFORMATION CONTACT:

Project IMPACT
Post Office Box 30693
Stockton, CA 95213
info@projectimpact.us

## IMPACT MODULES

| Module I: | What is A Man? |
|---|---|
| Definitions of Terms | Who are you? |
| Where are you? | Image vs. Reality |
| How do you measure up? | |
| What obstacles are keeping you from measuring up? | |

| Module II: | Violence Prevention |
|---|---|
| Violence Prevention | Self Talk |
| Time Outs | Conflict Resolution |
| Body Signals | |

| Module III: | Addictions |
|---|---|
| Addictions | Denial |
| Treatment | Recovery |
| Maintenance | Relapse |

| Module IV: | Relationships |
|---|---|
| Relationships | Relationship Dynamics |
| Cultivating Successful Relationships | |
| Specific Relationships | |

| Module V: | A Man's Ethics |
|---|---|
| Morality | Stability |
| Spirituality | Integrity |
| Love | |

| Module VI: | Life Skills |
|---|---|
| Financial Literacy101 | Leisure Time |
| Education/Occupation | Employment Skills |
| Basic Computer Skills | |

| Module VII: | Life Management |
|---|---|
| Parenting Skills | Health & Fitness |
| Financial Literacy102 | |

| Module VIII: | The Next Step |
|---|---|
| Reflections | Reconciliation |
| Gentlemen's Society | |

| Stand Alone Sessions | |
|---|---|
| Financial Literacy 101/102 | Stopping Recidivism |
| Child Support | |

INCARCERATED MEN PUTTING
AWAY
CHILDISH THINGS





MALE ACCOUNTABILITY

www.projectimpact.us
501(c)3



# Certificate of Completion

Awarded To

**JAMES THOMAS**

for successfully completing "MODULE III-ADDICTIONS" of Project IMPACT.

This certificate was awarded at California State Prison, San Quentin,

On this 19th day of November, in the year 2007.

_____
Chief Executive Officer

_____
Facilitator



# Certificate of Completion

**Awarded To**

## *JAMES THOMAS*

for successfully completing "**MODULE II-VIOLENCE PREVENTION**" of Project IMPACT.

This certificate was awarded at California State Prison, San Quentin,

On this 26th day of March, in the year 2007.

**Chief Executive Officer**

**Facilitator**



# Certificate of Completion

Awarded To

**IMPACT**

*Jame Thomas*

For successfully completing the "MAKING IT AS A MAN" of Project IMPACT

This certificate is awarded at Santa Clara, California

On this 10th day of July in the year 2006

Collette Carroly- Vice President

Roland B. Peck - Board Member

# Certificate of Completion

Awarded To

## JAMES THOMAS

For successfully completing "MODULE IV - Relationships" of Project IMPACT

This certificate was awarded at San Quentin State Prison,

On this 3rd day of October in the year 2005

_____
Vice President & Program Coordinator

_____
Member of the Board of Directors



**MARIN LITERACY PROGRAM**

San Rafael Public Library
Marin County Free Library

24 April 2007

R.E.A.C.H.
San Quentin

Dear R.E.A.C.H.,

Thank you so much for your generous tax-deductible donation of $1,000 to the Marin Literacy Program.

Because of community donors like you, we are able to offer more services to adults who are working to develop their reading, writing and speaking skills, so they can reach their full potential at work, at home and in the community.

Your donation will be acknowledged in our newsletter unless you notify us otherwise. No goods or services were given in exchange for this donation.

Sincerely,

Susan Charlton
Literacy Program Supervisor

EIN 94-3292597

*You guys were so generous to share your hard-earned money with us. We have put the funds to good use in REACHing more students. I think of y'all often when I see the San Quentin Calendar hanging in my office.*

marinliteracy@marinliteracy.org
www.marinliteracy.org

San Rafael Office
1100 E Street • San Rafael, CA 94901
**(415) 485-3318** • Fax (415) 485-3112

Inmate Literacy / F.L.A.G.ship
1100 E Street • San Rafael, CA 94901
**(415) 458-5042** • Fax (415) 458-5043

South Novato Office
6 Hamilton Landing, Ste. 140A
Novato, CA 94949 • **(415) 506-3167**

West Marin Office
Freitas Center • Olema, CA 94950
Phone & Fax **(415) 663-1849**



City of Salinas

200 Lincoln Avenue · Salinas, California 93901 · (831) 758-7381

August 29, 2005

Jacques Verduin
Direcor of the Insight Prison Project
San Quentin Correctional Facility
P. O. Box 888
Woodacre, CA 94973

Dear Mr. Verduin:

SUBJECT:   INMATE-TO-INMATE COMMENDATION

Please find enclosed a commendation from the Salinas Mayor and City Council in appreciation
of the money raised for the Salinas public libraries. Both Mayor and Councilmember Lutes
would sincerely appreciate your communicating their thanks to the inmates who participated
in the fund raising and transmitting or posting the commendation as appropriate.

Thank you for your help.

Sincerely,

Ann Camel
Salinas City Clerk



*WHEREAS*, the City of Salinas was confronted with the desperate measure of closing its public libraries due to uncontrollable economic factors; and

*WHEREAS*, community members organized the "Rally Salinas!" fund raising initiative to keep Salinas' libraries open temporarily until a permanent source of funding could be secured; and

*WHEREAS*, San Quentin's "Inmate-to-Inmate" tutors are strong advocates of the importance of literacy and participants sold baked goods and other food to fellow inmates in order to raise funds; and

*WHEREAS*, program participants successfully raised $500 for Marin County's literacy program and $1,000 for Salinas' libraries, thereby serving as a model and inspiration for other donors; and

*WHEREAS*, the City of Salinas is grateful to its generous donors, who have given scarce resources in order to promote reading and learning, and to offer Salinas' youth constructive alternatives that will positively impact their futures.

*NOW, THEREFORE*, I, Mayor Anna M. Caballero, on behalf of the City Council and entire Salinas community, offer our heartfelt thanks to San Quentin's Tutor-to-Tutor program and inmates for their generous contributions to Rally Salinas!

Dated this 23rd day of August 2005.

*Anna M. Caballero, Mayor*



**SAN RAFAEL OFFICE**
**SAN RAFAEL PUBLIC LIBRARY**
**1100 E STREET**
**SAN RAFAEL, CA, 94901**
**415 485-3318**

August 19, 2005

Project REACH Executive Council
Attn: Debra Sheldon, SAI
Education Department
CSP San Quentin
San Quentin, CA  94964

Re:  Donation – Marin Literacy Program

Dear Members of the Project REACH Executive Council:

On behalf of the staff I'd like to thank you and all of the tutors and students involved in the REACH project for your wonderful gift in the amount of $500.00.  I am grateful and humbled that your council raised the funds from your food sale to be given as a donation to the Marin Literacy Program.  Jane Curtis knows that this money has been set aside to be used for literacy education services at San Quentin.

I was so glad to be present when the check was given to the program.  When one sits in a position of authority, one doesn't always get to see what is being done in the trenches.  Jane always brings reports to our staff meetings telling of what has been happening with the REACH project and I read your stories in our student book, but it was such a pleasure to see what's being done first-hand.  I really enjoyed talking to some of your council members, and hearing from your students about the wonderful work that your tutors have been doing.  Please keep up the good work – small pleasures can make a big difference in one's life, and your donation and being there to receive it has been one of my personal small pleasures.

Sincerely,

*Barbara W. Barwood*

Barbara Barwood
Program Director

cc: Jane Curtis

*Sponsored by Marin County Free Library and the San Rafael Public Library*

# Certificate of Excellence



To Project R.E.A.C.H. Tutor

## James Thomas

In Recognition For The Special Efforts You Made
Towards Helping Your Peers Advance Their Academic Skills

Abraham Glasper
Project Reach Chairman

Debra Sheldon
Project Reach Chief Sponsor

January 5, 2005

# CERTIFICATE OF ACHIEVEMENT

## Project R.E.A.C.H.

HEREBY ACKNOWLEDGES THAT

### JAMES THOMAS

HAS DISPLAYED SINCERE COMMITMENT
TO HELPING INMATES IMPROVE THEIR LITERACY SKILLS.
THIS CERTIFICATE IS IN RECOGNITION OF THE ABOVE NAMED
TUTOR FOR HIS ONGOING DEDICATION TO THE
*Project R.E.A.C.H.* PROGRAM.

**Dennis Zaro**
Chief Sponsor / Project R.E.A.C.H.

Reach for Education Achievement and Change with Help

**December 17, 2003**

**Jane Curtis / Co-Sponsor**
Marin Literacy Program

# Certificate of Excellence

Presented to Project R.E.A.C.H. Tutor

## James Thomas

In Recognition of the Special Efforts You Have Made
Toward Helping Your Peers Advance Their Academic Skills

Abraham Glasper
Project REACH Chairman

January 5, 2005

Debra Sheldon
Project REACH Chief Sponsor



# Prospective Residence & Housing

SEP-25-2007 12:03 From:
Case 3:08-cv-02938-JSW   Document 1-2   Filed 06/12/2008 455 Page 104 of 128 P.2
SEP-25-2007 12:13P FROM:SEVENTH   P    5102788051     TO:   5225     P.1



# Seventh Step Foundation, Inc.

ADMINISTRATION OFFICE
475 Medford Avenue
Hayward, CA 94541

(510) 278-0230
FAX: (510) 278-4525
Email: Seventhstep@comcast.net

September 25, 2007

Board of Prison Terms

RE:    James Thomas
      CDC # C70569

My name is Raynetta Lewis and I am the Program Director for Seventh Step Foundation,
Inc., located at 475 Medford Avenue, Hayward, California.

Our primary focus is to help rehabilitate parolees who are currently on parole and have
recently returned to society. We will help them with recovery, life skills, employment,
housing and any other assistance they need to readjust back in the community. As the
Program Director, I truly feel everyone deserves the second chance. So if Mr. Thomas is
granted a parole date Seventh Step Foundation, Inc. and various other programs will do
our best to establish him back into society.

If you have any questions, you may contact me at (510) 278-0230.

Sincerely,

Raynetta Lewis
Program Director

RL:mm



# WALDEN HOUSE Inc

10/11/06

RE: James Thomas C70569

To: **BOARD OF PAROLE HEARINGS**

This correspondence is to document that James Thomas C70569 has been found to be an acceptable candidate for entry into the Walden House Substance Abuse Out-Patient Program upon his completion from a residential program.

After assessing Mr. Thomas history of past criminal abuse, we believe that he would benefit greatly from our program. Walden House has been an alternative sentencing option for persons with case histories similar to that of Mr. Thomas for over thirty-five years. We have had a large degree of success in their treatment; and we would like to offer him the opportunity to become a productive, responsible member of society.

In addition Walden House is in the position to assist Mr. Thomas with employment placement as we have been recognized and awarded in partnership with the Los Angeles Workforce Investment Board and Employability Partnership. Walden House has an excellent history of assisting and placing ex-offenders in employment in the greater Los Angeles area through our vocational and employment department.

Walden House is a highly structured environment designed to handle other in-depth clinical issues surrounding behavior, coping mechanisms, emotional expression, and the disabling effect of addiction. We offer a full continuum of managed health care to people with drugs, alcohol, and a criminal past history. Mental health is fostered through group therapy and individual psychotherapy. We also provide legal advocacy services, education and vocational training.

Thank you for your time in this matter. If you need additional information please call (213) 763-6220.

Sincerely,

Wayne Garcia
Director of Criminal Justice-Incustody Programs
Walden House Inc.

Lee Boone
PO Box 767
Suisun, CA 94585

September 09, 2006

Board of Prison
Re: Parole Hearing
James Thomas, C-70569

To Whom It May Concern:
I am most pleased to write a character reference for Mr. James Thomas.

I have known Mr. Thomas for more than 10 years and have been able to watch him mature from a young man to an empowered man who is ready to make positive life choices that will enable him to maximize his personal potential.

If allowed parole Mr. Thomas will be able to enter into a comprehensive therapeutic residential treatment program. Mr. Thomas will have the opportunity to utilize a 6 month to a year program at either the San Francisco or Los Angeles Walden House residential program. While in the treatment facility they will teach him skills and coping strategies to acclimate his self back into society.

As a Registered Addiction Specialist (RAS) I will be able to assist him in staying on the right track because he is willing and ready to continue staying on the right track. Mr. Thomas has gone through the action/willpower Stage of Change and is in the maintenance stage now. The idea behind the Stages of Change Model is that behavior change does not happen in one step. Rather, people tend to progress through different stages on their way to successful change. Also, each of us progresses through the stages at our own rate. So expecting behavior change by simply telling someone, for example, who is still in the "pre-contemplation" stage that he or she must go to a certain number of AA meetings in a certain time period is rather naive (and perhaps counterproductive) because they are not ready to change. Each person must decide for himself or herself when a stage is completed and when it is time to move on to the next stage. Moreover, this decision must come from inside you -- stable, long term change cannot be externally

imposed. Maintenance involves being able to successfully avoid any temptations to return to the bad habit. The goal of the maintenance stage is to maintain the new status quo. People in this stage tend to remind themselves of how much progress they have made. People in maintenance constantly reformulate the rules of their lives and are acquiring new skills to deal with life and avoid relapse. They are able to anticipate the situations in which a relapse could occur and prepare coping strategies in advance.

Mr. Thomas remains aware that what he is striving for is personally worthwhile and meaningful.

Mr. Thomas has turned his life around and if released he will be able to obtain employment with the aid of the Northern California Service League, who assists parolees in finding a suitable occupation and residency. Mr. Thomas will be provided one-to-one counseling, able to utilize a support network with Positive Directions Equals Change and also volunteer with Positive Directions Equals Change, assisting me with the homeless project and involving him in other projects such as mentoring the youth. Mr. Thomas will be a great asset in assisting me, Positive Direction Equals Change, and society because together we are working towards giving back to the community as much as possible.

Please accept this letter as a strong reference for Mr. James Thomas and if given the opportunity I will work with him to provide him with resources to continue staying involved in a positive environment.

Sincerely,

*Lee Boone*

Lee Boone
Registered Addiction Specialist



**LEE BOONE**
**Re-Entry Coordinator**

Adult Residential Facility
815 Buena Vista Ave. West
San Francisco, CA 94117
**WALDEN HOUSE Inc.**

Phone: 415 / 554-1450
Fax:    415 / 554-1475
Cell:   415 / 740-5591  leeboone@sbcglobel.net



FREE WASHER & DRYER

OLYMPIC WEIGHTS &
NEW WEIGHT MACHINE



BIG SCREEN TV
SURROUND SOUND

Let Walden House
help you make a
smooth
transition into
society.





**Walden House, Inc.**

1355 South Hill Street

Los Angeles, CA 90015

Phone: (213) 763-6220

Fax: (213) 746-2507

WALDEN HOUSE LA

IS A

STRUCTURED ENVIRONMENT,

WHERE THE GOAL

IS TO REMAIN

DRUG FREE, GET A JOB,

SAVE MONEY, AND STAY

OUT OF PRISON.



ETERNAL CHANGE
WITHIN

# P r o g r a m   N o r m s

- YOU MUST OBTAIN PERMISSION FROM YOUR COUNSELOR TO LEAVE THE FACILITY FOR ANY REASON.

- ALL MONEY MUST BE SUBMITTED TO STAFF UPON ADMISSION. ALL CLIENT MONEY WILL BE PUT IN THE SAFE AND THEN INTO A BANK FOR SECURITY.

YOU WILL BE ABLE TO WITHDRAW YOUR MONEY TWICE A WEEK.

- UPON LEAVING THE FACILITY YOU MUST SIGN OUT. WHEN RE-ENTERING THE FACILITY YOU MUST SIGN IN AND LET STAFF KNOW YOU HAVE RETURNED.

- PERSONAL CALLS ARE NOT TO BE MADE DURING CLINICAL FUNCTIONS.

- ALL CLIENTS MUST PARTICIPATE IN A HOUSE GI ON SAT

- ALL CLIENTS WHILE IN THE FACILITY WILL ATTEND GROUPS WHEN IN SESSION.

I have read the rules and privileges of Walden House Los Angeles, and agree to abide by them during my stay. I also understand that passes are a privilege. It is understood also that Walden House is a residential facility with scheduled groups, ponds, seminars and scheduled inside and outside support meetings and social activities.

# P r i v i l e g e s

- UPON RELEASE, PASSES ARE PERMITTED 14 DAYS AFTER ADMISSION. YOU MUST BE ADMITTED ON THE SAME DAY OF RELEASE FROM S.A.P.

- AFTER YOUR FIRST PASS YOU WILL BE PERMITTED TO TAKE A (12) HOUR PASS ON WEEKENDS OR ON YOUR SCHEDULED DAYS OFF.

- ANOTHER RESIDENT OR STAFF WILL ACCOMPANY ALL BUSINESS APPOINTMENTS WITHIN THE FIRST 30 DAYS.

- WHILE IN THE FACILITY YOU MUST ATTEND ALL GROUPS AND FAMILY MEETINGS.

- WHILE IN ORIENTATION PHASE YOU WILL OBTAIN CALIFORNIA STATE IDENTIFICATION AND BEGIN JOB SEARCH PREPARATIONS (RESUME. SOCIAL SECURITY CARD, ETC)

- YOU WILL BE PERMITTED TO BEGIN JOB SEARCH 30 DAYS AFTER ADMISSION. PENDING PROPER ID AND COMPLIANCE WITH ALL WALDEN HOUSE NORMS.

- THE REMAINDER OF YOUR AFTERCARE PROGRAM WILL CONSIST OF EITHER FULL-TIME EMPLOYMENT AND VOCATIONAL / EDUCATIONAL ACTIVITIES.

- AFTER 60 OR 90 DAYS YOU WILL QUALIFY FOR 2 OVERNIGHT PASSES PER MONTH. AS LONG AS YOU HAVE VERIFIABLE INCOME.

- BEFORE COMPLETION OF THE PROGRAM YOU ARE REQUIRED TO OBTAIN A BANK ACCOUNT AND SPONSOR OR MENTOR.

- UPON COMPLETION OF WALDEN HOUSE RE-ENTRY PROGRAM, YOU WILL BE CONSIDERED FOR SOBER LIVING WITH OUTPATIENT.

- Free gate pick ups via West

- Care from WH @ SATF

- WH @ CMC WEST.

- Centrally located job market

- Double occupancy rooms

- MTA bus passes provided free.

- Excellent vocational dept.

- Computer training lab

- Job search after 30 days

- Home style meals

- In house weekend visits

- Excellent relationship with parole.

FOR MORE
INFORMATION
WALDEN HOUSE.ORG

# HILL STREET ACTIVITY SCHEDULE

| TIME | MON | TUES | WED | THURS | FRI | SAT | SUN |
|---|---|---|---|---|---|---|---|
| 6:30 AM | Wake-up | Wake-Up | Wake-Up | Wake-Up | Wake-up | Sleep-In | Sleep-In |
| 7:00 AM | Breakfast/Meds | Breakfast/Meds | Breakfast/Meds | Breakfast/Meds | Breakfast/Meds | Sleep-In | Sleep-In |
| 7:30 AM | Job Function Meds | Job Function Meds | Job Function Meds | Job Function Meds | Job Function Meds | Sleep-In | Sleep-In |
| 8:00 AM | Morning Walk | Morning Walk | Morning Walk | Morning Walk | Morning walk | Breakfast | Sleep-In |
| 8:30 AM | Morning Meeting | Morning Meeting | Morning Meeting | Morning Meeting | Morning Meeting | Breakfast | Sleep-In |
| 9:30 AM | Job Function Group | Vocational Workshop | Vocational Workshop | Vocational Workshop | Vocational Workshop | G I | Coffee with Core 9:00 AM |
| 10:45 AM | Industrial Therapy | Industrial Therapy | Industrial Therapy | Indusrial Therapy | Industrial Therapy | G I | Wake-Up 10:00 AM |
| 11:30 AM | Lunch / Meds | Lunch / Meds | Lunch / Meds | Lunch / Meds | Lunch / Meds | Lunch 11:00 AM Meds 12:00 PM | Brunch 11:00 AM |
| 12:30 PM | Criminal Addictive Thinking | Hill Street ABC group | Reel Therapy Process Group | Orientation Caseload | Hill Street ABC group | Visiting | Visiting |
| 2:00 PM | Reel Therapy | Break | Break | Break | Break | Visiting | Visiting |
| 2:30 PM |  | Vocational Workshop | Educational Videos / Process | House Tighten Up | Anger Management | Visiting | Visiting |
| 4:00 PM | Medication | Medication | Medication | Medication Dinner 4:15pm | Medication | Medication | Medication |
| 4:30 PM | Dinner | Dinner | Dinner | Evening Meeting 5:00pm | Dinner | Dinner 5:00 PM | Dinner 5:00 PM |
| 5:30 PM | Evening Meeting | Evening Meeting | Evening Meeting | Extended Caseload | Evening Meeting | Evening Meeting | Evening Meeting |
| 6:15 PM | Job Function | Job Function | Job Function | Extended Caseload | Job Function | Open Program/ Passes | House Tighten - up |
| 6:30 PM | Job Function | Job Function | Job Function | Extended Caseload | Job Function | Open Program/ Passes | House Tighten - up |
| 7:00 PM | Living in Balance (33 topics) | Running stories / Alumni panel | Clinical Pond | Extended Caseload | Methadone Group | Open Program/ Passes | Pond |
| 7:00PM | Introduction to CGA | Dual Diagnosed Group | Job Club Group | Extended Caseload | Domestic Violence Group | Open Program/ Passes | Pond |
| 7:00PM | Hook on Phonics | Monthly HIV testing | S.T.E.P Parenting | Extended Caseload | Relapse Prevention | Open Program/ Passes | Pond |
| 9:00PM | Medication / Free time | Medication / Free Time | Medication / Free Time | Medication / Free Time | Medication / Free Time | Medication / Free Time | Medication / Free Time |

BED IS AT 11:00pm SUNDAY THRU THURSDAY AND 1:30am FRIDAY AND SATURDAY



# Training

# &



JAMES THOMAS
C-70569
San Quentin State Prison
San Quentin, CA  94974

## EMPLOYMENT OBJECTIVE

I am prepared for employment within your organization, and can utilize my training and experience to achieve both our objectives for growth and advancement.

## EMPLOYMENT HISTORY

2000-        **PRISON INDUSTRY AUTHORITY (PIA), San Quentin, California**
             **Warehouse Manager:**  Supervised a crew of workers, filled and delivered stock orders, used a computer to track incoming and outgoing inventory

1995-2000    **PRISON INDUSTRY AUTHORITY (PIA), San Quentin, California**
             **Furniture Upholsterer:**  Certified as Furniture Upholsterer according to U.S. Department of Labor, Dictionary of Occupational Titles, 780.381-018, as follows:  Repaired and rebuilt upholstered furniture, using handtools with knowledge of fabrics and upholstery methods: Removed covering, webbing, and padding from seats, arms, backs, and sides of workpieces, using a tack puller, chisel and mallet.  Removed defective springs by cutting cords and wires that hold them in place. Replaced webbing and springs or retied springs.

1987-1989    **STATE OF CALIFORNIA, San Quentin, California**
             **Machinist:**  Operated a lathe, mill and drill press, worked as a tool and die maker for two years and as a general machinist for three years.

## EDUCATION AND TRAINING

High School Diploma
Stockton J.A.T.C. Machinist Apprenticeship Program (4000 Hours)
General Equivalency Diploma (GED)
Vocational Electronics, San Luis Obispo, CA
Vocational C/N.C. Machinist Training, San Quentin, CA

## CERTIFICATION

Machinist 2400+
Forklift Operator
Electronic Technicians Association
Customer Service Specialist
VOA Project Choice Program Facilitator
Workplace Essential Skills
Furniture Upholsterer
Leadman Upholsterer
Peer Education Program / Basic Infectious Disease
Project Reach Tutor
IMPACT
T.R.U.S.T. Fellow Facilitator
ARC Addiction Recovery Counseling
ARC Alumni Coordinator
Non-Violent Communication

## SPECIAL SKILLS AND ATTRIBUTES

- ➢ **ABILITY TO READ SCHEMATICS AND DIAGRAMS**
- ➢ **ABILITY TO WORK INDEPENDENTLY**
- ➢ **GOOD COMMUNICATION SKILLS WITH OTHER EMPLOYEES**
- ➢ **SINCERE, DEDICATED, MOTIVATED WORKER**
- ➢ **FACILITATE CURRICULUM FOR A VARIETY OF SELF-HELP PROGRAMS**
- ➢ **STRONG ORGANIZATIONAL SKILLS**



CALIFORNIA

BUILDING &DEVELOPMENT

January 11, 2007

K.W. McClain
CC1
1 Main Street
San Quentin State Prison
San Quentin, CA 94964

Re: James Thomas #C70569

Dear K.W. McClain:

My name is Stan Keller; I am the Principal/Owner of California Building & Development. I have been in the construction industry for over 20 years. My company has projects in commercial as well as the residential fields. We are currently working on remodels, room additions, and tenant improvements. We are also capable of building from ground up. Our office is located in San Jose, CA.

I met Mr. Thomas during my involvement with Hitland Ministries. We had performed a play entitled "Grave Robbers" for the inmates at San Quentin. It was during this time that I found myself impressed by Mr. Thomas's behavior. He was very articulate in his manner, very focused in what his goals were and are. His attitude and his effort to change were very sincere. I believe that Mr. Thomas is ready to be a law-abiding citizen as well as an asset to his community.

I also believe that Mr. Thomas would be an excellent addition to our team. As a laborer his ability to stay focused, take initiative, detail oriented, work hard as well as being a smart individual are skills I look for in an employee. I can also teach him the trade. We would be working in various parts of the bay area, since the projects are not just in one set place.

Thank you so much for your time and consideration of Mr. Thomas's release.

Respectfully Submitted,

Stan Keller

> 2530 Berryessa Rd. Ste 123 San Jose, CA 95132   (B)408.942.0223   (F)408.8223   lic#599455



Volunteers of America
Bay Area

James Brown
Volunteers of America Bay Area
1601 Harbor Bay Parkway, Suite 150
Alameda, CA  94502

May 14, 2007

Board of Prison
RE:    Parole Hearing
James Thomas  C-70569

To Who It May Concern:

I am most pleased to write a character reference for James Thomas.

We of Volunteers of America Bay Area (VOABA), Project Choice have been in
contact with Mr. James Thomas for the past five years. Working with him on our
project curriculum, which includes cognitive journaling and one-on-one mentoring
for the purpose of parole planning and lifestyle change in order to meet the
standards of a successful parole.

Project choice is an extensive program supported by Mayor Ron Dellums
working in collaboration with Volunteers of America Bay Area to assist men with
their transition back into the community as assets.  Mr. Thomas is not only a
facilitator but a mentor as well, by using his past experience to internally motivate
men to have a better understanding of the choices they made, how these choices
effect others lives and how to make better choices to benefit himself, family,
friends and community.

Since knowing Mr. Thomas we have witnessed his interaction in class and with
the general population.  He has made attempts to help other inmates with their
transition back into their community and has participated in all facets of the
project.

We believe after interacting with James Thomas, others will benefit from his
knowledge and understanding of how to make positive choices in the future.  He
has been actively involved in extra curricular activities while incarcerated and has
been working on improving himself in preparation for his release.
The activities he has been involved in includes: Fascilitating T.R.U.S.T. and
I.M.P.A.C.T. Tutoring in Protect R.E.A.C.H. (ARC) Addiction Recover

Counseling, N.A., A.A. These programs have proven Mr. Thomas' dedication and commitment to enter society as a productive citizen.

As a part of Volunteers of America Bay Area, Project Choice, we will continue to work with Mr. Thomas once released and supporting his future endeavors, including housing assistance, continued education and training, clothing, transportation, preparing him and assisting him with employment, medical assistance and continued one-on-one mentoring.

Sincerely,

James Brown
Project Manager



**The National Trust**
**for the Development of African-American**
**1608** Nordic Hill Circle• Silver Spring, MD 20906
Tel: (301) 933-6151 • FAX (301) 933-6151 • www.keepthetrust.org

Dr. Garry A. Mendez, Jr.
Executive Director

February 6, 2007

Dear Board of Parole Hearing Chairperson,

This letter is to support the release of James Thomas (C70569) from San Quentin Correctional Facility.

As I stated in my previous letter of support I have known and worked with James over the past three years and he has been a valuable contributor to the work of the Trust, converting men from liabilities into assets.

The arrangements for James to enter Walden House in either Los Angeles or San Francisco continue to be in place and we will assist him in gaining employment through our community partner, Volunteers of America.

If you have questions, please feel free to contact me at (510) 893-2404 or mendez2us@yahoo.com.

Sincerely,

Dr. Garry A. Mendez Jr.

---

**AFFILIATIONS:**
National Black United Federation
Strengthening Fragile Families Initiative

**SUPPORTERS:**
US Department of Health and Human Services    C. S. Mott Foundation
Annie E. Casey Foundation                     Verizon
The California Endowment Foundation            Ford Foundation
W. K. Kellogg Foundation                       US Department of Justice

15 September 2006

Dear James Thomas,

I am responding in behalf of Goodwill Industries. My name is Carlene Gepner and I am a job developer for Metro North WorkSource Center. Here at Metro North we have many services available to assist you with job searching. Thank you for submitting your resume to us, upon your release feel to contact us for job seeking services. We have various trainings at different times by various companies. We here at Metro North do not offer the training ourselves. In order to receive information on training and positions we offer within our organization, please come into our location when you can. When you come in we will inform you on what we have available. Included with this letter are a flyer, an info card on resources through 2-1-1, and my business card.

Sincerely,

Carlene Gepner

**Metro North WorkSource Center**

342 San Fernando Road
Los Angeles, CA 90031

# (323) 539-2000

Monday and Friday 8:00 am – 5:00 pm
Tuesday –Thursday 8:00 am – 9:00 pm

Saturday 9:00 am – 1:00 pm

## SERVICES AND FACILITIES FOR JOB SEEKERS:

> MNWSC Is A CARF
> Accredited Organization!

- Workshops:
  - ◦ *What to Ask During your Interview*
  - ◦ *What is a Resume, and What Should it Look Like?*
  - ◦ *Effective Communication*
  - ◦ *Credit and You*
  - ◦ *First Impressions*
  - ◦ *Basic Computers (Must RSVP, max 6)*
- Job Training – we help you find the classes you need!
- Computers with **Internet access**, self-paced tutorials and current software
- Friendly staff to assist with using the facilities
- Certified Career Development Facilitators on site
- Telephones for contacting prospective employers
- Telephone message center and voice mail
- Copy and fax machines
- Job postings, job hotline numbers, and current newspapers
- Funding of vocational training for eligible job seekers and veterans
- Ongoing personal and professional development workshops
- Referrals to community resources
- *Free child watch assistance available while visiting the Center*

# Work✦Source
C A L I F O R N I A
*Building Business and Careers*

Dear: James Thomas

We are responding to a letter you sent May 15, 2006 in regards to the stabilization of a new beginning. Housing and employment are the steps that will assist the individuals that have been released from a state or general correctional institution.

**Step #1**
Report to the Department of Public Social Services (**DPSS**), the next day of release:
2415 West 6th Street
Los Angeles, CA 90057

Upon Contacting the LA county **DPSS**, you might be eligible for the following:
1. Immediate Shelter (That will provide two weeks at a Downtown L.A. hotel.)
2. Food Stamps (given the same day.)
3. Sign-up for **GA**, General Assistance (there is a 3 of 4 day delay between application and check.)

**Step #2**
Additional Housing Information:
     Report to the **PATH** program (People Assisting The Homeless)
     340 N. Madison Avenue
     Los Angeles, CA 90004
     (323) 644-2216 or E-Mail info@path.org

Fill out an application for:
1. Transitional Housing (housing assistance will be provided for up to six moths)
2. Request assistance for clothing, food, etc.

**Note:** Do to the time period that it takes the **PATH** staff to process the application, **it is very important for the individuals to report to the PATH program after being released.**

**Step #3**
Individuals will need to contact the **Work Source Satellite** and seek employment
**La Fayette Work Source satellite**
**520 S. La Fayette Park Place**
**Los Angeles, Ca 90057**
**(213) 252-6100**

# Please see the attached on the Government Assisted Housing Options

*Support Letters*

December 12,2006

To Whom It May Concern

San Quentin State Prison Parole Board

I' am writing this letter on behalf of my brother James Thomas Jr. I am married with two children, in a stable family environment. My husband and I work and are productive members of society. I am in full support of James release from prison. He has complied with your recommendations thus far.

I have no doubts that my brother (James), is ready to be released back into society. He has demonstrated a willingness to better himself, while incarcerated, through remaining committed to numerous programs over the years. Again and again he has touched not only me, yet has touched my entire family with his remorse for the crime that he committed. And to me that demonstrates the level of maturity that I've always wanted to see in him as a man.

He has remained and maintained his behavior as that of one worthy of joining society, that he may give back to the younger generation, in hopes of correcting some of their behavior defects. Please see that releasing him will be to his advantage, mentally and physically. He has paid his debt to society and is again remorseful. He was a teenager when this crime was committed and now he walks in the shoes of a man.

Our family is requesting that the parole board take all of these things into account when making its decision. James will be a better person upon release. He will always have a place to stay within my home, within my family. So should he be found suitable, please know that my husband and I, have a place that he may parole to here within our home. We are also willing to find him employment, as well as help him with all the things associated with re-entering him into society. Thank you for your time in reading and taking into consideration this letter of support.

Sincerely,
Pamela & Reggie Bullock

Pamela Bullock
661 - 943 -

Lamont Thomas
3717 S. La Brea Ave.
Los Angles, Ca. 90016

Re: James Thomas
    C70569

11/09/06

To The Board Of Prison Terms

My name is Lamont Thomas, and I am the brother of James Thomas,
and I am writing on behalf of my brother released from prison.
I can assure you that he has my family support in any and every
way he needs it. Since the passing of our father I have made
it my duty to make sure that my brother has a safe and secure
home to come to when he is released from Waldon House. I've
even moved from the city of Lancaster to the city of Los Angles
in order to be in accordance with the Board Of Prison Term
request.

I want you to know that I will do everything in my power to
assure that my brother is successful in staying out of prison,
and out of trouble, you know all of my life I've only known
my brother as a prisoner of the state, and I feel it is time
for me to know him as my brother that is by my side, helping
me to better deal with life out here in the real world, because
without our father to help guide me I'm going to need my big
brother to show me how to be a good man and a responsible person.

My family and I are aware that he committed an unforgettable
act, however, we don't feel that it's an unforgivable act, and
therefore we ask that you please release my brother James Thomas,
to our custody and allow us to take care of him for awhile.

Sincerly
Lamont Thomas

*Lamont Thomas* (signature)



Department of Sociology
2130 Fulton Street
San Francisco, CA 94117-1080
TEL 415 422-6671
FAX 415 422-5671

November 17, 2006

To the Board of Parole Hearings:

I write to express my support for Mr. James Thomas (C-70569) in his quest for parole. I have known James for nearly three years, in my capacity as sponsor and Executive Advisor for the San Quentin Trust for the Development of Incarcerated Men (hereafter, "The Trust"), an inmate-led group committed to positive change in themselves, their families, and their communities through self-awareness, area-specific life-skills workshops, and community activism. In this time, I have come to know him as a strong and respectful person of considerable conviction, whom I believe poses no threat and has paid his debt to society.

As a professor of sociology and criminology at the University of San Francisco, I am well versed in the challenges faced by inmates when they re-enter society upon parole. This is why I felt it important to become a sponsor for the Trust. The Trust, and James as one of its founding members, takes very seriously the notion that rehabilitation and preparation for re-entering society should begin far in advance of one's parole date. For this reason, they have taken it upon themselves to undergo intensive training in areas as diverse as anger management, self awareness, and values reformation. They have instituted their own year-long curriculum of workshops focused on self-esteem, conflict resolution, family relations, financial responsibility, communication, group dynamics, and a number of other areas of self improvement, to pass on what they have learned to the prison population at large as well as the community of Richmond and others affected by crime and violence. My role with the group has been to guide their preparation for these workshops, providing research and materials as well as co-facilitating the workshops. During the process of this work, I have seen James' involvement and commitment not only to the mission of the Trust and its classes but to making a positive change in his own life and in the life of others. He has also participated in a number of other voluntary programs, including Project REACH, a peer tutoring program, IMPACT, a self-improvement program, ARC, a 16-week drug counseling program, Alcoholics Anonymous, and Narcotics Anonymous. He has also acquired numerous vocational skills and certificates, which make him a prime candidate for gainful employment upon his release.

James has truly transformed himself from a liability to an asset, and I am confident that, upon parole, he would prove to be an asset to his community as well. He is thoughtful, composed, smart, skilled, and commitment to a non-violent and crime-free future for himself and his community.

Please do not hesitate to contact me if you require any further information or recommendation.

Sincerely,

Dr. Kimberly D. Richman
Department of Sociology
University of San Francisco



Volunteers of America
Bay Area

Michael A. Lacson
Volunteers of America Bay Area
1601 Harbor Bay Parkway, Suite 150
Alameda, CA 94502

September 14, 2007

Board of Prison
RE: Parole Hearing
Mr. James Thomas, C70569

To Whom It May Concern:

It is with great pleasure to provide a character reference for Mr. James Thomas.

My name is Michael A. Lacson and currently I am with Volunteers of America, Bay Area, working in San Quentin prison, under Measure Y, "Project Choice". I'm a Case Manager/Coach, providing pre-release services to young men transitioning from the California Department of Corrections, San Quentin Facility into their respective communities, in the area of housing, job placement, mental or physical heath arenas, for long-term support, etc. Also, I have spent approximately twelve (12) years being employed with the Bureau of Prisons, Department of Justice. I was an Officer and attained the rank of Correctional Supervisor (Lieutenant) by the end of my tenure. I have experienced and witnessed the trials and tribulations of incarcerated inmates and the obstacles that they have to endure to completely make a transformation to be a productive citizen for the community. I have been in contact with Mr. Thomas since February 16, 2007, he has provided an invaluable service with our project curriculum as a facilitator, which includes cognitive journaling and one-on-one mentoring.

Mr. Thomas along with other facilitators in our Project Choice classes, has guided clients with their past self destructive experiences to achecieved a better understanding of choices that they have made and how to make positive changes/choices for there future.

I have spent countless hours with Mr. Thomas, observing him during our classes, one on one, sessions, and interactions in the general population and sponsor meetings. I believe Mr. Thomas, have made significant changes and very determine to make a positive new beginning of his life, if given an opportunity. Furthermore, Mr. Thomas has been very active in enrolling and completing various self – help and extra curricular activities on improving himself in preparation for his release. These are some of the activities he has been involved in: Trust Fellows, What is a Man Project Impact, Inmate Employability Program, Relationships Project Impact, San Quentin T.R.U.S.T. Program and Workplace Essential Skills.

In conclusion, Mr. Thomas has been a model client and true to his word, has dramatically reshaped his way of thought and out looked in life. We as a community will be best serve if Mr. Thomas was given an opportunity to be part and positively contribute to society. Mr. Thomas is part of the Volunteers of America Bay Area, Project Choice team, I will be in contact and will continue supporting his future endeavors, including housing assistance, continued education and training, clothing, transportation, preparing him and assisting him with employment, medical assistance and continued one-on-one mentoring.

Sincerely,
Michael A. Lacson,  Case Manager        *A Ministry of Service*



**Dr. Garry A. Mendez, Jr.**

Executive Director

# The National Trust
## for the Development of African-American
**1608** Nordic Hill Circle▪ Silver Spring, MD 20906
Tel: (301) 933-6151 ▪ FAX (301) 933-6151 ▪ www.keepthetrust.org

November 28, 2006

Dear Board of Parole Hearings,

This letter is to support the release of James Thomas C70569 from San Quentin Prison.

I am Garry A. Mendez Jr. the founder and Executive Director of the National Trust which is based in the Washington DC area and has been in existence for nearly twenty years. The organization concentrates upon working with incarcerated men and their families, with a special emphasis upon converting men from liabilities into assets to themselves, their families and their communities. In becoming assets they develop into untapped resources for their families and their communities.

For the past three years we have been working in San Quentin prison creating the "Trust Fellows", men who are committed to changing their lives and the lives of their families and communities. Mr. Thomas is a founding member of the organization and has held an elected leadership role from the outset. He has demonstrated that he is intelligent and thoughtful and continuously challenges the group to design and develop methods of reaching the men who are leaving San Quentin on a daily basis so that they alter their lifestyles and behavior patterns. These behavior changes will reduce the amount of violence and crime in the inner-city communities.

Upon his release we have made arrangements for Mr. Thomas to enter Walden House in either Los Angeles or San Francisco dependent upon to which area he is paroled. He will be in their six month transition program back to the community. In addition Mr. Thomas will continue his activities with the National Trust in the community. These activities require that "Trust Fellows", utilize their skills in providing peer support for other men returning from prison and performing voluntary community service actions.

The National Trust considers Mr. Thomas an excellent candidate for release and we will provide him with the support that he needs while he is going through his transition.

---

**AFFILIATIONS:**
National Black United Federation
Strengthening Fragile Families Initiative

**SUPPORTERS:**
US Department of Health and Human Services
Annie E. Casey Foundation
The California Endowment Foundation
W. K. Kellogg Foundation

C. S. Mott Foundation
Verizon
Ford Foundation
US Department of Justice

Sincerely,

Garry A. Mendez Jr.

AFFILIATIONS:
National Black United Federation
Strengthening Fragile Families Initiative

SUPPORTERS:
US Department of Health and Human Services    C. S. Mott Foundation
Annie E. Casey Foundation    Verizon
The California Endowment Foundation    Ford Foundation
W. K. Kellogg Foundation    US Department of Justice



**ALAMEA COUNTY HEALTH CARE SERVICES AGENCY**
**PUBLIC HEALTH DEPARTMENT**

David J. Kears, Director
Arnold Perkins, Director

1000 Broadway, 5th Floor
Oakland, CA 94607

(510) 618-3453
(510) 267-8000

December 5, 2006

Board of Parole Hearings
1515 "K" Street, 6TH Floor
Sacramento, CA 94964

RE: James Thomas C70569

To Whom It May Concern,

I am writing to provide a letter of support for James Thomas a member of T.R.U.S.T. Fellowship in San Quentin Prison, San Quentin, and CA.

I first met Mr. Thomas more than four years ago when I was assigned by my supervisor, Mr. Arnold Perkins, who as Director of Alameda County Public Health Department (ACPHD) asked me to assist Dr. Garry Mendez, Director of the T.R.U.S.T. Foundation, to coordinate the first Health Fair for the men at San Quentin Prison. Since this was to be the First Health Fair to be held there, we were not sure of the needs of this population and sought the input of inmates. Mr. James Thomas stepped forward and helped guide the process of designing the First Health Fair.

On April 28th we conducted our third Health Fair at San Quentin, and it was a great success because of men like James Thomas who helped organized, advised and planned to the last detail the largest and most successful Health Fair in San Quentin's History.

In 2004 the Director of ACPH Department established the Male Initiative Program in order to educate men with health issues including newly released inmates who are re-entering the general population. As Co-Director of this program, I became more involved with the leadership/educational programs conducted by the T.R.U.S.T. Program, and again my path crossed with Mr. Thomas, who is always very willing to get involved and help his community.

During all my interactions with Mr. Thomas, I have known him be very forthcoming, responsible and loyal. For the above reasons and for many other positive attributes, I believe Mr. James Thomas should be viewed in a positive light and be given every consideration.

If you would like to speak to me, I can be reached at 510-208-5986. Thank you for your time.

$De A od$

Dr. Arnold Chavez

## Closing Statement
## James Thomas
## September 2007 Parole Hearing

I stand befor this commission today seeking to show, I have
made every effort to prepare myself for re-entry back into
society. I have come to terms with myself and I have tried
continuously to make amends for my behavior and crimes I
committed.

This was a hard lesson for me, but I have learned it well. In
my effort to confront the underlining cause of my behavior,
I have identified and removed the source from within me. Over
years of self-assessment and re-assessment, I realized that
I lacked substance, social skills, and moral value. I say to
you now I have through much soul searching, constant
re-evaluation, help from a lot of concerned people, I have
developed moral, ethical, and social skills, and a marketable
job skill which is needed in making a positive transition back
into society.

For many years, I constantly thought of the crimes I have
committed and the pain that I caused, Mr. Daniel Cavillo's
family, And other victims families, and also my own family.
My regrets wounded me deeply for the many victims that I
perpetrated my crime upon. I fully realize that every person
was victimized and traumatized by what I had done. I sincerely
apologize and seek their forgiveness.

I know the pain I personally inflicted upon Mr. Cavillo's family.
In my mind I do not justify nor minimize the act itself or my
behavior on June 14, 1982. It was unwarrented, undeserving,
and inherently wrong. With the lose of both of my parents during
my incarceration I can fully understand the depth of the pain
and misery that I caused Mr. Cavillo's family. I can only hope
that they find it in their heart to forgive me.

I have come to realize that the road to my life is paved by
the choices that I have made, And the ones I must make now.
I admit openly, I made wrong choices in the past. I have walked
a crooked road in the past, But I know the road ahead of me
lies strait and true. I now possess the right tools needed to
go out, function in society, and be productive. Never befor
in my life have I been more prepared to be a part of society.

My institutional record illustrates clearly the inner and outer
changes I have made and continue to make in my life. I have
received my GED, and I am licensed, in various job skills. I
feel that employment will not be a hindrance to me thanks to
my ongoing commitment and training in the field of education.
I am participating, and continuing in my 12-step program through
NA and AA. I am a tutor through the literacy program of San
Quentin's Project REACH. I have also helped to start a new group
at San Quentin. referred to as The San Quentin T.R.U.S.T. which
helps us to develop moral, ethical, and social skills.